# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

STATE OF FLORIDA,

    *Plaintiff*,

    v.                                 Case No. 8:21-cv-839

XAVIER BECERRA, Secretary of
Health and Human Services, in his
official capacity; HEALTH AND
HUMAN SERVICES; ROCHELLE
WALENSKY, Director of the
Centers for Disease Control and
Prevention, in her official capacity;
CENTERS FOR DISEASE
CONTROL AND PREVENTION;
The UNITED STATES OF
AMERICA,

    *Defendants*.

_____/

## COMPLAINT FOR DECLARATORY AND
## <u>PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF</u>

## INTRODUCTION

1.     The COVID-19 pandemic caused massive disruption and harm across the world. As of April 7, 2021, there have been 30,596,830 reported cases and 554,420 deaths in the United States.[1]

2.     Those numbers, which are staggering and sobering, do not portray the full picture. The pandemic started with great uncertainty and caused great fear. But with resolve, purpose, and ingenuity, we have developed multiple vaccines, therapeutics, and treatments that have reduced the mortality at unparalleled speed.

3.     As of April 6, 2021, 32.6% of the U.S. population has received at least one vaccine dose, while 19% is fully vaccinated.[2] Importantly, 75.9% of those 65-and-older have received at least one dose,[3] as states like Florida have prioritized the vaccination of vulnerable groups like seniors.

4.     The country is returning to normal. Florida is leading the way and has remained more open than many other large states. Industries have adapted to COVID-19 in Florida and are adapting elsewhere. They have found ways to do business safely, and before long, most Americans will be vaccinated.

---

[1] https://covid.cdc.gov/covid-data-tracker/#datatracker-home.

[2] https://covid.cdc.gov/covid-data-tracker/#vaccinations.

[3] https://covid.cdc.gov/covid-data-tracker/#vaccinations.

5.     On April 6, 2021, President Biden announced that all adults will be eligible to receive a vaccine by April 19, and he has set as a goal beginning to return to normal by the July 4th holiday.[4] Florida is ahead of President Biden's goal, both with reopening and with vaccinations. As of April 5, all adults in Florida are eligible for a vaccine.

6.     Despite the virus, and those who would lock down society indefinitely, people are traveling again. They are doing so safely with protective measures like vaccines, sanitation, and social distancing. On April 5, for example, 1,561,959 individuals traveled on airplane flights in the United States—almost fifteen times the number who were flying on the same day a year earlier.[5] It is not just air travel. Hotels, theme parks, restaurants, and many other industries are safely reopening.

7.     But as these industries begin to restart and rebuild, the cruise industry has been singled out, and unlike the rest of America, prevented from reopening. Despite the demonstrated success of reasonable COVID-19 safety protocols in Europe and Asia, the cruise industry in the United States has been subject to a nationwide lockdown since March 2020. As a result, the industry is on the brink of financial ruin.

---

[4]     https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/03/11/remarks-by-president-biden-on-the-anniversary-of-the-covid-19-shutdown/.

[5] https://www.tsa.gov/coronavirus/passenger-throughput.

8.      In October 2020, the Centers for Disease Control and Prevention ("CDC") expressly found that continuing this nationwide lockdown was unjustifiable. But since that time, notwithstanding its public decision to allow the cruise industry to reopen, the CDC has functionally continued the lockdown. And it now appears the CDC will continue that lockdown until November 2021, even though vaccines are now available to all adults who want them.

9.      The CDC does not have the authority to issue year-and-a-half-long nationwide lockdowns of entire industries. And even if it did, its actions here are arbitrary and capricious and otherwise violate the Administrative Procedure Act ("APA").

10.     Florida asks this Court to set aside the CDC's unlawful actions and hold that cruises should be allowed to operate with reasonable safety protocols.

11.     Absent this Court's intervention, Florida will lose hundreds of millions of dollars, if not billions. And, more importantly, the approximately 159,000 hard-working Floridians whose livelihoods depend on the cruise industry could lose everything.

## PARTIES

12.     Plaintiff State of Florida is a sovereign State and has the authority and responsibility to protect the wellbeing of its public fisc and the health, safety, and welfare of its citizens.

4

13.     Defendants are the United States, appointed officials of the United States government, and United States governmental agencies responsible for the issuance and implementation of the challenged administrative actions.

14.     Florida sues Defendant the United States of America under 5 U.S.C. §§ 702–03 and 28 U.S.C. § 1346.

15.     Defendant CDC issued and is implementing the October 30, 2020 Order, establishing its Framework for Conditional Sailing and Initial Phase COVID-19 Testing Requirements for Protection of Crew (the "Conditional Sailing Order"). *See* Ex. 1. The CDC is a component of Defendant the Department of Health & Human Services ("HHS").

16.     Defendant Rochelle Walensky is the Director of the CDC. She is sued in her official capacity.

17.     Defendant Xavier Becerra is the Secretary of HHS. He is sued in his official capacity.

## JURISDICTION AND VENUE

18.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1346, and 1361 and 5 U.S.C. §§ 702–03.

19.     The Court is authorized to award the requested declaratory and injunctive relief under 5 U.S.C. § 706, 28 U.S.C. § 1361, and 28 U.S.C. §§ 2201–02.

5

20.    Venue lies in this district pursuant to 28 U.S.C. § 1391(e)(1) because the State of Florida is a resident of this judicial district. Venue lies in this district under that provision for the independent reason that a substantial part of the events or omissions giving rise to the claim occurred in this judicial district—Tampa Bay is a major cruise port.

## FACTUAL BACKGROUND

### Florida's Cruise Industry

21.    The cruise industry is an essential part of Florida's economy. In 2019, the industry's direct expenditures in Florida generated "nearly 159,000 total jobs paying $8.1 billion in income."[6]

22.    Of all cruise embarkations in the United States, approximately 60% embark from Florida.[7] In 2019, approximately 11 million cruise passengers and crew members came ashore in Florida. These visitors spend money in Florida's local economies, and many Florida businesses depend on them.

### The COVID-19 Pandemic

23.    Beginning in early 2020, the COVID-19 pandemic devastated the cruise industry, like it did many industries. Outbreaks aboard cruise ships

---

[6] https://cruising.org/-/media/research-updates/research/2019-usa-cruise-eis.ashx, at 11, 43.

[7] https://cruising.org/-/media/research-updates/research/2019-usa-cruise-eis.ashx, at 6, 9, 15, 42.

were a significant concern, and experts, public officials, and medical personnel had a limited understanding of the virus, how to treat it, and how to prevent its transmission.

24.   In March 2020, many cruise ships in the U.S. voluntarily ceased operations. Around that same time, on March 14, 2020, the CDC began issuing nationwide lockdown orders applicable to the cruise industry, just as many states issued lockdown orders against their citizens. *See* Ex. 2.

25.   The CDC renewed its March 14 Order on April 9, July 16, and September 30. *See* Ex. 3; Ex. 4; Ex. 5.

26.   The cruise industry has been "ravaged," with "companies reporting billions of dollars in losses, causing some of them to downsize their fleets and sell ships for scrap."[8]

<u>The October 30 Conditional Sailing Order</u>

27.   On October 30, 2020, the CDC offered the cruise industry a glimmer of hope. Just as airlines, bus lines, hotels, restaurants, universities, theme parks, casinos, bars, and countless other industries have learned lessons during the pandemic and figured out how to operate safety—usually with precautions and reduced capacity—the CDC indicated that the cruise industry could do the same.

---

[8] https://www.nytimes.com/2021/03/19/travel/coronavirus-cruises.html.

28.    In its Conditional Sailing Order, the CDC purported to lift its lockdown order. It found that the "benefits of" opening "outweigh the costs of not allowing cruise ships to sail" so long as "cruise ships have taken the necessary precautions to mitigate risk." Ex. 1 at 16. But, as explained below, the Order has been "nothing more than an extension of a cruise ban wrapped as a present."[9]

29.    The Order begins by incorporating the findings of the earlier lockdown orders, and it expressly relies on what occurred on cruise ships at the beginning of the pandemic when the entire world was struggling to control the spread of COVID-19. Ex. 1 at 8, 12. It also expressly bases its conclusions on the lack of an available "FDA . . . authorized vaccine." *Id.* at 8.

30.    The Order then praises the cruise industry for taking "steps to improve their public health response to COVID-19." *Id.* at 13.

31.    Next, the Order discusses the CDC's "Request for Information," which appears to be the CDC's attempt to solicit feedback from the public without formally committing to notice and comment. *Id.* at 14.

32.    The Order then discusses the alternatives it considered. It appears to have considered only two: (1) outright free rein for cruise ships with no

---

[9] https://www.cruisehive.com/signs-that-cruises-could-start-in-june-from-the-u-s/47910.

oversight and no COVID-19 safety protocols whatsoever, and (2) continuing its lockdowns. *Id.* at 15–16.

33.     After discussing these alternatives, the Order explains its "plan" for reopening. This involves four phases: (1) "establishment of laboratory testing of crew onboard cruise ships in U.S. waters," (2) "simulated voyages designed to test a cruise ship operator's ability to mitigate COVID-19 on cruise ships," (3) "a certification process," and (4) "a return to passenger voyages in a manner that mitigates the risk of COVID-19." *Id.* at 16–17.

34.     Unlike the previous orders, which were of limited time duration and had to be renewed, the Conditional Sailing Order is effective for a year, until November 1, 2021. *Id.* at 41. In other words, unless cruise ship companies can complete the four-phase process, they will be shut down until November 1, 2021.

35.     Much has changed since October 30, 2020.

36.     *First*, multiple FDA-approved vaccines are now available, and most of the U.S. population will likely be vaccinated by summer. *See* ¶¶ 3, 5. Moreover, the effectiveness of the FDA-approved COVID-19 vaccines dwarfs the effectiveness of, for example, the average influenza vaccine. This

explains why, on March 8, 2021, the CDC released a statement that fully vaccinated people could, in its view, begin resuming certain activities.[10]

37.    *Second*, the cruise industry is "stirring to life" abroad.[11] European and Asian cruises, for example, are reopening with "resounding success."[12] Indeed, "[t]here have already been some success stories out of Europe where cruise lines have shown that they've got great protocols in place, that they are committed to adhering to them, that they can keep passengers in a bubble and that they can do effective testing."[13]

38.    *Third*, other industries—such as airlines, bus lines, hotels, restaurants, universities, theme parks, casinos, and bars—have continued to reopen successfully with reasonable COVID-19 protocols.

39.    As all of these changes were rendering the burdensome four-phase reopening process obsolete, the CDC made little progress. Over five months in, no cruise company has begun phase-two test voyages.

40.    At a March 18, 2021 Senate hearing, Senator Lisa Murkowski of Alaska asked Defendant CDC Director Walensky to "give . . . some indicator in

---

[10] https://www.cdc.gov/media/releases/2021/p0308-vaccinated-guidelines.html.

[11] https://www.nytimes.com/2021/03/19/travel/coronavirus-cruises.html.

[12] https://www.cruisehive.com/signs-that-cruises-could-start-in-june-from-the-u-s/47910.

[13] https://www.nytimes.com/2021/03/19/travel/coronavirus-cruises.html.

terms of a timeline" for phase two. Ex. 6 at 7. Defendant Walensky responded, "I can't." *Id.*

41.    At this rate, it is likely the industry will be locked down until at least November. While the CDC issued new guidance on April 2, 2021, this guidance is only a portion of what the industry needs before it can start phase-two test voyages.[14] And this new guidance doesn't adequately account for the CDC's recent statement that "fully vaccinated people can travel at low risk to themselves."[15] Moreover, the guidance moves the goal posts yet again. For example, the CDC has increased the reporting frequency of COVID-19-like illnesses by cruise ship operators from weekly to daily. It also now requires cruise ship operators to enter into agreements with all U.S. port and local health authorities where they intend to dock.

42.    The CDC has continued these actions against the cruise industry even as it has treated similar industries differently, including ones that hold passengers in close quarters. For example, the CDC has not shut down the airline industry—focusing instead on "cleaning of aircraft" and "recommendations for hand hygiene."[16]

---

[14]    https://www.cdc.gov/quarantine/cruise/management/technical-instructions-for-cruise-ships.html; https://www.cdc.gov/quarantine/cruise/instructions-local-agreements.html.

[15] https://www.cdc.gov/media/releases/2021/p0402-travel-guidance-vaccinated-people.html.

[16] https://www.cdc.gov/quarantine/air/managing-sick-travelers/ncov-airlines.html.

<u>Florida's Irreparable Harm</u>

43.    As a result of Defendants' actions, Florida has suffered hundreds of millions of dollars in harm, perhaps more. During the pandemic, Florida's ports have suffered a decline in operating revenue of almost $300 million, and this figure is projected to increase to nearly $420 million by July 2021.

44.    In 2019, before Defendants shut down the cruise industry, Florida received approximately $102.8 million in tax revenue from embarkations.

45.    And even the above numbers do not fully account for the economic impact on Florida of Defendants' actions. For example, since March 1, 2020, at least 6,464 former cruise industry employees have filed for state Reemployment Assistance benefits. Florida has paid them approximately $20 million in state benefits. And Florida receives other taxes as a direct or indirect result of the cruise industry, such as employment taxes and ground transportation taxes.

46.    Finally, if the U.S. cruise industry does not reopen soon, cruise lines are considering relocating abroad. They may never come back.

47.    Florida now seeks relief from this Court to prevent the irreparable harm Defendants' actions are causing.

## CLAIMS

## COUNT 1

### Agency action not in accordance
### with law and in excess of authority

### (Violation of the APA)

48.     Florida repeats and incorporates by reference ¶¶ 1–47.

49.     Under the APA, a court must "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory . . . authority, or limitations, or short of statutory right." *See* 5 U.S.C. § 706(2)(A), (C).

50.     The Conditional Sailing Order purports to derive its statutory and regulatory authority from 42 U.S.C. § 264 and 42 C.F.R. § 70.2 (the regulation implementing Section 264).[17] Ex. 1 at 2, 20.

51.     The Order is in excess of that authority in several ways.

52.     *First*, neither 42 U.S.C. § 264 nor 42 C.F.R. § 70.2 authorizes the CDC to make or enforce regulations that suspend the operation of cruise ships, much less every cruise ship in the country. Such a reading of those provisions would be "tantamount to creating a general federal police power." *Skyworks, Ltd. v. CDC*, 2021 WL 911720, at *10 (N.D. Ohio 2021).

---

[17] Any other authorities the CDC has relied on are related to these two authorities, and fail to justify the CDC's actions for the same reasons discussed below. *See, e.g.*, 42 U.S.C. § 268; 42 C.F.R. § 71.31(b).

53.     *Second*, Sections 264 and 70.2 permit the CDC to act only if it first "determines that the measures taken by" a state "are insufficient to prevent the spread" of a communicable disease "from such State . . . to any other State." 42 C.F.R. § 70.2. But here, the CDC has made no valid determination that the measures taken by Florida to protect the health and safety of its residents and tourists are insufficient. And any such determination would have to first take into account that people are now traveling with protective measures like vaccines, sanitation, and social distancing, and that the cruise industry has safely and successfully resumed sailing outside of U.S. waters.

54.     *Third*, the CDC's reading of its authority under 42 U.S.C. § 264 is wrong because it is divorced from context. The statute gives the CDC the authority to "make and enforce such regulations as in [its] judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases from foreign countries into the States or possessions, or from one State or possession into any other State or possession." 42 U.S.C. § 264(a). But in the next sentence, the statute clarifies that to "carry[] out and enforc[e]" those regulations, it authorizes the CDC to conduct "such inspection, fumigation, disinfection, sanitation, pest extermination, destruction of animals or articles found to be so infected or contaminated as to be sources of dangerous infection to human beings, and other measures, as in [CDC's] judgment may be necessary." *Id.* This second sentence clarifies the narrow nature of this

14

authority. *See, e.g.*, *Paroline v. United States*, 572 U.S. 434, 447 (2014) (discussing catch-all terms that "bring[] within a statute categories similar in type to those specifically enumerated"); Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 199 (2012) ("Where general words follow an enumeration of two or more things, they apply only to persons or things of the same general kind or class specifically mentioned (*ejusdem generis*)."); *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988) ("In ascertaining the plain meaning of [a] statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole."). In other words, the "second sentence . . . lists illustrative examples of the types of actions the CDC may take," and those examples limit the scope of the CDC's authority. *Skyworks*, 2021 WL 911720, at *9 (so holding); *accord Tiger Lily, LLC v. Dep't of Hous. & Urb. Dev.*, 2021 WL 1165170 (6th Cir. 2021) ("Plainly, government intrusion on property to sanitize and dispose of infected matter is different in nature from a moratorium on evictions.").

**COUNT 2**

**Arbitrary and capricious agency action**

**(Violation of the APA)**

55.    Florida repeats and incorporates by reference ¶¶ 1–47.

56.     Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary [or] capricious," as Defendants' actions are here. 5 U.S.C. § 706(2)(A).

57.     *First*, Defendants ignored important aspects of the problem. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Michigan v. EPA*, 576 U.S. 743, 751–53, 759–60 (2015). The lack of an FDA-approved vaccine in October 2020 was central to Defendants' decision to impose a burdensome framework on the cruise industry, yet Defendants did not consider the fact that vaccines would be available long before the Order expires in November 2021. And they have made inadequate efforts to consider the significant developments on that front since. Moreover, Defendants have made no effort to account for the success of foreign cruise companies, which operate safely with reasonable COVID-19 protocols. Instead, Defendants rely on stale information from the beginning of the pandemic before industries and public-health officials learned how businesses could operate safely.

58.     *Second*, Defendants' reasoning is inadequate. *See Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016). "The agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* In addition to the issues discussed in the preceding paragraph, the

Conditional Sailing Order states that it is necessary because "measures taken by State and local health authorities regarding COVID-19 onboard cruise ships are inadequate," but the Order does not identify the measures taken by States and localities and the cruise industry itself, much less explain how the measures are inadequate. *See* Ex. 1 at 19.

59.   *Third,* Defendants failed to consider lesser alternatives, *see DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020); *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009), such as imposing reasonable COVID-19 protocols, which have proved successful abroad.

60.   *Fourth*, Defendants failed to explain their differential treatment of the cruise industry versus other industries. It is "textbook administration law that an agency must provide a reasoned explanation for . . . treating similar situations differently." *W. Deptford Energy, LLC v. FERC*, 766 F.3d 10, 20 (D.C. Cir. 2014) (cleaned up). "[A]n agency must treat similar cases in a similar manner unless it can provide a legitimate reason for failing to do so." *Kreis v. Sec'y of Air Force*, 406 F.3d 684, 687 (D.C. Cir. 2005).

61.   *Fifth*, Defendants have acted in an arbitrary and capricious manner by failing to meaningfully follow their own Conditional Sailing Order. The Order provides that cruise lines will have an opportunity to complete a four-phase framework and "return to passenger operations," *see* Ex. 1 at 16–17, but the CDC has neither provided cruise lines an opportunity

17

to complete the framework nor allowed any cruise line to return to passenger operations, notwithstanding that the "benefits of" opening "outweigh the costs of not allowing cruise ships to sail," Ex. 1 at 16.

## COUNT 3

### Agency Action Unlawfully Withheld or Unreasonably Delayed

### (Violation of the APA)

62.    Florida repeats and incorporates by reference ¶¶ 1–47, 57–61.

63.    In the alternative, and for the same reasons stated in Count 2, Defendants' failure to allow the cruise industry to safely reopen constitutes final agency action unlawfully withheld or unreasonably delayed, in violation of 5 U.S.C. § 706.

## COUNT 4

### Failure to Provide Notice and Comment

### (Violation of the APA)

64.    Florida repeats and incorporates by reference ¶¶ 1–47.

65.    The APA required Defendants to provide notice of, and receive comment on, the Conditional Sailing Order because it is a substantive rule that "affect[s] individual rights and obligations." *Chrysler Corp. v. Brown*, 441 U.S. 281, 303 (1979); *see* 5 U.S.C. § 553.

66.    Defendants, however, failed to conduct proper notice and comment rulemaking. As a perennial excuse, Defendants seem to rely on the "good

18

cause" exception to the notice requirement, *see* 5 U.S.C. § 553(b)(B), and lean heavily on the year-old "emergency" of COVID-19. *See, e.g.*, Ex. 1 at 19, 20. But that exception "is to be narrowly construed and only reluctantly countenanced." *Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 93 (D.C. Cir. 2012).

67.    Good cause to depart from notice and comment does not exist when the agency has sufficient time to provide notice and comment. *See Kollett v. Harris*, 619 F.2d 134, 145 (1st Cir. 1980); *Regeneron Pharm., Inc. v. Dep't of Health & Hum. Servs.*, 2020 WL 7778037, at *11 (S.D.N.Y. Dec. 30, 2020) (noting that an agency's contemplation of rulemaking for two years "suggests that the agency could have acted sooner and complied with the notice and comment requirements"). So even if the good cause exception were applicable in March 2020, it no longer applies in April 2021.

68.    Moreover, even if an emergency could still be said to exist one year later such that it justifies "good cause," this exception to notice and comment is supposed to be temporary. *See Am. Fed'n of Gov't Emp., AFL-CIO v. Block*, 655 F.2d 1153, 1158 (D.C. Cir. 1981).

69.    And although the CDC solicited information from the public, the CDC did not respond or even attempt to address in any meaningful way the comments provided to it. Ex. 1 at 14–15. This suggests the CDC did not view that process as satisfying the notice and comment requirements, and even if it did, its failure to respond is fatal. *See Perez v. Mortg. Bankers Ass'n*, 575 U.S.

92, 96 (2015) (explaining that "[a]n agency must consider and respond to significant comments received during the period for public comment").

## COUNT 5

## Unconstitutional Exercise of Legislative Power

## (Violation of U.S. Const. Art. I, § 1)

70.    Florida repeats and incorporates by reference ¶¶ 1–47.

71.    Article I, Section 1 of the U.S. Constitution states, "[a]ll legislative powers herein granted shall be vested in a Congress of the United States." Under Article I, Section 1, only Congress may engage in lawmaking.

72.    If the Conditional Sailing Order does not exceed the authority under 42 U.S.C. § 264 and the relevant regulations, then Section 264 constitutes an unconstitutional exercise of lawmaking by the executive branch, affording the CDC the power to determine the rights of millions of citizens, to decide on the survival of countless businesses, and to make a host of sweeping policy decisions absent meaningful accountability.

## PRAYER FOR RELIEF

For these reasons, Florida asks the Court to:

a) Hold unlawful and set aside the Conditional Sailing Order.

b) Issue preliminary and permanent injunctive relief enjoining Defendants from enforcing the Conditional Sailing Order.

c) Postpone the effective date of the Conditional Sailing Order.

d) Declare unlawful the Conditional Sailing Order.

e) Declare that the cruise industry may open with reasonable safety protocols.

f) Award Florida costs and reasonable attorney's fees.

g) Award such other relief as the Court deems equitable and just.

Respectfully submitted,

Ashley Moody
ATTORNEY GENERAL

John Guard (FBN 374600)
CHIEF DEPUTY ATTORNEY GENERAL

*/s/ James H. Percival*
James H. Percival* (FBN 1016188)
CHIEF DEPUTY SOLICITOR GENERAL
*Lead Counsel

Jason H. Hilborn (FBN 1008829)
ASSISTANT SOLICITOR GENERAL

Anita Patel (FBN 70214)
SENIOR ASSISTANT ATTORNEY GENERAL

Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
james.percival@myfloridalegal.com

*Counsel for the State of Florida*