# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| STATE OF FLORIDA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| XAVIER BECERRA, Secretary of ) | |
| Health and Human Services, in his ) | |
| official capacity; HEALTH AND ) | Case No.: 8:21-CV-839-SDM-AAS |
| HUMAN SERVICES; ROCHELLE ) | |
| WALENSKY, Director of Centers for ) | |
| Disease Control and Prevention, in ) | |
| her official capacity; CENTERS FOR ) | |
| DISEASE CONTROL AND ) | |
| PREVENTION; UNITED STATES ) | |
| OF AMERICA, ) | |
| ) | |
| Defendants. | |

## STATE OF ALASKA'S MOTION TO INTERVENE

The State of Alaska moves to intervene in support of plaintiff, the State

of Florida, as of right pursuant to Federal Rule of Civil Procedure 24(a)(2) or,

alternatively, in permissive intervention pursuant to Federal Rule of Civil

Procedure 24(b). This litigation concerns the legality of an order issued by the

Center for Disease Control and Prevention ("CDC") that prohibits cruise

ships from operating in waters of the United States until November 1, 2021,

or until the vessel's operator can satisfy both overly burdensome and yet to be

determined requirements set by the CDC. The order directly affects the

1

economic health of Alaska, its small port communities, and its citizens. Moreover, Alaska has a substantial interest in the subject matter of this action because the CDC has exceeded its statutory authority by asserting a general police power over Alaska and its local communities. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 536 (2012) ("The independent power of the State also serves as a check on the power of the Federal Government: 'By denying any one government complete jurisdiction over all the concerns of public life, federalism protects the liberty of the individual from arbitrary power.'" (quoting *Bond v. United States*, 564 U.S. 211, 222, (2011)); *Skyworks, Ltd. v. Ctr. For Disease Control and Prevention*, ---F. Supp. 3d---, 2021 WL 911720, at *10 (N.D. Ohio March 10, 2021) (concluding that the CDC's current interpretation of its statutory authority is "tantamount to creating a general federal police power").

## BACKGROUND

### I.    The CDC issued a No Sail Order at the start of the pandemic.

In March 2020, the CDC issued the first of a series of No Sail Orders shutting down the cruise industry in the United States. 60 Fed. Reg. 16628. The order applied to passenger vessels with a capacity of 250 or more individuals operating in waters subject to the jurisdiction of the United States with an itinerary anticipating an overnight stay for passengers or crew. *Id.* The CDC renewed the No Sail Order in separate orders issued on

April 9, July 16, and September 30, 2020. *See* 85 Fed. Reg. 21004, 85 Fed. Reg. 44085, 85 Fed. Reg. 62732.

The No Sail Orders prohibited cruise ship operators from disembarking or reembarking crew members except as directed by the United States Coast Guard; prevented operators from embarking any new passengers or crew except as approved; directed cruise ship operators to observe health precautions as directed by the CDC; and directed operators to comply with all CDC recommendations and guidance relating to the passengers, crew, ship, or any article or thing on board the ship. 85 Fed. Reg. at 62737. As a condition of returning to sailing, the No Sail Orders required cruise ship operators to develop and implement a "robust plan to prevent, mitigate, and respond to the spread of COVID-19 among crew onboard cruise ships." *Id.* The orders further required operators to make this plan available to the CDC and address elements to adequately prevent, mitigate, and respond to the spread of COVID-19 among crew and minimize, to the greatest extent possible, any impact on government operations or the U.S. healthcare system. *Id.*

As a result of the pandemic, Alaska's 2020 cruise season was canceled.[1]

---

[1]     *See Alaska's Last Remaining Big-Ship Cruises of 2020 Have Been Canceled,* July 6, 2020, available at https://www.adn.com/business-economy/2020/07/06/alaskas-last-remaining-big-ship-cruises-of-2020-have-been-canceled/.

## II.     The CDC's Conditional Sail Order threatens Alaska's 2021 cruise season.

As of April 29, 2020, seven cruise ship operators—approximately 95% of cruise ships subject to the No Sail Orders—had submitted the necessary response plan. 85 Fed. Reg. at 62734. As of September 6, all five cruise ship operators with ships remaining in U.S. waters had submitted response plans that were "complete, accurate, and acknowledged." *Id.*

On October 31, 2020, the CDC issued a "Conditional Sail Order" that promised a "phased resumption of cruise ship passenger operations." 85 Fed. Reg. 70153. The initial phase consisted of testing and additional safeguards for crew members while the CDC ensures operators build the laboratory capacity needed to test future passengers. *Id.* Subsequent phases would include simulated voyages, certification for ships that meet specific requirements, and a phased return to passenger voyages. *Id.*

On April 2, 2021, the CDC issued technical guidance for phase 2a of its phased approach.[2] Among other requirements, this phase requires operators to create "planning materials for agreements that port authorities and local health authorities must approve to ensure cruise lines have the necessary infrastructure in place to manage an outbreak of COVID-19 on their ships to include healthcare capacity and housing to isolate infected people and

---

[2]      https://www.cdc.gov/media/releases/2021/s0402-conditional-sail-orders.html

quarantine those who are exposed."[3] This plan, in addition to a host of other requirements, requires operators to obtain "medical care agreements" that include contractual arrangements to provide for emergency medical transport of critically ill persons and contractual arrangements with shoreside medical facilities to ensure that travelers receive appropriate clinical evaluation.[4] In these agreements, the cruise ship operator "must document that its contractual shoreside medical facilities or healthcare systems either singularly or collectively have enough medical capacity in the judgment of the local health authorities to care for travelers if an unanticipated outbreak of COVID-19 occurs on board its ships."[5]

Along with the medical care agreements and other related requirements, cruise ship operators must enter housing agreements with shoreside facilities to allow for isolation of and quarantine of persons with suspected or confirmed COVID-19. The housing agreement provision includes another host of requirements, including an obligation by the cruise ship operator to "document that it has made contractual arrangements . . . in sufficient quantities as determined by the local health authorities to meet the housing needs of travelers until they meet CDC criteria to discontinue

---

[3]      *Id.*

[4]      https://www.cdc.gov/quarantine/cruise/instructions-local-agreements.html

[5]      *Id.*

5

isolation."[6] In addition to the housing requirements, the CDC also directs the parties to the agreement—which includes the cruise ship operator, the U.S. port authority, and all health departments exercising jurisdiction over the port—to jointly consider the potential needs of travelers under quarantine and isolation. These needs include the availability and frequency of testing; availability of mental health services; pharmacy delivery and other essential services; available of security; a check-in process, including delivery of luggage; procedures to ensure daily monitoring of travelers in quarantine; procedures to minimize contact between travelers in quarantine and support staff; and post-isolation and post-quarantine procedures to allow travelers to safely return home.[7]

The CDC has yet to issue technical guidance for Phase 2b—simulated voyages—or any of the other remaining phases.[8] Based on the Conditional Sailing Order, it will be at least a 90-day process for a cruise ship operator to complete a simulated voyage and possibly obtain a conditional sailing certificate. Alaska's cruise season is limited, extending from mid-May to early October each year. Unless the CDC's overly burdensome and opaque requirements are altered or lifted soon, it will be impossible for large-scale

---

[6]     *Id.*

[7]     *Id.*

[8]     https://www.cdc.gov/media/releases/2021/s0402-conditional-sail-orders.html

6

cruising to resume in the United States in time for any part of Alaska's season. And, given the CDC's current pace for issuing its technical guidance and the lead times necessary to arrange and market cruises, the CDC's action may jeopardize the 2022 cruise season as well.

### III.   The loss of another cruise season will have a catastrophic impact to Alaska and its economy.

The No Sail Orders have had an unsustainable impact on Alaska's economy. As stated in an Interim Report issued by the Federal Maritime Commission in October 2020:

> In the case of Alaska, there exists an outsized economic impact from the cessation of cruise activity. While the symptoms are the same as in other parts of the United States, the impact is much greater because of Alaska's distance and economic reliance on the tourism industry and, at the micro level, the almost total reliance of some small towns (and native Alaskans) on the income generated by cruise tourism.

[Ex. 1, at 4]

The State of Alaska directly lost an estimated $90.3 million in tourism revenues in 2020 and stands to lose even more if the cruise industry remains shut down for the 2021 cruise season. [Ex. 2, at 5] This revenue stems directly from the cruise industry and comes in the form of state taxes, fishing and hunting licenses, state park fees, passenger related revenues, and environmental compliance fees. [*Id.*]

Alaska's port and cruise line related communities lost 22,297 jobs in 2020 equating to over $305.7 million in lost wages. These lost wages and lost jobs impact Alaska by depleting the state's Unemployment Reserve Trust. In February 2020, the balance of this trust was $492.9 million; in March 2021, the balance of the trust was $265.8 million. [Ex. 2, at 7] Of this $227 million loss, $29.8 million is directly attributed to the cruise industry. [*Id.*]

The total amount of direct loss to the State of Alaska resulting from the cancellation of the 2020 season was well in excess of one billion dollars, but the impact to Alaska's communities was even greater. [*Id.* at 2] The cruise industry and the visitors it serves account for $3.0 billion of the state's economy. [*Id.*] The loss of the 2020 season had a particularly negative impact in Southeast Alaska, where the economies of many communities are entirely dependent upon tourism. [*Id.* at 1] For example, it is estimated that the city of Skagway lost over $13 million in revenue generated from the cruise industry last year alone; this is more than 100% of Skagway's operating budget. [*Id.* at 3–4] According to Skagway's mayor, the cancellation of the 2021 cruise season

> will mean 2 ½ years with no economy. Somewhere around $330 million in lost revenue for local businesses. People are already moving away. Population is down to around 800 from 1,100 last summer. Businesses will fail. A lot of them. We lost professionals in all sectors. The municipality will run out of reserves by next August, even with the stimulus funding.

[*Id.* at 4]⁹

These impacts, although they may not appear as dramatic as Florida's lost revenues, are uniquely significant to Alaska's small communities and they are not limited to Skagway. For example, it is estimated that only 26% of businesses in Ketchikan, another small community in Southeast Alaska, will survive a delayed restart to the tourism industry. [*Id.*]

While it is more dramatically felt in Alaska's port and cruise line communities, the effects of the CDC's orders extend throughout Alaska. Based on a report released in September 2020, it is estimated that over 160,000 cruise passengers would have visited interior Alaska last summer— an area that includes places like Denali National Park and Fairbanks. [*Id.*] These visitors would have stayed, on average, approximately two nights in either Denali or Fairbanks, providing demand for seasonal hotels that often cater to cruise passengers. As a result of the shutdown of the cruise industry, many of these seasonal hotels did not open at all in 2020, and many will suffer the same fate in 2021 if the CDC's Conditional Sail Order remains in place.

---

⁹ According to the 2016 Alaska Visitor Statistics Report, 96% of visitors to Skagway traveled by cruise ship. [Ex. 1, at 22]

## ARGUMENT

"It would be a colossal understatement to say that the COVID-19 pandemic has had far-reaching effects. It has changed everything from the way that friends and families interact to the way that businesses and schools operate to the way that courts hear and decide cases." *Swain v. Junior*, 961 F.3d 1276, 1280 (11th Cir. 2020). But to some industries—and the communities dependent on those industries—the impacts have been far more catastrophic.[10] Rather than building on the progress health officials have made since the start of this pandemic to allow the cruise industry to operate under reasonable restrictions within its statutory authority, the CDC's order leaves this industry ground to a halt. The federal agency's promise of a "phased approach to resuming passenger operations" is meaningless to Alaska because the CDC's current phases are arbitrary and overly burdensome and the CDC has not even fully defined what each of the phases will require, leaving the cruise industry unable to determine whether it is even possible to meet these guidelines during Alaska's 2021 cruise season. *See* 85 Fed. Reg. 70153. Because Alaska has a significant stake in the

---

[10]     Ceylan Yeginsu, Why U.S. Cruises Are Still Stuck in Port, N.Y. Times (March 19, 2021) (available at http://www.nytimes.com/2021/03/19/travel/coronavirus-cruises.html (reporting that the cruise industry has been "ravaged," with "companies reporting billions of dollars in losses, causing some of them to downsize their fleets and sell ships for scrap")).

10

outcome of this litigation, and because the CDC order impacts Alaska differently than Florida, Alaska should be allowed to intervene under Federal Rule of Civil Procedure 24.

## I.  Alaska should be permitted to intervene as of right under Rule 24(a)(2).

Alaska satisfies the requirements for intervention as of right under Rule 24(a)(2). A party is entitled to intervene as a matter of right if the motion to intervene is timely, the movant shows an interest in the subject matter of the suit, the movant's "ability to protect that interest may be impaired by the disposition of the suit," and "existing parties in the suit cannot adequately protect that interest." *Georgia v. U.S. Army Corps of Engr's*, 302 F.3d 1242, 1250 (11th Cir. 2002) (discussing Fed. R. Civ. P. 24(a)(2)). Courts are to construe Rule 24 liberally, with any doubts resolved in favor of the proposed intervenor. *Fed. Sav. & Loan Ins. Corp. v. Falls Chase Special Taxing Dist.*, 983 F.2d 211, 216 (11th Cir. 1993).

### A.  Alaska's motion to intervene is timely and will not unduly disrupt the litigation or prejudice the existing parties.

Alaska's request to join this litigation is timely. In determining whether a motion to intervene is timely, courts consider:

(1) The length of time during which the proposed intervenor knew or reasonably should have known of the interest in the case before moving to intervene; (2) the extent of prejudice to the existing parties as a result of the proposed intervenor's failure to move for intervention as soon as it knew or reasonably should

11

have known of its interest; (3) the extent of prejudice to the
proposed intervenor if the motion is denied; and (4) the existence
of unusual circumstances militating either for or against a
determination that their motion was timely.

*Georgia*, 302 F.3d at 1259 (citing *Chiles v. Thornbrugh*, 865 F.2d 1197, 1213

(11th Cir. 1989).

All four of these factors weigh in favor of the State of Alaska's request.

Alaska files this motion to intervene just over a week after Florida filed its

complaint. None of the existing parties will suffer any prejudice if Alaska is

allowed to intervene as the federal defendants will be able to respond to

Alaska's complaint at the same time it responds to Florida's, and Alaska will

be able to participate in any preliminary motions, scheduling proceedings,

discovery (if needed), or dispositive motions practice.

On the other hand, if the court denies intervention, Alaska will surely

suffer prejudice. In considering prejudice to the proposed intervenor, the

court must consider the "extent to which a final judgment in the case may

bind the movant even though he is not adequately represented by an existing

party." *United States v. Jefferson County*, 720 F.2d 1511, 1517 (11th Cir.

1983). Here, Florida seeks review of a nationwide order that imposes

restrictions on Alaska's cruise industry just as it does Florida's cruise

industry. Although the restrictions are the same, the two states are affected

differently. Florida's cruise industry runs year round; Alaska's season is

limited due to weather. Florida may have the infrastructure to satisfy some, if not all, of the CDC's various requirements. Alaska's small port communities may not be able to comply with the CDC's requirements for medical care and housing agreements, among other things. In short, this litigation will directly impact Alaska's interests, and Alaska's interests sufficiently differ from Florida's such that it would be prejudiced if not allowed to intervene. *See id.* (stating that a party is prejudiced even if he has an identical interest with a party, if he has a "sufficiently greater stake than the party that the party's representation may be inadequate to protect the movant's interest").

Lastly, no unusual circumstances counsel against intervention. Because Alaska has interests unique to only it, and because Alaska's motion is timely, all of the four factors under the timeliness inquiry weigh in favor of its request to intervene.

## B. Alaska has important, legally protected interests in this action.

Intervening parties must show that their "interest in the subject matter of the litigation is direct, substantial and legally protectable." *Georgia*, 302 F.3d at 1249; Fed. R. Civ. P. 24(a)(2). "In deciding whether a party has a protectable interest, . . . courts must be 'flexible' and must 'focus[]

13

on the particular facts and circumstances' of the case." *Huff v. Comm'r of IRS*, 743 F.3d 790, 796 (11th Cir. 2014) (quoting *Chiles*, 865 F.2d at 1214)).

Although the Eleventh Circuit has held that an economic interest alone is insufficient to warrant intervention, those cases are inapposite here because Alaska has a sufficient legal interest to establish Article III standing to pursue its own claim under the Administrative Procedures Act. *See United States v. South Fla. Water Mgmt Dist.*, 922 F.2d 704, 710 (11th Cir. 1991) ("By requiring that the applicant's interest be . . . 'legally protectable,' it is plain that something more than an economic interest is necessary." (quoting *New Orleans Pub. Serv., Inc. v. United Gas Pipe Line Co.*, 732 F.2d 452, 464 (5th Cir. 1984) (en banc)); *see also Fund For Animals, Inc. v. Norton*, 322 F.3d 728, 735 (D.C. Cir. 2003) (stating that a court's conclusion that proposed intervenor has constitutional standing is alone sufficient to establish the movant has "an interest relating to the property or transaction which is the subject of the action." (quoting Fed. R. Civ. P. 24(a)(2)).

Article III standing consists of three elements: "the plaintiff must have suffered an injury in fact, the defendant must have caused that injury, and a favorable decision must be likely to redress it." *Trichell v. Midland Credit Mgmg, Inc.*, 964 F.3d 990, 967 (11th Cir. 2020). In addition to showing a sufficient injury, "a plaintiff's grievance must arguably fall within the zone of interests protected or regulated by the statutory provision or constitutional

guarantee invoked in the suit." *Bennett v. Spear*, 520 U.S. 154, 162 (1997). "Whether a plaintiff's interest is 'arguably . . . protected . . . by the statute' within the meaning of the zone-of-interest test is to be determined not by reference to the overall purpose of the Act in question, but by reference to the particular provision upon which the plaintiff relies." *Id.* at 175–76. In *Bennett v. Spear*, the plaintiffs sought to challenge, under the APA, § 7 of the Endangered Species Act, 16 U.S.C. § 1536, which requires that each agency "use its best scientific and commercial data available." *Id.* at 176. Although the most obvious reason to require federal agencies to use the "best scientific and commercial data available" is to ensure that federal agencies rely on more than pure speculation when implementing the Endangered Species Act, the Supreme Court also recognized another objective—"to avoid needless economic dislocation produced by agency officials zealously but unintelligently pursuing their environmental objectives." *Id.* at 176–77. The same holds true in this case.

In their respective complaints, Alaska and Florida both seek to enforce 42 U.S.C. § 264, which grants the Secretary of Health and Human Services the power to make and enforce regulations necessary to prevent the introduction, transmission, or spread of communicable diseases, but limits that discretion to measures related to the inspection, fumigation, disinfection, sanitation, pest extermination, destruction of animals or articles found to be

15

so infected or contaminated as to be sources of dangerous infection to human beings. The most obvious reason to require the Secretary to focus his measures on the inspection, fumigation, and disinfection of articles and animals found to be infected or contaminated is to focus on those items that may facilitate the introduction, transmission or spread of communicable diseases. *See Skyworks, Ltd. v. Center for Disease Control and Prevention*, --- F. Supp. 3d---, 2021 WL 911720, at *9 (N.D. Ohio March 10, 2021) ("Tying these actions to "animals or articles" links the agency's power to specific, tangible things on which the agency may act."); *see also Tiger Lily, LLC v. U.S. Dep't of Housing & Urban Dev.*, --- F.3d ---, 2021 WL 1165170 (6th Cir. 2021) ("Plainly, government intrusion on property to sanitize and dispose of infected matter is different in nature from a moratorium on evictions."). But just as the statute at issue in *Bennett* had multiple objectives, so does this statute. It directs the agency's actions to those animals or articles actually "found" to be sources of infection, 42 U.S.C. § 264(a), and necessarily limits the agency's ability to target "amorphous disease spread" that would result in needless economic dislocation produced by agency officials zealously but unintelligently pursuing the equivalent of a federal police power. *See Skyworks, Ltd.*, 2021 WL 911720, at *10.

In *Skyworks Ltd. v. Center for Disease Control and Prevention*, the district court held that the CDC's eviction moratorium exceeded its statutory

16

authority under 42 U.S.C. § 264(a). 2021 WL 911720, at *10. In doing so, the court noted that the CDC's broad reading of its statutory authority had "few, if any, limits" and was "tantamount to creating a general federal police power." *Id.* The CDC's action with regard to the cruise ship industry is similarly broad and expansive. Rather than focusing its efforts on specific articles or animals found to be infected and that present an actual risk of transmission to other people, the CDC has set out to regulate every aspect of the cruise ship industry—from directing how and where passengers on cruise ships will get medical care or seek housing to requiring cruise ship operators to develop a program to educate port personnel and travelers about the importance of getting COVID-19 vaccines. *See* 85 Fed. Reg. 85. By exercising such broad authority over an entire industry, the CDC has exceeded its statutory authority and infringed on the states' police power, which "also serves as a check on the power of the Federal Government." *See Nat'l Fed'n of Indep. Bus.*, 567 U.S. at 536.

Further, these orders indirectly regulate Alaskan municipalities and the State, and regulate which Alaskan municipalities may accept cruise ships into port. By requiring cruise operators to obtain approval of certain contractual agreements from local port authorities and health authorities according to specific criteria, the CDC equally requires those port authorities and public health authorities to review those agreements according to its

criteria in order for municipalities to accept the ships into port. And the required terms of those agreements may bar certain Alaskan municipalities from accepting cruise ship traffic, infringing on the sovereignty of Alaska its political subdivisions. Alaska and its political subdivisions have a legally protected interest in regulating commerce within their own ports without ultra vires interference by the CDC. *See Tiger Lily, LLC*, --- F.3d ----, 2021 WL 1165170 (6th Cir. 2021) ("[W]e cannot read the Public Health Service Act to grant the CDC the power to insert itself into the landlord-tenant relationship without some clear, unequivocal textual evidence of Congress's intent to do so. Regulation of the landlord-tenant relationship is historically the province of the states.").

Alaska's economic interests also justify its standing. In *Texas v. United States*, the Fifth Circuit found Texas had standing to challenge the Deferred Action for Parents of Americans and Lawful Permanent Residents program as unlawful under the Administrative Procedures Act. 809 F.3d 134, 146, 149, 150–55 (2015). In doing so, the court recognized that states are entitled to a "special solicitude" in the standing inquiry, *id.* at 151 (citing *Massachusetts v. EPA*, 549 U.S. 497, 526)), and concluded that Texas met the injury in fact requirement "by demonstrating that it would incur significant costs in issuing drivers' licenses to DAPA beneficiaries." Like Texas, Alaska is entitled to "special solicitude" when it comes to standing. As a sovereign

state, Alaska is not a normal litigant for purposes of invoking federal jurisdiction. *Id.* at 151. Moreover, as in *Texas v. United States* and *Massachusetts v. EPA*, this dispute turns on the proper construction of a congressional statute, and, as discussed above, Alaska's interests are within the zone of interests of the statute at issue. *See Texas*, 809 F.3d at 151–52.[11] And, also like Texas, Alaska has shown that continuation of the CDC's Conditional Sail Order would have a major effect on Alaska's fisc. *See id.* at 157.

Alaska also satisfies the other two elements of standing because it can show that the CDC's orders have caused its injuries and a favorable decision from this Court would likely redress those injuries. Because Alaska has

---

[11] The zone of interest test "is not meant to be especially demanding and is applied in keeping with Congress's evident intent when enacting the APA to make agency action presumptively reviewable. *Texas*, 809 F.3d at 162 (internal quotation marks omitted). In enacting 42 U.S.C. § 264(a), Congress meant to preserve the states' authority to prevent the introduction, transmission, or spread of communicable diseases. 42 U.S.C. § 264(e); *see also* 42 C.F.R. § 70.2 (providing that, if the Director of the CDC determines that measures taken by health authorities of any State or possession "are insufficient to prevent the spread of any of the communicable diseases. . . , he/she may take such measures to prevent such spread of the diseases as he/she deems reasonable necessary, including inspection, fumigation, disinfection, sanitation, pest extermination, and destruction of animals or articles believed to be sources of infection"). Although the CDC has not considered Alaska's action in relation to the Conditional Sail Order, Alaska continues to have one of the best vaccination rates in the nation. As of April 2, 2021, nearly one-in-three Alaskans (253,240 people) had received their first shot while more than one-in-five (177,827) people were fully vaccinated. *See https://gov.alaska.gov/newsroom/2021/04/02/alaska-continues-to-lead-nation-in-vaccination-rates/*.

Article III standing to pursue its own claims under the Administrative Procedures Act, Alaska has a legally protectable interest under Rule 24(a)(2) to intervene in this litigation.

### C.  Alaska's ability to protect its interest may be impaired absent intervention.

Alaska must also show that resolution of this action "may as a practical matter impair or impede [its] ability to protect its interest." Fed. R. Civ. P. 24(a)(2). The nature of Alaska's interest and the effect that the disposition of the lawsuit will have on its ability to protect that interest are "closely related" issues. *Chiles*, 865 F.2d at 1214. "Where a party seeking to intervene in an action claims an interest in the very property and very transaction that is the subject of the main action, the potential stare decisis effect may supply that practical disadvantage which warrants intervention as of right." *Id.*; *see also Huff*, 743 F.3d at 800 ("'If an absentee would be substantially affected in a practical sense by the determination made in an action, he should, as a general rule, be entitled to intervene.'" (quoting *Cascade Natural Gas Corp. v. El Paso Natural Gas Co.,* 386 U.S. 129, 134 n.3 (1967))). Here, Alaska and Florida's interests are so situated that the disposition of this lawsuit will, as a practical matter, have a potentially persuasive *stare decisis* effect in any separate litigation that Alaska may be compelled to pursue if intervention is

not allowed. This reason alone is sufficient to show that Alaska's ability to protect its interest may be impaired absent intervention.

### D.    Florida will not fully represent Alaska's interests.

The last prong of Rule 24(a)(2) requires a movant to show that its interest will not be adequately protecting by the existing parties. The burden for making such a showing is "minimal" as the moving party need only show that current representation "may be inadequate." *Stone v. First Union Corp.*, 371 F.3d 1305, 1311 (11th Cir. 2004) (internal quotation marks omitted). Although courts may presume adequacy of representation "when an existing party seeks the same objectives as would-be interveners," this presumption is "weak" and "merely imposes upon the proposed interveners the burden of coming forward with some evidence to the contrary." *Clark*, 168 F.3d at 461.

Although the interests of Alaska and Florida are closely aligned, they are not identical. Alaska is "charged by law with representing the public interests of its citizens," *see Dimond v. District of Columbia*, 792 F.2d 179, at 193 (D.C. Cir. 1986), and its interests differ from that of Florida's citizens. For example, many of the communities in Southeast Alaska are entirely dependent on tourism, and although Florida's cruise season extends year round, Alaska's cruise season is limited due to weather. Additionally, the ability of Alaska's port communities to implement the CDC's orders may differ from Florida's, and these different experiences could contribute to the

21

court's "informed resolution of these questions." *See NRDC v. Castle*, 561 F.2d 904, 912–13 (D.C. Cir. 1977). For example, the CDC's Conditional Sail Order requires cruise operators to enter medical planning and housing agreements with local authorities. The ability of many of Alaska's small and isolated local ports to meet the demands of the CDC will likely be significantly different than that of Florida's local ports.

Further, Alaska's vaccination rates significantly outpace Florida's, particularly in some of the small coastal communities directly affected by the CDC's order. For example, in the community of Skagway referenced above, more than 70% of residents over 16 have received their first dose of COVID-19 vaccine, one of the leading rates in the nation.[12] Alaska's vaccination policies and practices may also differ from Florida's in ways that directly impact the arguments that the CDC's order is arbitrary and capricious.[13]

Therefore, because representation of Alaska's interest by any other party to this litigation would be inadequate, and because Alaska meets the

---

[12]    Data current as of April 19, 2021 (source Alaska Department of Health and Social Services, Vaccine Monitoring Dashboard, https://alaska-coronavirus-vaccine-outreach-alaska-dhss.hub.arcgis.com/); Melinda Munson, Skagway ranks first in U.S. for COVID-19 vaccinations, The Skagway News (April 9, 2021) (available online at https://skagwaynews.com/2021/04/09/skagway-ranks-first-in-u-s-for-covid-19-vaccinations/).

[13]    James Brooks, Alaska will offer COVID-19 vaccines to tourists starting June 1, The Anchorage Daily News (April 17, 2021) (available online at adn.com/alaska-news/2021/04/16/alaska-will-offer-free-covid-19-vaccines-to-tourists-starting-june-1/).

other requirements for intervention as of right, intervention should be granted.

## II. Alternatively, Alaska should be granted permissive intervention.

In the event the Court denies its request for intervention as of right, Alaska alternatively requests that the Court grant it permission to intervene under Rule 24(b). The Court may grant permissive intervention to a party who, on timely motion, asserts "a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). This is wholly discretionary, but in exercising its discretion, the Court will consider "whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." *Id.*

Here, Alaska's intervention would neither prejudice the existing parties nor unduly delay the proceedings. It has been just over a week since Florida filed its complaint, and the federal defendants have not yet responded. Moreover, as discussed above, although Alaska's and Florida's interests are closely aligned, and raise common questions of fact and law, the two states' interests are not identical. Implementation of the CDC's nationwide order raises issues that are unique to Alaska, and consideration of these issues would contribute to, rather than impede, a reasoned determination of this

action. *See League of Women Voters of Fla. v. Detzner*, 283 F.R.D. 687, 688 (N.D. Fla. 2012).

In sum, because Alaska has timely sought to intervene, because its participation will not delay this litigation, and because the claims it will assert raise common questions of fact and law, this Court, at a minimum, should grant its request for permissive intervention.

## CONCLUSION

For the foregoing reasons, the State of Alaska respectfully requests that the Court grant its motion to intervene and accept the accompanying Complaint [Ex. 3].

Dated April 20, 2021.     TREG R. TAYLOR
                          ATTORNEY GENERAL

                          Jessica M. Alloway,* *pro hac vice* pending
                          Alaska Bar No. 1205045
                          Assistant Attorney General
                          1031 West Fourth Avenue, Suite 200
                          Anchorage, AK 99501
                          Telephone: (907) 269-5275
                          Facsimile: (907) 276-3697
                          Email: jessie.alloway@alaska.gov
                          *Lead Counsel

                          Lael A. Harrison (*pro hac vice* pending)
                          Alaska Bar No. 0811093
                          Assistant Attorney General
                          123 4th Street, Suite 600
                          P.O. Box 110300
                          Juneau, AK 99811-0300
                          Telephone: (907) 465-3600
                          Facsimile: (907) 465-2520

Email: lael.harrison@alaska.gov

*/s/ Edward M. Wenger*
Mohammad O. Jazil (FBN 72556)
mjazil@hgslaw.com
Edward M. Wenger (FBN 85568)
edw@hgslaw.com
HOPPING GREEN & SAMS, P.A.
119 South Monroe Street, Suite 300
Tallahassee, Florida 32301
Phone: (850) 222-7500
Fax:  (850) 224-8551

Attorneys for State of Alaska

## Local Rule 3.01(g) certification

Pursuant to Local Rule 3.01(g), counsel for the State of Alaska conferred with counsel for the State of Florida, who indicated that Florida will not object to Alaska's motion to intervene. Counsel for the State of Alaska also certifies that counsel tried to identify and contact counsel for the defendants but was unable to do so. The State will continue to make diligent attempts to identify and contact defendants' counsel and will supplement this motion after three days.

*/s/ Edward M. Wenger*
Attorney

25

## CERTIFICATE OF SERVICE

I certify that on April 20, 2021, I electronically filed the State of

Alaska's Motion to Intervene and Proposed Complaint with the Clerk of

Court by using the CM/ECF system. I further certify that I mailed the

foregoing document and the notice of electronic filing by first-class mail to the

currently unrepresented defendants as follows:

Rochelle Walensky, Director
Centers for Disease Control and
Prevention
1600 Clifton Road
Atlanta, GA 30329-4027

Centers for Disease Control and
Prevention
1600 Clifton Road
Atlanta, GA 30329-4027

Xavier Becerra, Secretary
U.S. Health and Human Services
200 Independence Avenue, S.W.
Washington, DC 20201

U.S. Health and Human Services
200 Independence Avenue, S.W.
Washington, DC 20201

United States of America
c/o United States Attorney's Office
Civil Process Clerk
Middle District of Florida
400 N. Tampa St., Suite 3200
Tampa, FL 33602

United States of America
c/o Merrick Garland, Attorney
General for the United States
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

*/s/ Edward M. Wenger*
Attorney