## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | | |
|---|---|---|
| STATE OF FLORIDA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| STATE OF ALASKA, | ) | |
| | ) | |
| Plaintiff-Intervenor, | ) | Case No.: 8:21-CV-839-SDM-AAS |
| | ) | |
| v. | ) | |
| | ) | |
| XAVIER BECERRA, Secretary of | ) | |
| Health and Human Services, in his | ) | |
| official capacity; HEALTH AND | ) | |
| HUMAN SERVICES; ROCHELLE | ) | |
| WALENSKY, Director of Centers for | ) | |
| Disease Control and Prevention, in | ) | |
| her official capacity; CENTERS FOR | ) | |
| DISEASE CONTROL AND | ) | |
| PREVENTION; UNITED STATES | ) | |
| OF AMERICA, | ) | |
| | ) | |
| Defendants. | | |

---

## STATE OF ALASKA'S COMPLAINT FOR
## DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

### INTRODUCTION

1.     The State of Alaska, through the office of the Attorney General,

brings this action to challenge the U.S. Department of Health and Human

Services (HHS), Centers for Disease Control and Prevention's (CDC) October

Exhibit 3

31, 2020 Conditional Sailing Order and the technical guidance issued pursuant to that order.

2.      Alaska brings this action because the Conditional Sailing Order and technical guidance violate Federal law.

3.      This action is brought under:

a.      section 361(a), 42 U.S.C. § 264(a), of the Public Health Service Act, which grants the Secretary of HHS limited authority to make and enforce necessary regulations to prevent the introduction, transmission, or spread of communicable diseases.

b.      the Declaratory Judgment Act, 28 U.S.C. § 2201, which authorizes a federal district court in a case of actual controversy to declare the rights and other legal relations of an interested party seeking such declaration; and

c.      the Administrative Procedures Act (APA), 5 U.S.C. §§ 551 et seq., which provides a right of judicial review to persons suffering a legal wrong because of an agency action or adversely affected or aggrieved by agency action within the meaning of a relevant statute.

4.      By way of this lawsuit, the State of Alaska requests that the Court declare the parties rights and enjoin the defendants from enforcing the Conditional Sailing Order and technical guidance.

Exhibit 3

## PARTIES

5.    Plaintiff-Intervenor, the State of Alaska, is a sovereign state and has the authority and responsibility to protect its sovereignty, the wellbeing of its public fisc and the health, safety, and welfare of its citizens.

6.    Plaintiff State of Florida is a sovereign state and has the authority and responsibility to protect its sovereignty, the wellbeing of its public fisc and the health, safety, and welfare of its citizens.

7.    Defendants are the United States, appointed officials of the United States government, and United States governmental agencies responsible for the issuance and implementation of the challenged administrative actions.

8.    Defendant CDC is a component of the Department of Health and Human Services.

9.    Defendant Department of Health and Human Services is an agency of the United States.

10.    Defendant Rochelle Walensky is the Director of the CDC and is being sued in her official capacity.

11.    Defendant Xavier Becerra is the Secretary of HHS and is being sued in his official capacity.

Exhibit 3

## JURISDICTION AND VENUE

12.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331. The judicial review provisions of the APA waive sovereign immunity of the Federal government, and provide the right of judicial review for persons suffering a legal wrong because of agency action or who are adversely affected or aggrieved by agency action within the meaning of a relevant statute. 5 U.S.C. § 702–706.

13.     The APA authorizes this Court to decide all relevant questions of law, interpret constitutional, statutory, and regulatory provisions, and determine the meaning or applicability of the terms of an agency action, and to hold unlawful and set aside agency action that is not in accordance with law or is in excess of statutory authority. 5 U.S.C. § 706.

14.     The Court is authorized to award the requested declaratory and injunctive relief under 5 U.S.C. § 706, 28 U.S.C. § 1361, and 28 U.S.C. §§ 2201–02.

15.     Venue is proper in this Court under 28 U.S.C. § 1391(e) because this action is brought against officers of agencies of the United States in their official capacities and the actions and decisions challenged by this lawsuit were made, at least in part, in Florida and have a direct impact on the State of Florida. Venue lies in this district because Tampa Bay is a major cruise

4

Exhibit 3

port and a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## LEGAL BACKGROUND

16.    Section 361(a) of the Public Health Services Act, 42 U.S.C. § 264(a), authorizes the promulgation and enforcement of regulations to protect the public health against the introduction and interstate spread of communicable diseases:

> The [CDC], with approval of the [Secretary], is authorized to make and enforce such regulations as in his judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases from foreign countries into the States or possessions, or from one State or possession into any other State or possession. For purposes of carrying out and enforcing such regulations, the [Secretary] may provide for such inspection, fumigation, disinfection, sanitation, pest extermination, destruction of animals or articles found to be so infected or contaminated as to be sources of dangerous infection to human beings, and other measures, as in his judgment may be necessary.

17.    Pursuant to that statutory authority, HHS promulgated 42 C.F.R. § 70.2:

> Whenever the Director of the Centers for Disease Control and Prevention determines that the measures taken by health authorities of any State or possession (including political subdivisions thereof) are insufficient to prevent the spread of any of the communicable diseases from such State or possession to any other State or possession, he/she may take such measures to prevent such spread of the disease as he/she deems reasonable necessary, including inspection, fumigation, disinfection, sanitation, pest extermination, and destruction of animals or articles believed to be sources of infection.

5

Exhibit 3

18.    The CDC's regulations also state that it may require detention of a carrier until the carrier completes the necessary measures authorized by 42 U.S.C. § 264(a). 42 C.F.R. § 71.31(b). The regulations also state that the Director may issue a controlled free pratique to the carrier stipulating what authorized measures must be met. *Id.*

19.    The regulations further provide that whenever the CDC has "reason to believe that any arriving carrier or article or thing on board the carrier is or may be infected or contaminated with a communicable disease, [it] may require detention, disinfection, disinfestation, fumigation, or other related measures respecting the carrier or article or thing as [it] considers necessary to prevent the introduction, transmission, or spread of communicable diseases." 42 C.F.R. § 71.32(b).

20.    Section 365 of the Public Health Services Act, 42 U.S.C. § 268, requires consular or medical officers of the United States to report on the health conditions at the port or place at which such officer is stationed and requires customs and Coast Guard officers to aid in enforcement of quarantine rules and regulations.

Exhibit 3

## FACTUAL BACKGROUND

### I.   The CDC's Orders

21.    On March 13, 2020, members of the Cruise Lines International Association (CLIA) announced a pause in the operations of its members to assess and address the risks posed by the COVID-19 pandemic. CLIA is the world's largest cruise trade association; its members carry 95% of the world's oceangoing cruisers.

22.    On March 14, 2020, the CDC issued a No Sail Order and Suspension of Further Embarkation. This order applied to passenger-carrying vessels with a carrying capacity of 250 or more individuals operating in waters subject to the jurisdiction of the United States with an itinerary anticipating an overnight stay for passengers or crew. 60 Fed. Reg. 16628. The CDC renewed the No Sail Order in separate orders issued on April 9, July 16, and September 20, 2020. *See* 85 Fed. Reg. 21004, 85 Fed. Reg. 44085, 85 Fed. Reg. 62732.

23.    On June 19, 2020, CLIA announced that the major cruise lines voluntarily extended a suspension of operations out of U.S. ports until September 15, 2020. On August 5, 2020, CLIA again voluntarily extended the suspension, this time until October 31, 2020.

24.    The CDC's No Sail Orders prohibited cruise ship operators from disembarking or reembarking crew members except as directed by the United

Exhibit 3

States Coast Guard; prevented operators from embarking any new passengers or crew except as approved; directed cruise ship operators to observe health precautions as directed by the CDC; and directed operators to comply with all CDC recommendations and guidance relating to the passengers, crew, ship, or any article or thing on board the ship. 85 Fed. Reg. at 62737. As a condition of returning to cruise ship operations, the No Sail Orders required cruise ship operators to develop and implement a "robust plan to prevent, mitigate, and respond to the spread of COVID-19 among crew onboard cruise ships." *Id.* The orders further required operators to make this plan available to the CDC and address elements to adequately prevent, mitigate, and respond to the spread of COVID-19 among crew and minimize, to the greatest extent possible, any impact on government operations or the U.S. healthcare system. *Id.*

25.     The CDC cited §§ 361 and 365 of the Public Health Service Act, 42 U.S.C. §§ 264, 268 and 42 C.F.R. §§ 70.2, 71.31(b), and 71.32(b) as authority for the No Sail Orders. 85 Fed. Reg. at 62737.

26.     As a result of the pandemic, Alaska's 2020 cruise season was canceled.

27.     As of April 29, 2020, seven cruise ship operators—running approximately 95% of cruise ships subject to the No Sail Orders—had submitted the necessary response plan. 85 Fed. Reg. at 62734. As of

Exhibit 3

September 6, all five cruise ship operators with ships remaining in U.S. waters had submitted response plans that were "complete, accurate, and acknowledged." *Id.*

28.    On October 31, 2020, the CDC issued a "Conditional Sailing Order" that promised a "phased resumption of cruise ship passenger operations." 85 Fed. Reg. 70153 The initial phase consisted of testing and additional safeguards for crew members while the CDC ensures operators build the laboratory capacity needed to test future passengers. *Id.* Subsequent phases will include simulated voyages, certification for ships that meet specific requirements, and a phased return to passenger voyages. *Id.*

29.    On April 2, 2021, the CDC issued technical guidance for Phase 2a of its phased approach,[1] and imposed additional requirements under Phase 1.[2]

30.    For Phase 1, which applies to the ship's crew, the CDC, among other changes, increased from weekly to daily the reporting frequency of COVID-19 cases and illnesses, implemented routine testing of all crew based on the ship's color status, and updated the color-coding system used to classify ships' status with respect to COVID-19.

---

[1]    https://www.cdc.gov/media/releases/2021/s0402-conditional-sail-orders.html.

[2]    https://www.cdc.gov/quarantine/cruise/management/technical-instructions-for-cruise-ships.html.

9

Exhibit 3

31.     Among other requirements, Phase 1 provides the testing procedures for all crew members boarding cruise ships. Cruise ship operators must test all crew members on the day of embarkation. Operators must use a nucleic acid amplification test that the Food and Drug Administration (FDA) has authorized for emergency use and that has been evaluated on the FDA reference panel.[3] All embarking land-based crew must then immediately quarantine onboard for 14 days. All crew members must be tested a second time on day 14 of the quarantine using the same type of test used when they boarded. In comparison, any person entering the United States after international travel, must get tested no more than 3 days before he/she travels. For such international air travelers, the CDC will accept a viral test, which is either an antigen test or a nucleic acid amplification test.[4] Antigen tests are less expensive and more readily available then the nucleic acid amplification test.

32.     Phase 2a requires cruise operators to create "planning materials for agreements that port authorities and local health authorities must approve to ensure cruise lines have the necessary infrastructure in place to manage an outbreak of COVID-19 on their ships to include healthcare

---

[3]     Reference panels are an additional step to ensure the quality of the tests, validations of new assays, test calibration, and monitoring assay performance.

[4]     https://www.cdc.gov/coronavirus/2019-ncov/travelers/testing-international-air-travelers.html.

Exhibit 3

capacity and housing to isolate infected people and quarantine those who are exposed."[5] This plan, in addition to a host of other requirements, requires operators to obtain "medical care agreements" that include contractual arrangements to provide for emergency medical transport of critically ill persons and contractual arrangements with shoreside medical facilities to ensure that travelers receive appropriate clinical evaluation.[6] In these agreements, the cruise ship operator "must document that its contractual shoreside medical facilities or healthcare systems either singularly or collectively have enough medical capacity in the judgment of the local health authorities to care for travelers if an unanticipated outbreak of COVID-19 occurs on board its ships."[7]

33.    Along with the medical care agreements and other related requirements, cruise ship operators must enter housing agreements with shoreside facilities to allow for isolation of, and quarantine of, persons with suspected or confirmed COVID-19. The housing agreement provision includes another host of requirements, including an obligation by the cruise ship operator to "document that it has made contractual arrangements . . . in sufficient quantities as determined by the local health authorities to meet the

---

[5]     https://www.cdc.gov/media/releases/2021/s0402-conditional-sail-orders.html.

[6]     https://www.cdc.gov/quarantine/cruise/instructions-local-agreements.html.

[7]     *Id.*

Exhibit 3

housing needs of travelers until they meet CDC criteria to discontinue isolation."[8] In addition to the housing requirements, the CDC also directs the parties to the agreement—which includes the cruise ship operator, the U.S. port authority, and all health departments exercising jurisdiction over the port—to jointly consider the potential needs of travelers under quarantine and isolation. These needs include the availability and frequency of testing; availability of mental health services; pharmacy delivery, and other essential services; availability of security; a check-in process, including delivery of luggage; procedures to ensure daily monitoring of travelers in quarantine; procedures to minimize contact between travelers in quarantine and support staff; and post-isolation and post-quarantine procedures to allow travelers to safely return home.[9]

34.    The CDC has yet to issue technical guidance for Phase 2b—simulated voyages—or any of the other remaining phases. The Conditional Sailing Order provides that a cruise ship operator must provide written notice and request CDC's approval to conduct a simulation at least 30 days prior to the date on which the cruise ship operator proposes to conduct the simulation. 85 Fed. Reg. at 70160. The CDC does not explain why a cruise

---

[8]     *Id.*

[9]     *Id.*

Exhibit 3

ship must do a simulated voyage if it has successfully completed a cruise outside of U.S. waters using COVID-19 mitigation measures. After a simulated voyage, the cruise ship operator must submit the materials required for a conditional sailing certificate at least 60 days prior to the date on which the cruise ship operator proposes to commence restricted passenger operations. *Id*. Thus, even assuming the CDC had issued the technical guidance for the remaining phases, the Conditional Sailing Order specifies another 90-day process before a cruise ship operator may obtain a conditional sailing certificate.

35.     Alaska's cruise season is limited, extending from mid-May to early October each year. Unless the CDC's overly burdensome and opaque requirements are altered or lifted soon, it will be impossible for large-scale cruising to resume in the United States in time for any part of Alaska's 2021 season. And, given the CDC's current pace for issuing its technical guidance and the lead times necessary to arrange and market cruises, the CDC's action may jeopardize Alaska's 2022 cruise season as well.

## II.     The Impact to Alaska

36.     The CDC's orders have had an unsustainable impact on Alaska's economy.

37.     The State of Alaska lost millions in tourism revenues in 2020 and stands to lose even more if the cruise industry remains shut down for the

Exhibit 3

2021 cruise season. This revenue stems directly from the cruise industry and comes in the form of state taxes, fishing and hunting licenses, state park fees, passenger related revenues, and environmental compliance fees.

38.     Alaska's port and cruise line related communities lost thousands of jobs equating to millions in lost wages. These lost wages and lost jobs impact Alaska by depleting the state's Unemployment Reserve Trust.

39.     The total amount of direct loss to the State of Alaska resulting from the cancellation of the 2020 season was $1.7 billion, but the impact to Alaska's communities was even greater. This cancelation of the 2020 cruise season had a particularly negative impact in Southeast Alaska, where the economies of many communities are entirely dependent upon tourism.

40.     While it is more dramatically felt in Alaska's port and cruise line communities, the effects of CDC's orders extend throughout Alaska as thousands of cruise passengers visit interior Alaska each cruise season.

## III.   The cruise industry has successfully resumed cruises in other parts of the world.

41.     Royal Caribbean Group and Norwegian Cruise Line Holdings Ltd. convened a panel of experts in public health, infectious disease, biosecurity, epidemiology, hospitality, and maritime operations to examine every aspect of the cruise ecosystem and recommend the most effective,

Exhibit 3

scientifically sound ways to make the cruise experience healthier and safer. This panel is known as the Healthy Sail Panel.

42.     The Healthy Sail Panel welcomed observers from the CDC, CLIA, and other cruise lines.

43.     The Healthy Sail Panel offered 74 different recommendations that, if implemented, "would enable cruise operators to resume operations in ways that would minimize risk and would protect guests, crew, and destination communities." The Panel's recommendations were centered around four primary themes: (1) keep COVID-19 off ships; (2) mitigate the risk of infection; (3) protect destinations; and (4) detect and contain COVID-19.

44.     The report prepared by the Healthy Sail Panel was issued on September 21, 2020 and submitted to the CDC in response to its request for public comment. The CDC has not addressed the Healthy Sail Panel's recommendations.

45.     CLIA reviewed the Health Sail Panel's recommendations, and in September 2020, CLIA implemented a mandatory "Member Policy for Mitigation of COVID-19." CLIA made this policy mandatory for all its members, which includes 95% of the world's oceangoing cruisers. All ships impacted by the CDC's Conditional Sailing Order are members of CLIA.

Exhibit 3

46.     The cruise industry has resumed service in other parts of the world, including Europe, the South Pacific, and Asia. Of the nearly 400,000 passengers that have recently sailed on ships, there have been less than 50 confirmed cases of COVID-19.

47.     In the United States, over one million people traveled by plane for Thanksgiving in 2020. Nearly three million additional people flew in the days immediately following the holiday.

48.     Unlike cruise travel, the CDC has not shut down air travel (either international or domestically) or other transportation-related industries.

## IV.   The CDC's Conditional Sailing Order fails to consider current conditions.

49.     Before the CDC takes measures to prevent the spread of disease, it must "determine[] that the measures taken by health authorities of any State or possession (including political subdivisions thereof) are insufficient to prevent the spread of any of the communicable diseases from such State or possession to any other State or possession." 42 C.F.R. § 70.2.

50.     In issuing its Conditional Sailing Order or any following technical guidance, the CDC has not taken into consideration the specific actions taken by Alaska or its local health authorities.

Exhibit 3

51.     Alaska has continually had one of the highest vaccination rates in the country and became the first state to extend vaccine eligibility to anyone 16 and older. Vaccination rates have been particularly high in Southeast Alaska.

52.     Throughout the pandemic, Alaska's hospitalization rates have remained consistently low.

## FIRST CLAIM FOR RELIEF
### (Violation of the APA – Arbitrary and Capricious Agency Action)

53.     Alaska incorporates by reference each of the allegations in paragraphs 1 through 52.

54.     The APA provides that courts shall set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, or in excess of statutory jurisdiction, authority, or limitations. 5 U.S.C. § 706(2). Accordingly, the APA provides a statutory cause of action through which other statutes such as the Public Health Services Act may be enforced, and also a legal vehicle for judicial review of agency fact findings and agency exercise of discretion.

55.     The CDC's Conditional Sailing Order and technical guidance are contrary to law (Public Health Services Act and related regulations), an abuse of discretion, and arbitrary and capricious, and therefore must be set aside. 5 U.S.C. § 706.

Exhibit 3

56.     The CDC's Conditional Sailing Order and technical guidance do not take into consideration the measures taken by Alaska or its local health authorities as required by 42 C.F.R. § 70.2, or explain why those measures are inadequate.

57.     The CDC failed to take into consideration the unique circumstances of Alaska, subjecting the cruise industry to arbitrary and overly burdensome requirements with no justification.

58.     The CDC failed to explain why the cruise industry is subject to different and much more stringent requirements than other industries. For example, the CDC does not explain why it requires a nucleic acid amplification test for any person disembarking a cruise ship in U.S. waters when its guidance allows for a traveler to participate in a cruise overseas and then fly internationally and enter the United States with a negative antigen test.

59.     The CDC also failed to reasonably consider the proposed recommendations of the Healthy Sail Panel or CLIA's mandatory Member Policy for Mitigation of COVID-19 or the successful implementation of those recommendations in cruises occurring in other parts of the world.

60.     The CDC's Conditional Sailing Order and technical guidance are not factually supported and not a reasonable application of governing law.

Exhibit 3

61.     Although the CDC's Conditional Sailing Order concludes the "benefits of [reopening] outweigh the costs of not allowing cruise ships to sail," the CDC has failed to timely notify the cruise industry—as well as Alaska and its local communities—what requirements it will impose to reopen.

62.     For these and other reasons, the CDC's Conditional Sailing Order is arbitrary and capricious and represents an abuse of discretion.

## SECOND CLAIM FOR RELIEF
### (Violation of APA — Agency action not in accordance with law)

63.     Alaska incorporates by reference each of the allegations in paragraphs 1 through 62.

64.     The APA provides that courts shall set aside unlawful agency action that is not in accordance with the law. 5 U.S.C. § 706(2).

65.     The CDC's Conditional Sailing Order and technical guidance are not in accordance with the law because they exceed the CDC's statutory authority under § 361 of the Public Health Services Act, 42 U.S.C. § 264(a). They also exceed the scope of the CDC's own implementing regulations.

66.     Section 361 of the Public Health Services Act does not grant the CDC broad authority to impose any regulatory action simply because the Secretary believes those actions will help prevent the spread of disease. Instead, § 361 grants the CDC limited authority to take measures to regulate

Exhibit 3

"animals or articles found to be infected or contaminated" by providing for their "inspection, fumigation, disinfection, sanitation, pest extermination, [or] destruction." 42 U.S.C. § 264(a). CDC's reading of its statutory authority would be tantamount to creating a general federal police power.

67.     The CDC's Conditional Sailing Order and technical guidance exceed the statutory authority granted by § 361 because the CDC regulates more than animals or articles found to be infected or contaminated and requires more than inspection, fumigation, disinfection, sanitation, pest extermination, or destruction.

68.     The CDC's Conditional Sailing Order and technical guidance further violate the law because the CDC failed to consider the actions taken by Alaska and its local health authorities to prevent the spread of COVID-19 and it failed to make the necessary determination that Alaska's measures were insufficient. *See* 42 C.F.R. § 70.2.

### THIRD CLAIM FOR RELIEF
### (Violation of APA — Failure to Provide Notice and Comment)

69.     Alaska incorporates by reference each of the allegations in paragraphs 1 through 68.

70.     The APA requires federal agencies to provide notice and comment on substantive rules that affect individual rights and obligations.

Exhibit 3

71.     The "good cause" exception to the notice and comment requirement is "narrowly construed and only reluctantly countenanced." *Mack Trucks, Inc. v. E.P.A.*, 682 F.3d 87, 93 (D.C. Cir. 2012). The exception excuses notice and comment only in emergency situations, or where delay could result in serious harm.

72.     With regarding to CDC's Conditional Sailing Order and technical guidance, notice and comment was not "impracticable, unnecessary, or contrary to public interest." *See* 5 U.S.C. § 553(b)(B).

73.     By October 31, 2020, the cruise industry had been under a No Sail Order for seven months. The CDC did not issue its technical guidance for Phase 2a until April 2, 2021. There was no imminent threat to support an "impracticability" finding; this administrative rule is not "routine" or "insignificant" and therefore does not qualify as "unnecessary"; and there are no facts to support a finding that providing notice and comment, under these circumstances, would be "contrary to the public interest." *See Mack Trucks, Inc.*, 682 F.3d at 94–95. To the contrary, providing notice and comment in this situation would very much further the public interest by providing the cruise industry, states, and local communities the opportunity to participate in the process and inform the CDC of the actions they have already taken. *See* 42 C.F.R. § 70.2.

Exhibit 3

## FOURTH CLAIM FOR RELIEF
### (U.S. Const. Art. I, § 1 — Unconstitutional Exercise of Legislative Power)

74.     Alaska incorporates by reference each of the allegations in paragraphs 1 through 73.

75.     Article I, Section 1 of the U.S. Constitution provides that "[a]ll legislative powers herein granted shall be vested in a Congress of the United States."

76.     A reading of § 361(a), 42 U.S.C. § 264(a), of the Public Health Service Act, that grants the CDC the broad authority to take any measure as long as the Secretary believes those actions will help prevent the spread of disease would amount to an unlawful delegation of legislative power to the executive branch.

## PRAYER FOR RELIEF

For the foregoing reasons, the State of Alaska respectfully requests that this Court enter judgment providing the following relief:

A.     Vacate the Conditional Sailing Order and technical guidance as being contrary to law, arbitrary and capricious, and an abuse of discretion;

B.     Grant a Declaratory Judgment finding the Conditional Sailing Order and technical guidance are contrary to § 361(a), 42 U.S.C.

22

Exhibit 3

§ 264(a), of the Public Health Service Act and its implementing

regulations;

C.      Grant a Declaratory Judgment finding the Conditional Sailing

Order and technical guidance are arbitrary and capricious and an

abuse of discretion;

D.      Issue preliminary and permanent injunctive relief enjoining the

federal defendants from enforcing the Conditional Sailing Order

or technical guidance;

E.      Award Alaska its costs of litigation and attorneys' fees to the

extent recoverable under applicable law; and

F.      Grant Alaska such other and further relief as is just and

appropriate.

Dated April 20, 2021.         TREG R. TAYLOR
                              ATTORNEY GENERAL

                              Jessica M. Alloway,* *pro hac vice* pending
                              Alaska Bar No. 1205045
                              Assistant Attorney General
                              1031 West Fourth Avenue, Suite 200
                              Anchorage, AK 99501
                              Telephone: (907) 269-5275
                              Facsimile: (907) 276-3697
                              Email: jessie.alloway@alaska.gov
                              *Lead Counsel

Exhibit 3

Lael A. Harrison (*pro hac vice* pending)
Alaska Bar No. 0811093
Assistant Attorney General
123 4th Street, Suite 600
P.O. Box 110300
Juneau, AK 99811-0300
Telephone: (907) 465-3600
Facsimile: (907) 465-2520
Email: lael.harrison@alaska.gov

*/s/ Edward M. Wenger*
Mohammad O. Jazil (FBN 72556)
mjazil@hgslaw.com
Edward M. Wenger (FBN 85568)
edw@hgslaw.com
HOPPING GREEN & SAMS, P.A.
119 South Monroe Street, Suite 300
Tallahassee, Florida 32301
Phone: (850) 222-7500
Fax:  (850) 224-8551

Attorneys for State of Alaska

Exhibit 3