## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

STATE OF FLORIDA,

     *Plaintiff,*

     v.                     Case No. 8:21-cv-839-SDM-AAS

BECERRA, *et al.,*

     *Defendants.*

_____

## FLORIDA'S AMENDED MOTION FOR A PRELIMINARY INJUNCTION

The COVID-19 pandemic is a great tragedy. But that tragedy has been made worse by leaders who refuse to account for the human cost of shutting down society. Livelihoods have been destroyed, some of them permanently. Now, thankfully, vaccines are available to any adults who want them, and businesses have learned how to mitigate the spread of the virus. Most industries are now back to business, and it is long past time for the rest to follow suit.

The cruise industry in Florida cannot do so. It has been locked down for over a year. And this lockdown was not enacted pursuant to the State's police power, by the United States Congress, or even by the politically accountable President. Rather, it was imposed by the Centers for Disease Control and

Prevention ("CDC") pursuant to a limited delegation from Congress to inspect and disinfect property and animals.

Congress did not, in granting those limited powers, authorize the CDC to shut down a multi-billion-dollar industry for over a year. The plain text of the CDC's authority does not authorize these acts, even without applying the major-questions doctrine or clear-statement rule—both of which would apply to such radical power claimed by unaccountable federal bureaucrats. In any event, the CDC's actions—including its refusal to account for vaccines, other interventions, and the success of cruise industries abroad during the pandemic—violate the Administrative Procedure Act ("APA").

This Court should preliminarily enjoin the CDC's unlawful acts and allow the approximately 159,000 Floridians whose livelihoods depend on the cruise industry to get back to work. Without this Court's intervention, Florida will lose millions, if not billions, of dollars. And if companies like Carnival follow through on their threat to move operations abroad, the State of Florida may never be the same.

## BACKGROUND

_Florida's Cruise Industry_. The cruise industry is an essential part of Florida's economy. In 2019, the industry's direct expenditures in Florida generated "nearly 159,000 total jobs paying $8.1 billion in income." Ex. 1 at 14, 46. Of all cruise embarkations in the United States, about 60% embark from

Florida. *Id.* at 9, 12, 18, 45. In 2019, around 13.6 million cruise passengers and crew members came ashore in Florida. *Id.* at 14. These visitors spend money in Florida's local economies, and many Florida businesses depend on them. *Id.* at 45–47; Ex. 2 at 6–7.

*The COVID-19 Pandemic*. Beginning in early 2020, the COVID-19 pandemic devastated the cruise industry, as it did many industries. Outbreaks aboard cruise ships were a significant concern, and experts, public officials, and medical personnel had a limited understanding of the virus, how to treat it, and how to prevent its transmission. In March 2020, many cruise ships in the U.S. voluntarily ceased operations. ECF 1-3 at 9.

That same month the CDC began issuing nationwide lockdown orders against the cruise industry, just as many states issued lockdown orders against their citizens. *See* ECF 1-4. The CDC renewed its March Order on April 9, July 16, and September 30. *See* ECF 1-5, 1-6, 1-7. The cruise industry has been "ravaged," with "companies reporting billions of dollars in losses, causing some of them to downsize their fleets and sell ships for scrap." Ex. 3 at 2.

*The October 30 Conditional Sailing Order*. On October 30, 2020, the CDC offered the cruise industry a glimmer of hope. Just as many other industries have learned lessons during the pandemic and now operate with safety protocols, Exs. 4, 5, 6 (recommending measures like social distancing, mask wearing, and frequent cleaning for hotels, casinos, and sporting

3

events), the CDC indicated that the cruise industry could do the same. In its Conditional Sailing Order, the CDC purported to lift its lockdown order. It found that the "benefits of" opening "outweigh the costs of not allowing cruise ships to sail" so long as "cruise ships have taken the necessary precautions to mitigate risk." ECF 1-3 at 16. But the Order has been "nothing more than an extension of a cruise ban wrapped as a present." Ex. 7 at 7.

 The Order begins by incorporating the findings of the earlier lockdown orders, and it expressly relies on what occurred on cruise ships at the beginning of the pandemic when the entire world was struggling to control and understand the spread of COVID-19. ECF 1-3 at 8, 12. It also expressly bases its conclusions on the lack of an available vaccine. *Id.* at 8. The Order then praises the cruise industry for taking "steps to improve their public health response to COVID-19." *Id.* at 13.

Next, the Order discusses the CDC's "Request for Information" in July 2020, which appears to be the CDC's attempt to solicit feedback from the public without formally committing to notice and comment. *Id.* at 14. The Order then discusses the alternatives the CDC considered. It appears to have considered only two: (1) outright free rein for cruise ships with no oversight and no COVID-19 safety protocols and (2) continuing its lockdowns. *Id.* at 15–16.

After discussing these "alternatives," the Order explains its "plan" for reopening. This plan involves four phases: (1) "establishment of laboratory

4

testing of crew onboard cruise ships in U.S. waters," (2) "simulated voyages designed to test a cruise ship operator's ability to mitigate COVID-19 on cruise ships," (3) "a certification process," and (4) "a return to passenger voyages in a manner that mitigates the risk of COVID-19." *Id.* at 16–17. And unlike the previous orders, which were for a short time, the Conditional Sailing Order is effective for a year, until November 1, 2021. *Id.* at 41. So unless cruise companies can complete the four-phase process, the CDC will lock them down until at least November 1, 2021.

The federal government recognizes the scope of these decisions. The Order provides that if it "qualifies as a rule" then the Office of Information and Regulatory Affairs ("OIRA") "has determined that [the Order] would be a major rule" under the Congressional Review Act, 5 U.S.C. § 804(2). ECF 1-3 at 19.

Much has changed since the CDC promulgated the Order in October 2020. *First*, multiple vaccines are now widely available. Over 50% of American adults have received one vaccine dose and 33% are fully vaccinated.[1] And the CDC now admits that fully vaccinated people who cruise in other countries "do not need to self-quarantine after cruise travel." Ex. 8 at 2.

---

[1] CDC, *COVID-19 Vaccinations in the United States*, https://covid.cdc.gov/covid-data-tracker/#vaccinations (last visited April 22, 2021).

*Second*, the cruise industry is "stirring to life" abroad. Ex. 3 at 2. European and Asian cruises, for example, are reopening with "resounding success." Ex. 7 at 6. Around 400,000 passengers have cruised "following stringent, science-based protocols that resulted in a far lower incident rate than on land." Ex. 9 at 3; *see also* Ex. 10 at 6:14–18. In fact, the CDC recommends that passengers on those cruises follow safety protocols like social distancing, wearing masks, and handwashing. Ex. 8 at 3.

*Third*, other industries—such as airlines, bus lines, hotels, restaurants, universities, theme parks, casinos, and bars—have reopened without facing CDC lockdowns, even those that hold people in close quarters. For example, the CDC has not shut down the airline industry—focusing instead on "cleaning of aircraft" and "recommendations for hand hygiene." Ex. 11 at 2–4.

As these advancements were rendering the burdensome, four-phase reopening process for cruises obsolete, the CDC made little progress. Almost six months in, no cruise company has begun phase *two* test voyages. At a March 18, 2021 Senate hearing, Senator Lisa Murkowski of Alaska asked Defendant CDC Director Walensky to "give . . . some indicator in terms of a timeline" for phase two. ECF 1-8 at 7. Defendant Walensky responded, "I can't." *Id*.

At this rate, the CDC will likely continue its lock down until November. That means the cruise industry will miss out—again—on the critical summer cruising season. Although the CDC issued new guidance on April 2, 2021, this

guidance is only some of what the industry needs before it can start phase *two* test voyages. Ex. 12; Ex. 13; Ex. 14; Ex. 10 at 6:19–7:2; Ex. 8 at 2. And the new guidance does not adequately account for the CDC's recent statement that "fully vaccinated people can travel at low risk to themselves," Ex. 15 at 2, or its admission that—contrary to earlier claims—"touching surfaces is not thought to be a common way that COVID-19 spreads." Ex. 16 at 3.

The latest guidance makes clear that the CDC does not intend to proceed with reopening the cruise industry in good faith—in fact, one commentator recently referred to the CDC's process as a "ruse" designed to "keep the industry docked." Ex. 17 at 3. Florida now seeks relief from this Court.

## LEGAL STANDARD

A plaintiff seeking a preliminary injunction must establish (1) "that he is likely to succeed on the merits," (2) "that he is likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the balance of equities tips in his favor," and (4) "that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

## ARGUMENT

## I.   FLORIDA IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS

### a. *The Conditional Sailing Order violates the APA.*

Under the APA, courts must "hold unlawful and set aside" agency action that is "in excess of statutory jurisdiction, authority, or limitations"; that is

"not in accordance with law"; or that is "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A), (C). These are disjunctive, so "[e]ven when an administrative agency did not act 'in excess of statutory jurisdiction,' . . . it still may have acted arbitrarily and capriciously." *In re Gateway Radiology Consultants, P.A.*, 983 F.3d 1239, 1262–63 (11th Cir. 2020).

   i. <u>The Conditional Sailing Order exceeds the CDC's authority</u>.

  Defendants have "gone beyond what Congress has permitted [them] to do." *City of Arlington v. FCC*, 569 U.S. 290, 298 (2013). The CDC bases its Conditional Sailing Order mainly on 42 U.S.C. § 264, but also on a handful of regulations. ECF 1-3 at 20.[2] Because neither that statute nor the cited regulations give the CDC the power it claims, its actions violate the APA. *See City of Arlington*, 569 U.S. at 298.

  **1.** Section 264 gives the CDC the authority to "make and enforce such regulations as in [its] judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases from foreign countries into the States or possessions, or from one State or possession into any other State or possession." 42 U.S.C. § 264(a). But in the next sentence, the statute clarifies that to "carry[] out and enforc[e]" those regulations, Congress authorizes the

---

[2] 42 U.S.C. § 268—which the CDC also references in the Order (ECF 1-3 at 20)—authorizes the CDC to enlist the help of other officers to enforce its rules but does not grant any more authority. And neither do 18 U.S.C. § 3559, 18 U.S.C. § 3571, and 42 U.S.C. § 271—also cited by the Order (ECF 1-3 at 20)—which address sentencing, fines, and penalties. And 42 U.S.C. § 243 (ECF 1-3 at 20) authorizes the CDC only to accept help from states.

CDC only to conduct "such inspection, fumigation, disinfection, sanitation, pest extermination, destruction of animals or articles found to be so infected or contaminated as to be sources of dangerous infection to human beings, and other measures, as in [the CDC's] judgment may be necessary." *Id.*

This second sentence clarifies the narrow nature of the CDC's authority. "[W]here general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114–15 (2001).[3] The residual phrase "other measures," 42 U.S.C. § 264(a), is "controlled and defined by reference to the enumerated categories . . . before it," *Circuit City,* 532 U.S. at 115. These "other measures" thus are limited to measures like "inspection, fumigation, disinfection, sanitation, [and] pest extermination," and they are applied to "animals or articles" that are "so infected" that they are "sources of dangerous infections to human beings." § 264(a). Put differently, the "second sentence . . . lists illustrative examples of the types of actions the CDC may take" and against whom or what the CDC may take those actions. *Skyworks, Ltd. v. CDC*, 2021

---

[3] *Accord Paroline v. United States*, 572 U.S. 434, 447 (2014) (Catch-all terms "bring[] within a statute categories similar in type to those specifically enumerated."); Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 199 (2012) ("Where general words follow an enumeration of two or more things, they apply only to persons or things of the same general kind or class specifically mentioned (*ejusdem generis*)."); *see also Reading Law at* 195 ("Associated words bear on one another's meaning (*noscitur a sociis*).").

WL 911720, at *9 (N.D. Ohio Mar. 10, 2021). And those examples limit the scope of the CDC's authority. *Id.* (so holding).

The ordinary meaning of the text, then, is that Congress authorized the CDC to take only "other measures" that are "similar in nature" to inspecting and disinfecting animals and articles. The Sixth Circuit recently agreed with that conclusion in denying the CDC a stay of an injunction against its eviction moratorium.  "Plainly," the Sixth Circuit explained, "government intrusion on property to sanitize and dispose of infected matter" under § 264 "is different in nature from a moratorium on evictions." *Tiger Lily, LLC v. HUD*, --- F.3d ---, 2021 WL 1165170, at *3 (6th Cir. 2021).

Moreover, given the gravity of the power the CDC claims,[4] it must identify a clear statement from Congress, which it cannot do. Congress does not "hide elephants in mouseholes," *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001), and it "speak[s] clearly if it wishes to assign to an agency decisions of vast economic and political significance," *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) (quotation omitted).[5] While the statutory text

---

[4] The CDC admits that if the Conditional Sailing Order "qualifies as a rule"—which it does—then OIRA has determined it is a "major rule." ECF 1-3 at 19. That means the Order is likely to have at least a $100 million effect on the economy or some other significant—or "major"—adverse effect, Ex. 18; 5 U.S.C. § 804(2).

[5] *Accord FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000) ("Congress could not have intended to delegate a decision of such economic and political significance to an agency in so cryptic a fashion."); *King v. Burwell*, 576 U.S. 473, 485–86 (2015) (similar); *Indus. Union Dep't v. API*, 448 U.S. 607, 645 (1980) (plurality op.) (similar); *U.S. Telecom Ass'n v. FCC*, 855 F.3d 381, 417 (D.C. Cir. 2017) (Kavanaugh, J., dissenting from denial of

does not support the CDC's position at all, it certainly does not satisfy that higher standard.

Finally, to the extent § 264 is ambiguous—a point Florida contests—Courts also must avoid interpretations that raise significant "constitutional questions." *Jones v. United States*, 529 U.S. 848, 857 (2000). Accepting the CDC's "broad construction" of its statutory authority "raises . . . concerns about federalism" and "concerns about the delegation of legislative power to the executive branch." *Tiger Lily*, 2021 WL 1165170, at *4. If this Court determines that § 264 is ambiguous, it should adopt Florida's reading of the statute.

**2.** Beyond § 264, the Order relies on 42 C.F.R. §§ 70.2, 71.31(b), and 71.32(b).[6] ECF 1-3 at 20. But if the CDC lacks the statutory authority under § 264 for the Order—which it does—regulations implementing § 264 cannot grant the CDC more authority. *See, e.g.*, *Am. Fin. Servs. Ass'n v. FTC*, 767 F.2d 957, 965 (D.C. Cir. 1985). Further, these regulations fail to move the needle, and § 70.2 provides an independent basis to find the Conditional Sailing Order unlawful.

Section 70.2 largely tracks the relevant language of § 264 and fails to

---

rehearing en banc) ("[T]he Supreme Court has required *clear* congressional authorization for major agency rules of this kind."); *see also Gregory v. Ashcroft*, 501 U.S. 452, 460–61 (1991) (discussing "plain statement rule").

[6] The CDC also cites two more regulations as authority to issue and enforce the Order. These regulations address penalties and fines, but do not grant more authority. ECF 1-3 at 20 (citing 42 C.F.R. §§ 70.18 and 71.2).

authorize the challenged acts for the same reasons. But § 70.2 renders the Order ultra vires for another reason. Section 70.2 allows the CDC to exercise its § 264 authority only if it first "determines that the measures taken by" a state "are insufficient to prevent the spread" of a communicable disease "from such State . . . to any other State." 42 C.F.R. § 70.2. The CDC, however, refused to consider measures by Florida and the industry, claiming that § 70.2 is per se satisfied because "[c]ruise ships by their very nature travel interstate and internationally." ECF 1-3 at 19. That argument proves too much. Livestock and people, for example, also travel internationally and cross state lines. The CDC's regulations require it to consider the adequacy of Florida's measures and it did not do so.

Nor do any of the other regulations the CDC cites authorize the Conditional Sailing Order. Section 71.31 addresses inspecting ships, including detaining them for the limited period needed to conduct the inspection. Subpart (a) allows inspection if a carrier reports that any of its passengers are sick or died or if the carrier is importing articles that require disinfection under § 71.42. Subpart (b) allows the CDC to "require detention of a carrier until completion of the measures outlined in this part." These measures include, for example, "non-invasive procedures . . . to detect the potential presence of communicable diseases," § 71.20(a); "requir[ing] individuals to provide contact information," § 71.20(b); determining whether to inspect a ship, § 71.31(a);

quarantining arriving individuals, §§ 71.32–33; requiring medical examinations of arriving individuals, § 71.36; and disinfecting cargo, § 71.42. These are detailed, explicit "measures" the CDC may take to inspect ships. Shutting down the cruise industry is not such a "measure." And if the CDC argues that its Conditional Sailing Order is the "detention of a carrier" under § 71.31(b), that detention is authorized only for the limited period needed to conduct authorized inspections and quarantines. The CDC cannot detain cruise ships indefinitely.

Section 71.32(b) similarly allows the CDC to "require detention, disinfection, disinfestation, fumigation, or other related measures" when the CDC "has reason to believe that any arriving carrier or article or thing on board the carrier is or may be infected or contaminated with a communicable disease." As with § 71.31(b), the "detention" must be limited to the time needed to disinfect the ship and complete "other related measures."

Properly read, these regulations make sense as an outflow of § 264,[7] which allows the government in limited situations to sanitize and disinfect certain objects, quarantine sick individuals, and take other similar measures.

---

[7] "It is a 'foundational principle of administrative law' that judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.'" *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1907 (2020). The CDC represented that it issued the Order under 18 U.S.C. §§ 3559, 3571; 42 U.S.C. §§ 243, 264, 268, 271; and 42 C.F.R. §§ 70.18, 70.2, 71.2, 71.31(b), 71.32(b). ECF 1-3 at 20. Florida has addressed those here and the CDC may not now rely on new statutes and regulations.

They do not allow a year-long industry shutdown.

ii.  <u>The Conditional Sailing Order is arbitrary and capricious</u>.

Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary [or] capricious," as Defendants' actions are here. 5 U.S.C. § 706(2)(A).

*First*, Defendants ignored important aspects of the problem. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Michigan v. EPA*, 576 U.S. 743, 751–53, 759–60 (2015). The lack of a vaccine in October 2020 was central to Defendants' decision to impose a burdensome framework on the cruise industry. ECF 1-3 at 8. But Defendants did not consider the fact that vaccines would be available long before the Order expires in November 2021—even though one month before he signed the Order, then-CDC Director Robert Redfield told the U.S. Senate to expect a vaccine in late 2020.[8] And Defendants have made inadequate efforts to consider the significant developments on that front since.[9] Defendants also have not tried to account for the success of foreign cruise companies, which operate with COVID-19 protocols. Instead, they rely on stale information from the

---

[8] U.S. Sen. Comm. on Appropriations, *Review of Coronavirus Response Efforts*, 1:26:30–1:28:00 (Sept. 16, 2020), https://www.appropriations.senate.gov/hearings/review-of-coronavirus-response-efforts.

[9] CDC, *COVID-19 Vaccinations in the United States*, https://covid.cdc.gov/covid-data-tracker/#vaccinations (last visited April 22, 2021).

beginning of the pandemic before industries and public-health officials learned how businesses could operate safely. ECF 1-3 at 3–4 (incorporating "findings and other evidence" from March 2020).

*Second*, Defendants' reasoning is inadequate. *See Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016). "The agency 'must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Id.* The CDC found that "[t]he benefits of" opening the cruise industry "outweigh the costs of not allowing cruise ships to sail." ECF 1-3 at 16. But its actions—specifically, continuing to lock down the industry—do not rationally connect to that conclusion. *Accord Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1111 (D.C. Cir. 2019) ("An agency cannot ignore its prior factual findings that contradict its new policy.").

Facts on the ground further contradict the CDC's reasoning. The Conditional Sailing Order purportedly seeks to "prevent the further introduction, transmission, and spread of COVID-19 into and throughout the United States." ECF 1-3 at 9. But the Order has caused American cruise passengers to board American flights—which the CDC has not locked down—to fly to other countries, cruise, and then fly back to the United States, at which point they need not quarantine. Ex. 9 at 3; Ex. 10 at 11:9–13. The CDC's reasoning behind shutting down the cruise industry is therefore flawed.

15

The Conditional Sailing Order also reasons that it is necessary because "measures taken by State and local health authorities regarding COVID-19 onboard cruise ships are inadequate," ECF 1-3 at 19, and that COVID-19 "transmission has not been controlled sufficiently by the cruise ship industry." ECF 1-3 at 17. But the cruise industry has not operated since March 2020. And the Order does not even consider measures taken or proposed by Florida, its local governments, or the cruise industry since then.

*Third*, Defendants ignored lesser alternatives, *see DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020); *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009), such as imposing safety protocols. *See* Ex. 8 at 3; Ex. 9 at 3. The CDC instead took an all-or-nothing approach, considering only two extreme "alternatives": continuing the cruise-industry lockdown or letting the industry sail with zero safety measures. That is especially glaring because the CDC considered lesser alternatives for every other industry.

*Fourth*, Defendants failed to explain their differential treatment of the cruise industry versus other industries. Agencies "must treat similar cases in a similar manner." *Kreis v. Sec'y of Air Force*, 406 F.3d 684, 687 (D.C. Cir. 2005). If they don't, they must explain why, *W. Deptford Energy, LLC v. FERC*, 766 F.3d 10, 20 (D.C. Cir. 2014), and provide a "legitimate reason," *Kreis*, 406 F.3d at 687. But Defendants did not even try to explain why they chose to lock down the cruise industry but not lock down hotels, casinos, airlines, sporting

events, and similar industries that involve people in close quarters.

*Fifth*, Defendants have acted in an arbitrary and capricious manner by failing to meaningfully follow their own Conditional Sailing Order. The Order provides that cruise lines will be able to complete a four-phase framework and "return to passenger operations." ECF 1-3 at 16–17. But the CDC has neither provided cruise lines an opportunity to complete the framework nor allowed any cruise line to return to passenger operations, even though, again, the CDC has found that the "benefits of" opening "outweigh the costs of not allowing cruise ships to sail." ECF 1-3 at 16.

### iii. The CDC is unlawfully withholding or unreasonably delaying actions to which it has committed.

If the Court determines that the CDC does have the statutory authority to promulgate the Conditional Sailing Order and shut down the cruise industry—which it does not—then the CDC is violating its own Order. Almost six months later, the cruise industry remains stuck in phase one. By refusing to comply with its own order, the CDC is unlawfully withholding and unreasonably delaying its own action under the APA. 5 U.S.C. § 706.

### iv. The CDC failed to provide notice and comment.

The APA required Defendants to provide notice of, and receive comment on, the Conditional Sailing Order because it is a substantive rule that "affect[s] individual rights and obligations." *Chrysler Corp. v. Brown*, 441 U.S. 281, 303

(1979); *see* 5 U.S.C. § 553. The Order—among other things—prevents the cruise industry from sailing, cruise-industry employees from working, and Florida's hotels, restaurants, gas stations, and other industries from receiving the business of would-be cruise passengers. Ex. 1 at 45–47; Ex. 2 at 6–7. And it causes Florida to pay unemployment benefits, deprives Florida of tax revenue, and harms Florida's economy, ports, and public fisc. The CDC also admits that, if it is a rule, it is a major rule with at least a $100 million impact. ECF 1-3 at 19; Ex. 18; 5 U.S.C. § 804(2).

Defendants, however, failed to conduct proper notice and comment rulemaking. They rely on the "good cause" exception to the notice requirement, *see* 5 U.S.C. § 553(b)(B), and the year-old "emergency" of COVID-19, arguing that it would be "impractical" and "contrary to the public's health, and by extension the public interest," to go through proper rulemaking procedures. ECF 1-3 at 19.

"[A] mere recital of good cause," though, "does not create good cause." *Mobil Oil Corp. v. DOE*, 610 F.2d 796, 803 (Temp. Emer. Ct. App. 1979). Further, the good-cause exception "is to be narrowly construed and only reluctantly countenanced." *Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 93 (D.C. Cir. 2012). The CDC's position is that whenever it thinks the APA's rulemaking procedures are "contrary to the public's health" then, "by extension," those procedures also are contrary to the "public interest." ECF 1-3 at 20–21. But

that argument proves too much because the CDC's regulations always address the public health (or at least should).

Good cause based on the "impracticalities" of notice and comment also does not exist when the agency has sufficient time to provide notice and comment. *See Kollett v. Harris*, 619 F.2d 134, 145 (1st Cir. 1980); *Regeneron Pharm., Inc. v. HHS*, 2020 WL 7778037, at *11–12 (S.D.N.Y. Dec. 30, 2020). So even if the good-cause exception applied in March 2020, it no longer applies in April 2021. Moreover, this exception to notice and comment is supposed to be temporary—meaning the agency should conduct notice and comment after promulgating the rule, which the CDC has not done. *See Am. Fed'n of Gov't Emps. v. Block*, 655 F.2d 1153, 1158 (D.C. Cir. 1981).

And although the CDC asked the public questions back in July 2020, 85 Fed. Reg. 44083, the CDC did not respond or even attempt to address in any meaningful way the answers provided to it. ECF 1-3 at 14–15. This failure suggests the CDC correctly did not view that process as satisfying the APA's formal notice and comment requirements, and even if it did, the CDC's failure to respond is fatal. "An agency must consider and respond to significant comments received during the period for public comment." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015).

Finally, asking the public questions is a far cry from 5 U.S.C. § 553's mandate to publish notice of "the terms or substance of *the proposed rule* or a

19

description of the subjects and issues involved." *See Nat'l Lifeline*, 921 F.3d at 1115 (emphasis added). "For notice to be sufficient, the final rule must be 'a logical outgrowth' of the proposed rule" so that "the affected party 'should have anticipated' the agency's final course in light of the initial notice." *Id.* (citation omitted).

### b. *The Conditional Sailing Order violates the Constitution.*

Even if Florida's claims were unreviewable under the APA—and they are not—Florida remains entitled to an injunction. If the Conditional Sailing Order does not exceed the authority under § 264 and the relevant regulations, then § 264 and those regulations constitute an unconstitutional exercise of lawmaking by the executive branch. They would afford the CDC the power to determine the rights of millions of citizens, to decide on the survival of countless businesses, and to make a host of sweeping, substantial economic policy decisions absent meaningful accountability.

The Sixth Circuit already recognized this dilemma. In *Tiger Lily*, the government—as it is sure to do here—proposed that § 264's phrase "other measures" is a "broad grant of authority to impose any number of regulatory actions, provided the Secretary believes those actions will help prevent the spread of disease." 2021 WL 1165170, at *4. But the Sixth Circuit explained that such a "broad construction" raises "concerns about the delegation of legislative power to the executive branch." *Id.* So too here.

II.   **FLORIDA HAS STANDING TO CHALLENGE THE CONDITIONAL SAILING ORDER, WHICH HAS IRREPARABLY HARMED FLORIDA AND WILL CAUSE FURTHER IRREPARABLE HARM.**

States are entitled to "special solicitude" in the standing context. *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007); *see also Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607 (1982) (recognizing states' "quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general"). Moreover, a "state has standing to sue in its sovereign capacity when it has suffered an economic injury" or must "expend[] any of its resources." *Chiles v. Thornburgh*, 865 F.2d 1197, 1208 (11th Cir. 1989). For example, the Eleventh Circuit has "readily conclude[d]" that Florida had standing to challenge an allegedly illegal agency action there that "*may* adversely impact" its "economy" and "thereby injur[e]" Florida. *Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1130 (11th Cir. 2005) (emphasis added).[10]

And economic harm caused by federal agency action also establishes irreparable harm. These harms "cannot be undone through monetary remedies," *Ferrero v. Associated Materials Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991), because the United States has sovereign immunity, *Odebrecht*

---

[10] Florida also "has an interest in securing observance of the terms under which it participates in the federal system." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607–08 (1982). But the CDC has denied Florida the ability to participate in the APA-mandated notice-and-comment rulemaking process, among other things.

*Const., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1289 (11th Cir. 2013).[11]

Florida has suffered—and is likely to continue to suffer—hundreds of millions of dollars in economic harm, perhaps more. Since March 1, 2020, the Conditional Sailing Order has forced Florida to expend around $20 million in state unemployment benefits alone. Ex. 19 at 3. Florida has also lost tens of millions of tax dollars, if not more, from cruise-passenger activities. *See, e.g.*, Ex. 20 at 44; Ex. 21 at 29; Ex. 22 at 10; Ex. 23 at 36; Ex. 24 at 27; Ex. 25 at 3. And Florida's ports have lost even more. Ex. 26 at 3–4.

And these numbers do not account for the full economic effect on Florida. Florida's hotels, restaurants, gas stations, and many other industries benefit from would-be cruise passengers. Ex. 1 at 45–47; Ex. 2 at 6–7; Ex. 27 at 2.

Most pressing, the important summer cruising season is fast approaching, Ex. 10 at 6:19–7:2, and the cruise industry is ready to reopen, *e.g.*, Ex. 9 at 2; Ex. 28 at 2–3; Ex. 10 at 5:7–20. If it does not reopen soon, cruise lines are considering relocating abroad—some already have. Ex. 10 at 11:2–8; Ex. 28 at 4; Ex. 29. They may never come back.

---

[11] *Accord California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018) (noting that states challenging federal agency action "will not be able to recover monetary damages"); *Chamber of Commerce v. Edmondson*, 594 F.3d 742, 770–71 (10th Cir. 2010) (same).

## III.   THIS COURT MAY REVIEW THE CONDITIONAL SAILING ORDER.

The Conditional Sailing Order is final agency action that is subject to judicial review. The Conditional Sailing Order "mark[s] the consummation of the agency's decisionmaking process"—it is not "merely tentative or interlocutory." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1813 (2016). And it determines "rights or obligations . . . from which legal consequences will flow." *Id.* The Order has already caused—and is causing— irreversible and significant consequences for Florida and others. *See* § II. It is final agency action.

Florida also satisfies the zone-of-interest requirement. The CDC acknowledges as much in its own regulations, requiring the CDC to first establish that Florida has failed to take sufficient health measures before intruding on Florida's sovereignty. *See* 42 C.F.R. § 70.2; *see also* 42 U.S.C. § 243. Further, the CDC's actions have devastated Florida's economy and its citizens and have cost the State hundreds of millions of dollars.

"[T]he zone of interests adequate to sustain judicial review is particularly broad in suits to compel federal agency compliance with law." *FAIC Sec., Inc. v. United States*, 768 F.2d 352, 357 (D.C. Cir. 1985) (Scalia, J.). In other words, "in the APA context, . . . the [zone of interests] test is not 'especially demanding,'" *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014), and courts do not "require any 'indication of

23

congressional purpose to benefit the would-be plaintiff.'" *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012).

Finally, nothing else prevents this Court from reviewing the Conditional Sailing Order. The APA creates a "basic presumption of judicial review." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2567 (2019). "[A] very narrow exception" to that presumption exists, however, when an action is "committed to agency discretion by law." *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 410 (1971); 5 U.S.C. § 701(a)(2). This action is not one of those "rare instances" because § 264 is not "drawn in such broad terms that . . . there is no law to apply." *Overton Park*, 401 U.S. at 410; *accord Forsyth Cty. v. U.S. Army Corps of Eng'rs*, 633 F.3d 1032, 1040–41 (11th Cir. 2011). The law to apply is clear. Indeed, the Sixth Circuit already has applied it to explain why the CDC exceeded its authority when trying to rely on § 264 to pause evictions. *Tiger Lily,* 2021 WL 1165170, at *3–4.

## IV.   THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST FAVOR PRELIMINARY INJUNCTIVE RELIEF.

The equities and public-interest factors merge for federal-government action. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Both favor an injunction here. "Forcing federal agencies to comply with the law is undoubtedly in the public interest." *Cent. United Life., Inc. v. Burwell*, 128 F. Supp. 3d 321, 330 (D.D.C. 2015). And "[t]he effect on the health of the local economy is a proper

consideration in the public interest analysis." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1138 (9th Cir. 2011). It also is "against the public interest to force a person out of a job." *Vencor, Inc. v. Webb*, 829 F. Supp. 244, 251 (N.D. Ill. 1993). The Conditional Sailing Order does just that— for an entire industry.

## V.   NO BOND IS REQUIRED UNDER RULE 65(c).

"[T]he amount of security . . . is a matter within the discretion of the trial court." *BellSouth Telecomm. v. MCIMetro Access Transmission Servs.*, 425 F.3d 964, 971 (11th Cir. 2005).

## CONCLUSION

For all these reasons, the Court should grant Florida's motion for a preliminary injunction.

Respectfully submitted,

Ashley Moody
ATTORNEY GENERAL

John Guard
CHIEF DEPUTY ATTORNEY GENERAL

James H. Percival* (FBN 1016188)
CHIEF DEPUTY SOLICITOR GENERAL
*Lead Counsel

Jason H. Hilborn (FBN 1008829)
ASSISTANT SOLICITOR GENERAL

/s/ *Anita Patel*
Anita Patel (FBN 70214)
SENIOR ASSISTANT ATTORNEY GENERAL

Office of the Attorney General
The Capitol, PL-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
james.percival@myfloridalegal.com
jason.hilborn@myfloridalegal.com
anita.patel@myfloridalegal.com
*Counsel for the State of Florida*

May 5, 2021

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 5th day of May, 2021 a true and correct copy of the foregoing was filed with the Court's CM/ECF system, which provides notice to all parties.

/s/ *Anita Patel*
Anita J. Patel