IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | | |
|---|---|---|
| STATE OF FLORIDA,<br>  *Plaintiff*, | §<br>§<br>§ | |
| v. | §<br>§ | Civil Action No. 8:21-CV-00839 |
| XAVIER BECERRA, Secretary of Health and Human Services, in his official capacity; HEALTH AND HUMAN SERVICES; ROCHELLE WALENSKY, Director of the Centers for Disease Control and Prevention, in her official capacity; CENTERS FOR DISEASE CONTROL AND PREVENTION; The UNITED STATES OF AMERICA,<br>  *Defendants*. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | |

## STATE OF TEXAS' MOTION TO INTERVENE

1.  COVID-19 has coupled tragic loss of life with deep economic pain. In the Spring of 2020, Americans and the world sought to slow a scarcely-understood pandemic. Government officials, business owners, and citizens made difficult decisions with little data on how the virus spread or how to treat it, and with no way to test for it, or to vaccinate against it. But now, thanks to better understanding of COVID-19 transmission, improved treatment and testing options, and a variety of miraculous vaccines, we are turning the corner.

2.  Unfortunately, government policy has not always kept pace with medical

1

advancement against the pandemic. The resulting prolonged economic shutdown has left many people—and, in some cases, entire industries—facing financial ruin. The Center for Disease Control and Prevention ("CDC") has issued a series of "no-sailing" or "conditional-sailing" orders that have brought the Texas passenger cruise industry, and the community of businesses supporting and benefitting from that industry, to a halt. The CDC's outdated and unlawful regulation harms the State of Texas, its economy, and its citizens.

3. The State of Texas moves to intervene in support of Plaintiff, the State of Florida, as of right pursuant to Federal Rule of Civil Procedure 24(a)(2) or, alternatively, in permissive intervention pursuant to Federal Rule of Civil Procedure 24(b). Texas is a sovereign state and has the authority and responsibility to protect its sovereignty, the wellbeing of its public fisc, and the health, safety, and welfare of its citizens. This litigation concerns the lawfulness of a CDC regulatory order with a profound effect on the Texas public fisc, including tax revenues to the state and the well-being of multiple industries vital to the State's economy. The CDC order also raises constitutional concerns bearing on the lawfulness and reach of the CDC's authority.

## I.     BACKGROUND

### A.     Before COVID -19, the Unique Texas Cruise Industry Flourished

4. The passenger cruise industry in Texas operates primarily out of the Port of

Galveston, where nearly 1.1 million cruise passengers embarked in 2019. *See* Exh. 1, 47, attached to Exh. A, hereto (hereinafter, "Exh. 1"). The Texas cruise industry has grown quickly and steadily for nearly a decade. *See* Exh. 2, 7, attached to Exh. A, hereto (hereinafter, "Exh. 2"). Galveston accounted for nearly 8% of U.S. cruise embarkations before the pandemic. *Id*. In 2018, cruise visitor spending in Texas exceeded an estimated $65 million. *Id*., 8. Cruise ships accounted for 47% of the Port of Galveston's revenue in 2019. *Id*. This volume of traffic also helped keep pilots, tugs, and longshoremen operational and employed.

5.   The impact of Texas' cruise industry reaches inland, as well. Hotels, restaurants, bars, retail stores, entertainment venues, touring ventures, and airlines all benefit from Texas' cruise industry. *Id*. In 2019, tourism-related businesses like travel agencies, airlines, and hotels received some $816 million in direct cruise industry expenditures in Texas. Exh. 1, 47. Another $452 million in such expenditures went to petroleum refiners, along with wholesale trade and advertising agencies. *Id*. Texas food processors, machinery and computer equipment manufacturers, apparel manufacturers, software publishers, communication and navigation equipment manufacturers and distributors, insurance carriers, legal professionals, architects and engineers all also benefit from the Texas cruise industry. *Id*., 47-48. These direct

expenditures created almost 29,600 jobs and $1.8 billion in income in 2019. *Id.*, 48.

**B.    As the Pandemic Began, the CDC Issued a No-Sailing Order**

6.    In March 2020, in response to the global COVID-19 pandemic, the CDC issued its initial order locking down the cruise industry and preventing sailings from United States ports.  60 Fed. Reg. 16628.

7.    The March 14, 2020 order was renewed on April 9, 2020, July 16, 2020, and September 31, 2020.  85 Fed. Reg. 21004, 85 Fed. Reg. 44085, 85 Fed. Reg. 62732.

8.    On October 30, 2020, the CDC issued the Conditional Sailing Order, which set forth conditions required for cruises to resume.  85 Fed. Reg. 70153.

9.    The Conditional Sailing Order laid out four phases of reopening the cruise industry: 1) establishment of laboratory testing of crew; 2) simulated voyages designed to assess the operator's ability to mitigate COVID-19 risk; 3) a certification process; and finally, 4) a return to passenger voyages with risk mitigation in place.  *Id.*

10.    The Conditional Sailing Order is not set to expire until November 1, 2021.  85 Fed. Reg. 70162.

11.    Cruise companies failing to complete the four-phase process will not be allowed to sail until November 1, 2021. *Id.*

12. On April 2, 2021, the CDC issued guidance regarding the Conditional Sailing Order. The new guidance adds additional requirements for phases one and two but does not contain technical guidance for simulated voyages. The guidance specifies that a cruise ship operator must request CDC's approval at least thirty days before a simulated voyage and submit materials from that voyage necessary to obtain a conditional safety certificate to the CDC at least 60 days before passenger operations can resume. In other words, the CDC has built in a minimum three-month waiting period from the time it issues guidance for simulated voyages and when a cruise ship operator might potentially be permitted to set sail.[1]

13. Without additional operative guidance, it is likely the cruise industry will be locked down until at least November 1, 2021, and possibly longer.

### C. As Infection Rates Drop, the Economy Is Re-Opening

14. As of April 2021, COVID-19 vaccines are widely available,[2] and infection rates have fallen dramatically nationwide[3]—as well as in Texas.[4] Travel and

---

[1] https://www.cdc.gov/quarantine/cruise/covid19-cruiseships.html

[2] https://www.nytimes.com/interactive/2020/us/covid-19-vaccine-doses.html?action=click&module=Top%20Stories&pgtype=Homepage (compiling CDC data).

[3] https://www.nytimes.com/interactive/2021/us/covid-cases.html?action=click&module=Top%20Stories&pgtype=Homepage

[4] https://www.nytimes.com/interactive/2021/us/texas-covid-cases.html

hospitality services from airplanes to Ubers and from motels to resort spas are transporting and accommodating people around the country. Many schools, restaurants, sports venues and other gathering places are open in some capacity.

15. Meanwhile, Texas' Port of Galveston has emerged as perhaps uniquely situated to address local COVID-19 concerns. The port is located just one mile from the University of Texas Medical Branch at Galveston ("UTMB"). Exh. 2, 7. UTMB is one of the largest academic medical hospitals in the country, and its facilities include a National Biosafety Level 4 Laboratory. *Id*. UTMB has also implemented an Infectious Disease Management Plan, and has experience in managing Ebola outbreaks. *Id*. The Port of Galveston has also already held a table-top exercise preparing for possible COVID-19 outbreaks on-ship. *Id*.

**D.     Damage Caused by Prolonged Shutdown of Passenger Cruises**

16. The persistence of the Conditional Sailing Order directly and negatively affects the Texas fisc. The Conditional Sailing Order has already cost $1.2 billion in direct spending.[5] The cruise shutdown has also cost 23,000 jobs, and $1.6 billion in lost wages across the State of Texas.  Exh. 3, attached to Exh. A, hereto (hereinafter, "Exh. 3").

---

[5] Shelley Childers, Galveston Leaders Ask for Abbott to Back Them in Pressuring CDC to Lift Moratorium on Cruises (April 12, 2021) (available at https://abc13.com/cruise-ship-news-virus-cruises-out-of-galveston-royal-caribean-cruiseship/10510221/).

17. The Conditional Sailing Order also directly and negatively affects Texas tax revenues, which are largely generated by sales taxes.[6] This downturn in tax revenue correlates with a concomitant greater dependence on government services during an economic downturn and contributes to serious state budget concerns.[7] Texas' 2020 sales tax collections fell by $816 million from the previous year.[8]

## II.   ARGUMENT

18. Rather than building on the progress health officials have made since the start of this pandemic to allow the cruise industry to operate under reasonable restrictions within its statutory authority, the CDC's order leaves cruise ships anchored in port while their interests—and those of the many industries that rely on cruise ships sailing—remain at sea.[9]

19. Texas has a significant stake in the outcome of this litigation and, as detailed

---

[6] Jason Saving, Covid-10's Fiscal Ills: Busted Texas Budgets, Critical Local Choices (Southwest Economy, Third Quarter 2020) (available at https://www.dallasfed.org/research/swe/2020/swe2003/swe2003b.aspx) ("Overall, the decline in Texas tax revenue illustrates the many and varied ways in which COVID-19 has directly or indirectly affected the state government's fiscal situation").

[7] *Id.*

[8] *Id.*

[9] Ceylan Yeginsu, Why U.S. Cruises Are Still Stuck in Port, N.Y. Times (March 19, 2021) (available at http://www.nytimes.com/2021/03/19/travel/coronavirus-cruises.html (reporting that the cruise industry has been "ravaged," with "companies reporting billions of dollars in losses, causing some of them to downsize their fleets and sell ships for scrap")).

herein, the CDC order impacts Texas differently than Florida. Therefore, the Court should allow Texas to intervene under Federal Rule of Civil Procedure 24.

### A.    Rule24(a)(2): Intervention as of Right

20.   Texas is entitled to intervention as of right under Rule 24(a)(2). Intervention as a matter of right requires (1) a timely motion by (2) a movant with an interest in the subject matter of the suit, (3) whose "ability to protect that interest may be impaired by the disposition of the suit," and a showing that (4) "existing parties in the suit cannot adequately protect that interest." *Georgia v. U.S. Army Corps of Engr's*, 302 F.3d 1242, 1250 (11th Cir. 2002). Rule 24 is liberally construed, with any doubts resolved in favor of the proposed intervenor. *Fed. Sav. & Loan Ins. Corp. v. Falls Chase Special Taxing Dist.*, 983 F.2d 211, 216 (11th Cir. 1993).

### 1.   Texas' Motion to Intervene is Timely

21.   Texas' request to join this litigation is timely. To determine if a motion to intervene is timely, courts consider four factors: (1) the time the proposed intervenor knew or reasonably should have known of the interest in the case before moving to intervene; (2) the extent of prejudice to the existing parties resulting from any failure to move for intervention as soon as it knew or reasonably should have known of its interest; (3) the extent of prejudice to the

proposed intervenor if the motion is denied; and (4) unusual circumstances militating for or against a determination that the motion was timely. *Georgia v. U.S. Army Corps of Engr's*, 302 F.3d at 1259 (citing *Chiles v. Thornburgh*, 865 F.2d 1197, 1213 (11th Cir. 1989)). Each factor supports Texas' motion.

22. Texas files this motion to intervene fewer than thirty (30) days after Florida filed the Complaint and prior to the filing of any responsive pleadings by Defendants.[10] Texas' intervention prejudices none of the existing parties because Texas is available to participate in scheduling matters, any requisite discovery, early-stage motion practice, and dispositive motions.

23. Denial of this Motion will prejudice Texas. Evaluation of such prejudice requires the Court to consider the "extent to which a final judgment in the case may bind the movant even though he is not adequately represented by an existing party." *United States v. Jefferson County*, 720 F.2d 1511, 1517 (11th Cir. 1983). The CDC order challenged in this lawsuit is a nationwide order issued under a regulatory premise requiring state-specific findings related to precautions against the spread of infectious diseases. The restrictions of the Conditional Sailing Order do not differ from state to state (already a problem for the Order, which requires state-specific findings), but Texas' ability to tolerate those restrictions, or to meet requirements for lifting the restrictions,

---

[10] Defendants have only filed an Unopposed Motion for Extension of Time. *See* Dkt. 16.

will necessarily differ from those of any other state. For one, Texas' single cruise port in Galveston is a stone's throw from world-class medical facilities with specialized infectious disease facilities. For another, Texas' oil and gas industry, which provides fuel for cruise ships, is uniquely affected by the continued disuse of the massive vessels.

24. Lastly, no unusual circumstances counsel against the timeliness of Texas' intervention, but a pair of unusual circumstances support the timing of Texas' motion. Two important developments have occurred since Florida filed suit. First, the State of Alaska moved to intervene. Alaska's appearance required further due diligence by Texas regarding the necessity of its own intervention. Second, the CDC issued a "Dear Colleague" letter last week providing commentary on the Conditional Sailing Order. This letter required additional diligence by the State of Texas regarding intervention.

25. Because Texas has unique interests, and because the motion to intervene is timely, all four timeliness factors support Texas' request to intervene.

## 2. Texas' Legally-Protected Interests in This Suit are Direct and Substantial

26. "Well before the creation of the modern administrative state, [the U.S. Supreme Court] recognized that States are not normal litigants for the purposes of invoking federal jurisdiction." *Massachusetts v. EPA*, 549 U.S. 497, 519 (2007). Rather, States are entitled to "special solicitude" in establishing

standing in federal court. *Id*. at 520; *see also Alfred L. Snapp & Son, Inc. v. Puerto Rico,* 458 U.S. 592, 607 (1982) (recognizing states' quasi-sovereign interest "in the health and well-being—both physical and economic—of its residents in general").

27. When the State of Georgia filed suit to protect its air from pollution originating beyond its borders, Justice Holmes wrote:

> This is a suit by a State for an injury to it in its capacity of *quasi*-sovereign. In that capacity the State has an interest independent of and behind the titles of its citizens, in all the earth and air within its domain. It has the last word as to whether…its inhabitants shall breathe pure air.

*Georgia v. Tennessee Copper Co.*, 206 U.S. 230 (1907); *see also Massachusetts*, 549 U.S. 519.

28. States may also sue in their sovereign capacities when they have suffered economic injury or must expend resources. *Chiles*, 865 F.2d at 1208. States have standing to challenge the lawfulness of agency action that "may adversely impact" their "economy" and "thereby injur[e]" the state. *Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1130 (11th Cir. 2005). Moreover, continued compliance with the subject regulation risks irreparable harm because the resulting economic outlook is bleak, and federal sovereign immunity precludes recovery of monetary damages. *LabMD, Inc. v. FTC*, 678 Fed.Appx. 816, 822 (11th Cir. 2016) (*citing Odebrecht Const., Inc. v.*

*Secretary, Florida Dept. of Transp.*, 715, F.3d 1268, 1289 (11th Cir. 2013); *see also Texas v. U.S. EPA*, 829 F.3d 405, 433034 (5th Cir. 2016).

29. Texas' economic interests also justify its standing. In *Texas v. United States*, the Fifth Circuit found Texas had standing to challenge the Deferred Action for Parents of Americans and Lawful Permanent Residents program as unlawful under the Administrative Procedures Act. 809 F.3d 134, 146, 149, 150–55 (2015). Recognizing States' "special solicitude" in the standing inquiry, the court concluded that Texas met the injury in fact requirement "by demonstrating that it would incur significant costs in issuing drivers' licenses to DAPA beneficiaries." Like *Texas v. United States* and *Massachusetts v. EPA*, this dispute turns on the proper construction of a congressional statute, and, as discussed above, Texas' interests are within the zone of interests of the statute and regulation at issue. *See Texas*, 809 F.3d at 151–52. And, Texas has shown continuation of the CDC's Conditional Sailing Order would have a major effect on its fisc. *See id.* at 157. Texas also satisfies the other two elements of standing because it can show that the CDC's orders have caused its injuries, and a favorable decision from this Court would likely redress those injuries. Because Texas has Article III standing to pursue its own claims under the Administrative Procedures Act, Texas has legally protectable interests under Rule 24(a)(2) that justify its intervention in this litigation.

### 3.  Texas' Ability to Protect its Interests May be Impaired Absent Intervention

30.  Intervention as of right also requires a showing that, absent intervention, this action "may as a practical matter impair or impede [Texas'] ability to protect its interest." FED. R. CIV. P. 24(a)(2). Here, Texas' interest is "closely related" to the effect that the disposition of the lawsuit will have on its ability to protect that interest. *Chiles*, 865 F.2d at 1214. "Where a party seeking to intervene in an action claims an interest in the very property and very transaction that is the subject of the main action, the potential stare decisis effect may supply that practical disadvantage which warrants intervention as of right." *Id.*; *see also Huff*, 743 F.3d at 800 ("'If an absentee would be substantially affected in a practical sense by the determination made in an action, he should, as a general rule, be entitled to intervene.'") (quoting *Cascade Natural Gas Corp. v. El Paso Natural Gas Co.,* 386 U.S. 129, 134 n.3 (1967)).

31.  This case is about an order affecting both Texas and Florida. It is difficult to conceive of any result to this litigation that would not directly affect Texas' interests. Moreover, the practical effect of this lawsuit's disposition may have a persuasive *stare decisis* effect in any separate litigation Texas would need to initiate if denied intervention here. Thus, Texas' ability to protect its interest may therefore be impaired absent intervention.

### 4. Florida Will Not Fully Represent Texas' Interests

32. The last prong of Rule 24(a)(2) requires a movant to show that its interest will not be adequately protected by the existing parties. The burden is "minimal." *Stone v. First Union Corp.*, 371 F.3d 1305, 1311 (11th Cir. 2004) (holding the movant need only show that representation "may be inadequate.") (cleaned up). Although courts may presume adequacy of representation "when an existing party seeks the same objectives as would-be interveners," this presumption is "weak" and "merely imposes upon the proposed interveners the burden of coming forward with some evidence to the contrary." *Clark v. Putnam County*, 168 F.3d 458, 461 (11th Cir. 1999).

33. Although the interests of Texas and Florida are closely aligned, they are not identical. The Conditional Sailing Order draws its authority, in substantial part, from 42 C.F.R. § 70.2, which requires a specific determination that Texas' measures to control the spread of COVID-19 on cruise ships are inadequate. 42 C.F.R. 70.2. Florida's various ports will likely have substantial differences from Texas' Port of Galveston. For example, the CDC's Conditional Sailing Order requires cruise operators to enter medical planning and housing agreements with local authorities. Texas' Port of Galveston is located just one mile from UTMB medical facilities, which have extraordinary experience in pandemic outbreaks in both the Ebola and COVID-19 context. Exh. 2, 7. These

facilities include one of the largest academic medical hospitals in the country, a National Biosafety Level 4 Laboratory, and an Infectious Disease Management Plan. *Id*. Texas' passenger cruise port has also already held a table-top exercise preparing for possible COVID-19 outbreaks on-ship. *Id*. These unique resources and experiences at Texas' Port of Galveston may materially differ from those available to the variety of Florida ports for passenger cruises in ways material to Section 70.2's state-specific analysis.

34. Another Texas-specific condition under the Conditional Sailing Order is the Order's effect on demand for bunker fuel produced in Texas. If another summer cruising season is canceled, this factor could become a force multiplier of economic damage to Texas caused by the cruise industry shutdown. This force multiplier would be unique to Texas, just as Florida's multiple large-scale port facilities, and Alaska's short cruising season, are unique to those states.

35. Texas' vaccination policies, practices, and success rates may also differ from Florida's in ways material to the state-by-state analysis and determination required under Section 70.2.

36. In short, no two states will suffer the same injuries from the Conditional Sailing Order, and no two states will have identical resources for reopening the cruise industry. The Court's consideration of this case benefits from the participation of the stakeholders ultimately affected by the litigation's outcome.

37. Therefore, because Florida cannot adequately represent Texas' interest, and because Texas meets all other requirements for intervention as of right, the Court should grant Texas' Motion to Intervene.

**B.      Rule 24(b)(1)(B): Permissive Intervention**

38. Alternatively, Texas requests that the Court grant it permission to intervene under Rule 24(b). The Court may grant permissive intervention to a party who, on timely motion, asserts "a claim or defense that shares with the main action a common question of law or fact." FED. R. CIV. P. 24(b)(1)(B). Permissive intervention is a discretionary determination made based upon the Court's consideration of "whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." *Id.*

39. Texas' intervention will neither prejudice the existing parties nor unduly delay the proceedings. Florida filed the instant cause fewer than 30 days ago.

40. While Texas' and Florida's interests align closely, and raise common questions of fact and law, their interests are not identical. Consideration of the Conditional Sailing Order's unique effects on Texas would contribute to, rather than impede, a reasoned determination of this action. *See League of Women Voters of Fla. v. Detzner*, 283 F.R.D. 687, 688 (N.D. Fla. 2012).

41. Texas has timely sought to intervene, its participation will not delay this litigation, and Texas' claims raise common questions of fact and law with

16

Florida's claims. The Court should therefore grant Texas' request for permissive intervention.

## CONCLUSION

For the foregoing reasons, the State of Texas respectfully requests the Court grant its motion to intervene, and accept and file the accompanying Complaint. Exh. A.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

SHAWN COWLES
Deputy Attorney General for Civil Litigation

THOMAS ALBRIGHT
Chief, General Litigation Division

/s/ *Ryan G. Kercher*
RYAN G. KERCHER
Texas Bar No. 24060998
Assistant Attorney General
GENERAL LITIGATION DIVISION
Ryan.Kercher@oag.texas.gov
Telephone: (512) 463-2120
Facsimile:  (512) 320-0667
        (*Pro Hac Vice* Application Pending)

KIMBERLY FUCHS
Texas Bar No. 24044140
Assistant Attorney General
ADMINISTRATIVE LAW DIVISION
Kimberly.Fuchs@oag.texas.gov
Telephone: (512) 475-4195
Facsimile:  (512) 320-0167
        (*Pro Hac Vice* Application Pending)


OFFICE OF THE ATTORNEY GENERAL OF TEXAS
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548


LEWIS BRISBOIS BISGAARD & SMITH  LLP

DAVID S. HARVEY, JR.
Florida Bar Number: 0984043
401 East Jackson Street, Suite 3400
Tampa, Florida 33602
Phone:  813.739.1900;
Fax:  813.739.1919
Email: david.harvey@lewisbrisbois.com

ATTORNEYS FOR THE STATE OF TEXAS

## CERTIFICATE OF CONFERENCE

Pursuant to Local Rule 3.01(g), counsel for the State of Texas conferred with counsel for the State of Florida, who indicated that Florida will not object to Texas' intervention. Counsel for the State of Texas also conferred with counsel for the State of Alaska, who indicated that Alaska will not object to Texas' intervention. Counsel for the State of Texas also conferred with counsel for the Defendants, Amy Powell with the U.S. Department of Justice, who indicated Defendants would reserve the right to oppose Texas' motion after sufficient time to review it.

/s/ *Ryan G. Kercher*
RYAN G. KERCHER

## CERTIFICATE OF SERVICE

I certify that on May 5, 2021, I electronically filed this Motion for Intervention with the Clerk of Court by using the CM/ECF system, which provides notice to all parties.

/s/ *David S. Harvey, Jr.*
DAVID S. HARVEY, JR.