# EXHIBIT A

Docket No. CDC-2020-0087

Please accept these comments from the State of Alaska (SOA) in reference to Docket No. CDC-2020-0087.  As a premier destination for tourists, particularly in the cruise ship space, we are in a unique situation to provide substantive comment on the No Sail Order, as well as the questions posed in this request for information.

In general SOA ascribes to the FEMA paradigm of *"locally executed, state managed, and federally supported."* The same paradigm holds true with respect to the resumption of cruise ship operations in the COVID-19 environment.  Cruise ship destination communities and ports of call within Alaska are in the best position to make risk-informed decisions, in a collaborative environment with the operators of cruises ships of all sizes.  Since the beginning of the pandemic, Alaskan communities and the SOA Department of Health and Social Services (DHSS) have worked directly with entities such as Cruise Lines International Association and individual cruise line operators to make the best decisions to protect the health and welfare of Alaskans, our visitors, and industry.  Alaska is a model for public/private partnerships, and collectively government and industry have a long-standing tradition of robust communications and collaboration.

The effects of the pandemic, including CDC's No Sail Order, have severely impacted the economic and fiscal health of Alaska.  We are appreciative of CDC's quick action to minimize the introduction of COVID-19 to our state through cruise ship operations, particularly when little was known about the SARS-CoV-2 virus, methods of transmission, and overall epidemiology.  Understanding that Alaska's economy is closely tied to the tourism industry, we agree that the No Sail Order was a prudent decision at the time, and allowed our communities and industry to develop a cohesive understanding of the epidemic and how to mitigate the spread.  Just as important was the collective, voluntary actions cruise ship operators of all sizes took, knowing the economic impact, in order to protect our communities. To further illustrate the impact to Alaska, the below information speaks to the overall economic impact of the visitor industry in our state.  The most recent data is from a 2017 analysis that can be located at https://www.commerce.alaska.gov/web/ded/DEV/TourismDevelopment/TourismResearch.aspx.

| Highlights | | | | |
|---|---|---|---|---|
| Peak Season Jobs 52,000 | Taxes and Revenues $125.6 M | Visitor Spending $2.8 B | Economic Impact $4.5 B | Labor Income $1.5 B |

These highlights are not specific to the cruise industry, although in general cruise line operations and associated shoreside activities represent 60% of all summer visitors to the state.

The State, nation, and world have all learned a tremendous amount about the virus, and have worked tirelessly to develop non-pharmaceutical interventions, build healthcare capacity, and fortify communications, with two primary goals in mind: 1. Protect the health and safety of Alaskans and Alaska communities; and, 2. Safely restart the economy in all sectors.  We strongly believe that our communities and industry partners are well-positioned to resume cruise ship operations for the 2021 season.

For ease of readability, we have left all questions posed in the original docket below.  Where SOA does not have substantive comment, "No Comment" will be noted.

Planning and Infrastructure

1. Given the challenges of eliminating COVID-19 on board cruise ships while operating with reduced crew on board during the period of the April 15, 2020 No Sail Order Extension, what methods, strategies, and practices should cruise ship operators implement to prevent COVID-19 transmission when operating with passengers?

   a. A robust program of crew screening and routine screening testing of crewmembers should be a cornerstone of resuming operations.  Alaska has observed a number of cultural or stigma-perception issues with crewmembers of vessels, primarily in the seafood industry, not wanting to report minor or moderate symptoms consistent with COVID-19 disease.  Consistent with those observations, cruise line operators should implement rigid, consistent daily symptom and temperature screening of crewmembers, and implement all-hands routine surveillance testing.

   Passenger mitigation operations should be "portal-to-portal" with robust communications and direction provided to passengers beginning with sales and booking, through the sailing, and through the disembarkation and return to home process, and longer as necessary.  At this time the SOA requires all travelers into the state, whether tourist, critical infrastructure worker, or resident, to receive at least one PCR test when arriving into the state.  That same requirement applies to cruise ship passengers, and we encourage specific requirements, whether federally mandated or through voluntary compliance of cruise ship operators, to require passengers to obtain a PCR test with negative results immediately prior to boarding.  As additional test methodologies are approved for use and recommended by CDC, we would support those as well.

   Mitigation efforts should maximize the potential for physical distancing between passenger cohorts and crew.  Capacity limitations in order to allow for physical separation of dining and gaming tables > 6', physical barriers where feasible, and staggered dining, excursion, and onboard activities would all assist in maintaining separation.  If practicable, cohorting small groups of passengers along with dedicated onboard staff, to create a passenger/crewmember cohort may assist with containing discrete outbreaks to the smallest number possible.

   Robust COVID-positive shipboard response plans should be developed.  The SOA and cruise operators have conducted detailed planning, training, and exercising with the United States Coast Guard (USCG) with respect to Mass Rescue Operations.  Those preparedness steps should be conducted specifically for COVID-19 outbreaks prior to the resumption of operations.  A critical factor in the planning process relates to shoreside medical operations, and non-emergency passenger repatriation operations and planning.  Alaska has bolstered the capability and capacity of coastal communities to respond to COVID-19 cases with respect to patient care, testing, forward patient movement, etc., but many Alaskan ports of call still have very limited infrastructure to support a widespread outbreak or repatriation operation.  It will be incumbent on cruise line agencies and corporations to have robust surge capacity in place to augment local transportation, emergency medical services, and healthcare capacity.  Examples include pre-contracted air charter services for both COVID and non-COVID evacuation or repatriation, case management/passenger services staff, and shore-based logistical services.

   Cruise operators in Alaska should continue to comply with USCG Captain of the Port orders and direction from the CDC Anchorage Quarantine Station and state/local public health officials when COVID is suspected or confirmed to be aboard.  Ships operating in Alaskan waters are already well versed and familiar with the *Alaska Multi-Agency*

*Maritime Communicable Disease Emergency Response Plan*, and we recommend utilizing that plan, and other existing plans where possible, as opposed to new federal plan requirements.

2. How should cruise ship operators bolster their internal public health programs with public health experts and invest in a robust public health infrastructure to ensure compliance with measures to detect, prevent, and control the spread of COVID-19?

    a. Since the beginning of the pandemic and no-sail order, operators have worked closely with industry associations such as the Cruise Line Industry Association and Small Passenger Vessel Association.  Those trade organizations have stood up national and international panels of public health experts to assist with overall planning and mitigation efforts.  We recommend that those panels continue to monitor the evolving base of knowledge on COVID-19 and the SARS-CoV-2 virus throughout the 2021 season, and continue to revise industry-wide recommendations and guidance to include routine communications with operator companies and their safety, health, and medical teams.

    In addition, cruise line operators should be allowed to adjust shipboard and on-shore protocols on a regional basis, as dictated by local and state public health officials.  Due to the unique operating environments within Alaska, it is important that CDC and other federal agencies provide high-level frameworks and guidance, that allow operators to adjust the operational and tactical implementation of mitigation and response measures to the communities they visit in the State.  Flexibility at the operator or ship-level is necessary, as there are no consistent mandates or restrictions at all U.S. ports of call, and communities will likely have very specific requirements based on the conditions of the pandemic at the time of sailings.

    Operaters should be encouraged to work collaboratively with state and local officials to plan for multi-operator port calls in communities that can accommodate multiple large cruise ships at a time.  The timing of shoreside activities will likely need adjustments in order to minimize the impact to our communities from multiple vessels disembarking on the same day or at the same time.

    Vessel-wide health screening, to include temperature checks, and continuous screening testing of employees should be recommended with periodicity to assist in early containment measures should COVID-19 be identified aboard the vessel.  Alaska has responded to real-world outbreaks on vessels in the fishing industry, and strongly believe that continuous screening testing should be accomplished to reduce the overall attack rate of an outbreak aboard the vessel.

    Finally, operators should develop testing, contact tracing, and reporting infrastructure that can be accomplished by the operator, reducing the need to rely on shore-based medical and public health infrastructure to the maximum extent possible.  Being able to efficiently share outbreak and testing data with local and state public health officials will be vital in order to assist industry with outbreak response activities.

3. How should cruise ship operators ensure internal public health programs are involved in all levels of decision-making processes relating to passenger and crew operations, crew welfare and mental health, occupational health, food safety, potable and recreational water safety, outbreak prevention and management response, and illness surveillance?

    a. Operators sailing to Alaska should be granted the flexibility to work directly with Alaska -based federal agencies, state, and local officials as they have done historically.  This includes regular communications with the Alaska Division of Public Health, CDC Anchorage Quarantine Station, USCG District-17, local government, and local healthcare

    providers.  Existing protocols and requirements of the *Alaska Multi-Agency Maritime Communicable Disease Emergency Response Plan*, in addition to standard statutory and regulatory requirements should continue to be followed.

4. What is the feasibility of conducting COVID-19 diagnostic testing using FDA-approved or authorized laboratory tests on board a cruise ship?
   a. Fishing industry operators in Alaska are currently exploring the feasibility of conducting on-board FDA-approved or authorized laboratory tests.  At this time, we cannot comment on the feasibility since industry has only recently been able to commercially procure diagnostic testing equipment.  Alaska supports making FDA-approved or authorized, CLIA-waived testing equipment more commercially available to the private sector.  Further, we are hopeful that direct point of care antigen testing will be authorized or approved for use in the maritime environment for both diagnostic and surveillance testing.

a. Should specimens be tested on board or should specimens be collected on board for commercial testing onshore?
   a. Where feasible, authorized, or approved, on-board testing would be the preferred method.  Many Alaska cruise ship destination communities have very little laboratory capacity, which often requires specimens to be transported to shore, and then further shipped to the Alaska State Public Health Laboratories or to commercial laboratories in the Lower-48 states.  This adds an additional layer of time necessary for resulting, which may not be effective for diagnostic testing.  Continuous screening testing may be conducted in this manner, and should be arranged directly between operators and commercial diagnostic laboratories.

b. How frequently should cruise ship operators test all passengers and crew?
   a. We recommend all passengers get tested within 72 hours of departure to the port of embarkation, followed by an additional test 7 to 14 days after embarkation.  In addition, any passenger who displays signs or symptoms of COVID-19, regardless of severity, should undergo additional testing.  If on-board collection, processing, and resulting can be accomplished, symptomatic passengers and anyone sharing a cabin should quarantine in their cabin to the maximum extent practicable until results are provided.

   Crewmembers should be subject to continuous screening testing (in addition to immediate diagnostic testing when symptomatic).  The periodicity of screening testing should be no less than 100% of crewmembers once every 28 days.  During initial sailing 100% of the crew should be tested at day 5 and day 8.  If strict quarantine and entry testing is performed on new crew arrival, they should continue to be tested with the general crew population at least once every 28 days.  For crewmembers who have contact with shore-based workers or local community members during port calls, 100% of those workers should be tested 7-10 days after on-shore contacts.  If a vessel is in a maintenance window, and crew remains aboard for more than 21 days with no contact between crew and passengers, no continuous screening testing should be required.

c. What would be the anticipated financial cost of testing all passengers and crew?
   a. No Comment

5. Because reports of illness may lead to restrictions on crew activities, how should cruise ship operators encourage crew members to report mild symptoms of COVID-like illness to medical personnel?
   a. Operators should designate adequate isolation or quarantine quarters aboard the vessel that prioritizes minimal exposure while allowing for some freedom of movement for crewmembers to be able to leave the quarters but remain in the isolation or quarantine area for periods of time, as opposed to requiring ill crewmembers to be confined to

small crew-quarters for the entire quarantine or isolation period.  When possible, operators should ensure sufficient quarters and areas of the ship are available for multiple persons under monitoring or investigation, and not plan to disembark ill crew to shoreside facilities unless the on-board medical provider deems it necessary to transfer the patient to a higher level of care.

a. How should cruise ship operators encourage medical personnel to report these cases to CDC?

    a. They should report cases to the Anchorage CDC Quarantine Station, USCG, and Alaska Division of Public Health in accordance with the *Alaska Multi-Agency Maritime Communicable Disease Emergency Response Plan*.

6. What should be the medical capacity to manage an outbreak or a severe case of COVID-19 on board the ship?

    a. The specific capacity should be recommended based on overall crew and passenger capacity, configured for COVID-19 capacity restrictions, as opposed to an arbitrary percentage or number of cases/patients.  It will be important to consider the capacity to quarantine close contacts of COVID-positive cases as well.  Most ports of call in Alaska have very limited healthcare and medical infrastructure, and operators should take steps to keep passengers and crew aboard for all but the most severe cases requiring a higher level of care, as diagnosed by on-board medical providers.

a. What arrangements should cruise ship operators have with private companies to transport and obtain medical care shoreside for passengers and crew with severe COVID-19?

    a. Operators should have robust plans and pre-arranged contracts in place with aeromedical and ground transport companies in the region to which they sail, or in specific Alaskan communities.  As noted previously, Alaska's healthcare and medical capacity is very limited in most ports of call, and should be prioritized for the care of Alaska residents when possible.  Those arrangements should include transport to specific locations in the Lower-48 states where additional arrangements have been made with local healthcare providers to accommodate COVID-positive care of patients.

7. What pre-arrangements should be made to ensure that all U.S. seaport communities will accept a returning ship after a COVID-19 outbreak is identified?

    a. Operators have worked hand-in-hand with Alaska seaport communities to ensure response planning has been conducted and agreed upon.  Due to the limited infrastructure in most Alaska seaport communities, it may be advisable for operators to sail to Lower-48 seaports for significant outbreaks.  CDC should encourage consistency in seaport communities' requirements and restrictions to the maximum extent possible.

8. What plans should cruise ship operators have for operationalizing shoreside quarantine facilities in the event of a COVID-19 outbreak on board a ship, without exposing the public and without relying on Federal, State, or local resources?

    a. Where practicable, operators should enter into pre-arranged contracts with commercial lodging, transportation, and feeding companies to support shoreside quarantine. Due to the limited lodging, dining, and healthcare infrastructure in Alaska, facilities may need to be identified outside of the port of call, and potentially in the Lower-48 states.

9. Due to obstacles with commercial travel thus far, what pre-arrangements should cruise ship operators make with the airline industry to accept crew and passengers from ships not affected by COVID-19?

    a. For crew and passengers from ships not affected by COVID-19, operators should ensure that clear and consistent airline or State of Alaska requirements are provided from the very beginning, either at the time of booking or at the employee on-boarding process. Universal masking, social distancing and hygiene protocols should all be provided to crew and passengers.  Suggestions for pre-travel quarantine should be provided as well.

10. How should cruise ship operators address specific country travel restrictions that emerge as COVID-19 activity increases in geographical areas, such as

a. border closures preventing passengers and crew from repatriating?

    a. Operators should develop robust outbreak response plans that include contracted air travel from Alaska seaport communities to Lower-48 communities where practicable.

b. seaport closures preventing porting of ships?

    a. No Comment

c. embarking passengers originating from countries with heightened COVID-19 activity?

    a. Passengers originating from countries with heightened COVID-19 activity should follow the requirements and restrictions put in place by CDC and the U.S. Department of Homeland Security for entry into the United States.

11. What measures should cruise ship operators be required to take to reduce the burden on U.S. government resources if foreign seaports deny cruise ships the ability to come into port during a voyage?

    a. Operators should have detailed contingency plans that include options to return to the port of embarkation or alternate U.S. seaports should foreign seaports deny cruise ships the ability to make foreign port calls.

12. Given difficulties cruise ship operators have experienced when repatriating crew via non-commercial transportation, what preparations should the industry make to repatriate passengers or crew via non-commercial transportation after COVID-19 is identified on board?

    a. No Comment

13. What innovations should cruise ship operators develop to reduce transmission of COVID-19 on board ships and how would these innovations be effective?

    a. Congregate dining, recreation, and entertainment facilities should be reconfigured to maximize the opportunity for social distancing of passengers and crew, allowing family or small cohort groups of passengers or crew to be together.  Shipboard activity and work schedules should be modified/staggered to reduce the overall number of participants at any one activity.  Robust pre-boarding quarantine, screening, and testing should be recommended.  Physical distancing or barriers should be considered in areas of the vessel where it makes sense (casinos, theatres, dining rooms, etc.).  Onboard bars and entertainment venues should explore the ability to physically separate entertainers (in particular bands and singers) from other crewmember and passengers.

14. Should cruise ship operators implement other interventions to decrease or prevent the spread of COVID-19 on board ships?

    a. Operators should explore the feasibility of retrofitting onboard ventilation systems.  Minimizing the amount of crew changeover should be considered, and shore leave policies adjusted to minimize potential exposure of the workforce.

15. What evidence of efficacy or other rationale exists for any public health interventions that cruise ship operators propose to take on board ships?

    a. No Comment

Resumption of Passenger Operations

16. What steps should cruise ship operators take to prevent the introduction of COVID-19 onto ships after resuming passenger operations?

a. Answered above.

a. Should cruise ship operators deny boarding to passengers with COVID-like illness or confirmed infection with COVID-19?

a. Yes.  Early identification through the use of pre-travel and pre-boarding  testing and screening should be utilized to identify those passengers as early as possible.

b. Should cruise ship operators deny boarding to passengers with known exposure to a person with COVID-19 during the previous 14 days?

a. Yes.  Known exposure or close contacts should continue to follow quarantine and/or quarantine and testing requirements that may be in place at the time of sailing.

c. What methods should cruise ship operators use to screen for exposures and detect COVID-like illness in passengers seeking to board the ship?

a. Multiple proactive screenings though affirmative health questionnaires, and temperature screening, should be conducted during the arrival, terminal, and boarding process.  FDA and CDC approved testing should be required prior to embarkation of all passengers.

d. Should cruise ship operators deny boarding to passengers coming from COVID-19 high-incidence geographic areas?

a. Passengers coming from COVID-19 high-incidence geographic areas should follow federal recommendations of CDC and the U.S. Department of Homeland Security prior to arrival at the port of embarkation.  It would be impractical for operators to conduct travel or point of origination investigations on all passengers.

e. How should cruise ship operators manage embarking crew with COVID-like illness, known exposure, or coming from high-incidence geographic areas after resuming passenger operations?

a. Operators should consider developing crew travel and quarantine procedures and infrastructure to support onshore quarantine of crewmembers with COVID-like illness or known exposure, until crewmembers are medically released from isolation or quarantine.  Alaska has detailed examples of pre-arrival testing and quarantine requirements for fishing industry employers at https://covid19.alaska.gov/health-mandates/.

f. Should cruise ship operators test passengers and crew pre-boarding? If yes, what should the testing protocol be?

a. Yes. Operators should consider pre-arrival testing within 72 hours of departure to the port of embarkation, with and additional test between 7-14 days of embarkation.

g. Should cruise ship operators transport and house passengers and crew denied boarding at the seaport to avoid exposing the public?

a. Yes.

17. Should cruise ship operators plan to reduce passenger and crew loads to decrease the risk of transmission on board the ship?

a. Yes.  Capacity reductions should be considered in order to maximize social distancing opportunities and to accommodate activity scheduling to minimize close contacts to the maximum extent practicable.

a. To what extent and for how long should cruise ship operators reduce passenger capacity?

a. No Comment

b. To what extent might reducing passenger capacity affect the economic viability of cruise lines?

> a. No Comment

c. Should cruise ship operators be required to provide scientific evidence that reducing passenger capacity will prevent transmission on board?

> a. No Comment

18. Should cruise ship operators decrease the length of voyages and, if so, by how much?

> a. No.  If extended-length voyages occur, we recommend that operators should consider additional mid-voyage testing of passengers along with the continuous screening testing of crew discussed above.

a. How would decreasing the length of voyages affect the transmission of COVID-19 on board the ship and in U.S. communities?

> a. No Comment

b. Should cruise ship operators be required to provide scientific evidence that reducing length of voyages would decrease the risk of further introduction of COVID-19 to U.S. communities?

> a. No Comment

19. Should cruise ship operators limit shore excursions?

> a. Operators and shore side excursion vendors should consider limiting the amount of family groups or travel cohort groups as necessary to minimize large gatherings and congregate activities to the extent practicable and economically feasible.

a. What precautions should cruise ship operators take during shore excursions to prevent passengers and crew from being exposed to COVID-19?

> a. In combination with the answer above, operators should require universal masking of passengers and comply with all local mandates and restrictions adopted to mitigate the introduction and transmission of COVID-19.

> b. During shore excursions, how should cruise ship operators prevent transmission of COVID-19 into land-based communities?

> a. See above. In addition, operators and shore side excursion vendors should consider limiting the opportunities for unstructured "free-time" for passengers and crews to travel throughout the community.

20. Should cruise ship operators restrict the number of persons per room (*e.g.,* maximum capacity of 2 adults per cabin)?

> a. Cabin occupancy doesn't necessarily need to be restricted, but operators should consider family group or small travel cohort group activities to the maximum extent practicable, to encourage passengers to interact within their family unit or small travel cohort.

a. Should cruise ship operators be required to provide single-occupancy rooms with private bathrooms for crew after resuming passenger operations?

> a. Operators should consider reserving an appropriate number of single-occupancy rooms with private bathrooms for quarantine and isolation purposes.

21. What mental health services should cruise ship operators provide to crew and passengers during quarantine or isolation?

a. Robust onboard services should be made available to crew and passengers. Operators should consider quarantine and isolation areas onboard to allow limited, no-contact activity for those requiring quarantine or isolation.

22. What precautions should the cruise line industry take to safely disembark passengers and crew without transmitting COVID-19 into local seaport communities?

a. In addition to pre-travel and pre-embarkation health screening and testing, daily health screening (to include temperature checks) and pre-disembarkation screening of passengers and crew should be considered.

23. Should the cruise line industry immediately cancel cruise voyages if COVID-19 cases are identified on board or after disembarkation?

a. Not necessarily. Operators should have a robust case response plan in place that includes contact tracing, quarantine and isolation of cases and close contacts. Response plans should consider increased testing of passengers and crew upon case identification. In addition, operators should comply with the requirements of the *Alaska Multi-Agency Maritime Communicable Disease Emergency Response Plan* and comply with any orders or direction provided by state and local public health authorities, the CDC Anchorage Quarantine Station, and the USCG.

24. Because of the economic costs associated with cruising, some cruise ship passengers may be reluctant to cancel travel plans if they become ill or are exposed to COVID-19 or may try to hide symptoms of illness. Should cruise ship operators fully refund or provide incentives to passengers that:

a. Are denied boarding due to COVID-like illness symptoms, confirmed infection, or known exposure?

a. Yes. This should include the suggestion that passengers obtain travel and medevac insurance prior to their voyage.

b. are denied boarding due to coming from high-incidence geographic areas?

a. Yes. This should include the suggestion that passengers obtain travel and medevac insurance prior to their voyage.

c. request last-minute cancellations due to COVID-19 concerns?

a. Yes. This should include the suggestion that passengers obtain travel and medevac insurance prior to their voyage.

25. Due to the costs associated with seeking medical care on board, and the likelihood that sick passengers will be isolated and their travel companions quarantined for the remainder of their voyage, how should cruise ship operators encourage passengers to notify the medical center when they experience COVID-19 symptoms?

a. Up-front and clear communications on passenger expectations should be provided on operator and booking websites, and sent and acknowledged as part of the booking process. Daily health screening should be utilized in conjunction with continued communications and signage asking passengers to self-identify.

26. How should cruise ship operators decrease or eliminate the risk for COVID-19 transmission for both passengers and crew in the following group settings?

a. Embarkation and disembarkation?

> a. Staggered schedules and timing, clearly marked social distancing signage, and hand sanitization should be used throughout all portions of the voyage. Universal masking should be required.

b. Safety drills and trainings?

> a. Staggered schedules and timing, clearly marked social distancing signage, and hand sanitization should be used throughout all portions of the voyage. Universal masking should be required.

c. Dining?

> a. Staggered schedules and timing, clearly marked social distancing signage, and hand sanitization should be used throughout all portions of the voyage. Universal masking should be required. Buffet-style options should be limited, and in-room dining options should be expanded.

d. Onboard entertainment events?

> a. Staggered schedules and timing, clearly marked social distancing signage, and hand sanitization should be used throughout all portions of the voyage. Universal masking should be required. Operators should consider additional separation of entertainers who project their voice, and venue capacity restrictions should be considered.

> d. Shore excursions?

> a. Staggered schedules and timing, clearly marked social distancing signage, and hand sanitization should be used throughout all portions of the voyage. Universal masking should be required. See above for additional suggestions for shore excursions.

## Summary Questions

27. What benefits can be expected in terms of averted deaths and illnesses and how does this compare to the expected financial costs of the above measures?

> a. No Comment

28. Should cruise ship operators be required to designate a responsible company official who will accept legal responsibility for failure to implement measures to protect public health?

> b. Company officials and vessel masters in general should be responsible for compliance with federal, state, and local requirements and/or restrictions. However, companies should clearly identify a COVID-19 safety official, and vessels should clearly designate an individual onboard for purposes of implementation of mitigation measures.

Please note that comments received, including attachments and other supporting materials, are part of the public record and are subject to public disclosure. Comments will be posted on *https://www.regulations.gov.* Therefore, do not include any information in your comment or supporting materials that you consider confidential or inappropriate for public disclosure. If you include your name, contact information, or other information that identifies you in the body of your comments, that information will be on public display. CDC will review all submissions and may choose to redact, or withhold, submissions containing private or proprietary information such as Social Security numbers, medical information, inappropriate language, or duplicate/near duplicate examples of a mass-mail

campaign. CDC will carefully consider all comments submitted to this docket. CDC does not accept public comment by email.



JAXPORT

September 21, 2020

Port Canaveral

Port Everglades

Maritime Unit
Centers for Disease Control and Prevention (CDC)
1600 Clifton Road NE, MS V18-2
Atlanta, GA 30329

Port of Fernandina

### RE: Docket No. CDC-2020-0087

The Florida Ports Council (FPC) serves as the professional association for Florida's 14 deepwater public seaports and their management. Seaports are one of the state's greatest economic assets, positively affecting every region and every resident. Whether moving over a hundred million tons of cargo annually or millions of cruise passengers, Florida's seaports generate and support a vast array of commerce. These seaports are the gateway for shipment of goods into and out of Florida and link our state to vital international markets. Prior to this pandemic, our seaports had a $117.6 billion economic impact on the state and account for more than 900,000 direct and indirect jobs.

Port of Fort Pierce

Port of Key West

PortMiami

We appreciate the measured response by the CDC and others to help this nation react to the impact of COVID-19 on our citizens and economy. Through a myriad of federal, state and local efforts every business activity but cruise passenger operations have restarted their operations under new guidelines to ensure the safety of the public and workers. Cruise passenger operations remain the only industry that has not been permitted to operate under any guidelines issued by federal health or safety officials.

Port Manatee

Port of Palm Beach

The cruise industry makes an enormous contribution to the state of Florida and is one of the state's largest employers. The industry contributes over $8.5 billion to Florida's economy. Florida seaports account for close to two-thirds of all U.S. cruise embarkations and is the home to the top three cruise ports in the world. Carnival Corporation, Norwegian Cruise Line Holdings and Royal Caribbean Cruises, Ltd., which combined control more than three-fourths of the North American cruise industry's capacity, have their headquarters in Miami, as do other cruise lines. The purchases and other financial aspects of the cruise industry on Florida affect virtually every industry in the country and the state. These activities support over 154,000 jobs in Florida alone, and a total personal income impact on this state of $7.7 billion dollars.

Port of Panama City

Port of Pensacola

Port of Port St. Joe

Port St. Pete

Port Tampa Bay

The impact of this passenger industry is also felt throughout this nation and hemisphere. Cargo and other consumer activity transiting Florida's seaports to the Caribbean and other parts of Latin America also support tourism activity generated by the cruise industry during ports of. The inability of the cruise industry to commence operations continues to have a detrimental impact in

**TEL:** 850.222.8028 | **FAX:** 850.222.7552
502 East Jefferson Street, Tallahassee, Florida 32301 | **www.flaports.org**






Florida and beyond. In Florida alone, we estimate that economic activity losses will exceed $22 billion through 2020. If the cruise industry is still unable to operate into 2021, these economic losses will continue to mount for Florida and this nation.

We appreciate the efforts of the CDC to collect information to help ensure the safe resumption of passenger operations at Florida's seaports. In response to your request for information, we offer the following responses to questions relevant to Florida's seaports.

> Question 6a – what arrangements should cruise ship operators have with private companies to transport and obtain medical care shoreside for passengers and crew with several COVID-19?

Answer – Currently all severe medical emergencies are handled by cruise ship operators using available transportation services for severe cases of confirmed COVID-19. We recommend that this activity by the cruise ship operators continue as currently provided.

> Question 7 – what pre-arrangements should be made to ensure that all U.S. seaport communities will accept a returning ship after a COVID-19 outbreak is identified?

Answer -- The Florida Department of Health and the CDC currently have cooperative state/federal procedures to deal with existing COVID-19 cases in Florida. Prior to the federal order to cease all cruise activities at Florida seaports, the agencies worked with a layered command and control organization of cruise lines, local health agencies, healthcare providers, federal agencies (i.e. U.S. Customs and Border Protection and the U.S. Coast Guard) and port authorities to safely remove non-infected passengers and infected passengers from impacted cruise vessels.

Based on this experience, we recommend that the CDC in partnership with the Florida Department of Health develop a set of guidelines and protocols for the transportation and medical treatment for any people onboard a returning ship after a COVID-19 outbreak is identified. Guidelines should include procedures for testing prior to disembarkation, location and duration of any necessary isolation or quarantine, medical testing and surveillance procedures, and procedures for ending isolation or quarantine. Once these guidelines have been established, cruise ship operators and local communities can then develop necessary solutions to implement appropriate procedures.

> Question 8 – what plans should cruise ship operators have for operationalizing shoreside quarantine facilities in the event of a COVID-19 outbreak on board a ship, without exposing the public and without relying on Federal, State, or local resources?

 

Answer – Operational plans developed by cruise ship vessels for future voyages should identify adequate shoreside quarantine facilities, including quarantine and transportation services that could be used to isolate and quarantine affected passengers and crew. We recommend that cruise ship operators collaborate with local port authorities to make necessary arrangement prior to the start of any voyage.

> Question 16a – should cruise ship operators deny boarding to passengers with COVID-line illness or confirmed infection with COVID-19?

Answer – Passengers with possible, probable, or confirmed COVID-19 illness should be denied boarding. Cruise lines should develop pre-boarding protocols to efficiently assure that passengers of concern are segregated for further examination, and if needed, safely removed from the terminal facility, limiting exposure to others.

> Question 16b – should cruise ship operators deny boarding to passengers with known exposure to a person with COVID-19 during the previous 14 days?

Answer – Passengers with possible, probable, or confirmed COVID-19 illness and close contact with a person with COVID-19 during the past 14 days should be denied boarding.

> Question 16c – what methods should cruise ship operators use to screen for exposures and detect COVID-like illness in passengers seeking to board the ship?

Answer – the U.S. maritime industry (including the cruise industry) and federal, state and local first responders currently use a layered approach for a variety of security and health procedures at our nation's seaports. We recommend a similar layered approach for medical screening at our nation's seaports. This layered approach could include requirements for a diagnostic test within  72 hours prior to embarkation or a rapid test prior to boarding the ship, the completion of a health screening questionnaire prior to travel (and submitted to the cruise line for approval), and multiple symptom tests prior to boarding public transportation and prior to transiting a cruise terminal. Cruise lines have experience in pre-boarding protocols for security and business reasons and could integrate additional health protocols into a pre-boarding process.

> Question 16d – should cruise ship operators deny boarding to passengers coming from COVID-19 high-incidence geographic areas?

Answer – Passengers traveling from such geographic areas in the U.S. should be allowed to board the vessel so long as they present proof of a negative diagnostic




test within 72 hours of embarkation and successfully complete other required screening. If a travel ban is in effect from a geographic area outside of the U.S., those passengers should be screened at air or land ports of entry well in advance of arriving at the cruise terminal or vessel.

> Question 16e – how should cruise ship operators manage embarking crew with COVID-like illness, known exposure, or coming from high-incidence geographic areas after resuming passenger operations?

Answer – Cruise ship operators should deny boarding for any crew members with possible, probable, or confirmed COVID-like illness, or close contact with any know exposure within the past 14 days. However, crew members with a negative diagnostic test within 72 hours of embarkation should be permitted to board provided such crew members quarantine for at least 14 days in isolated rooms onboard the vessel. Crew members should be subject to routine medical screening to mitigate the risk of transmission.

> Question 16f – should cruise ship operators test passengers and crew pre-board. If yes, what should the testing protocol be?

Answer – similar to the answers for questions 16c and 16d, cruise ship operators should adopt a layered approach to medical screening. This can include proof of a negative diagnostic test at least 72 hours prior to embarkation or the requirement to complete a rapid test prior to boarding the ship.

> Question 16g – should cruise ship operators transport and house passengers and crew denied boarding at the seaport to avoid exposing the public?

Answer – Cruise ship operations should not be required to arrange for private transportation and accommodation for any passenger denied transit through cruise terminals or boarding the vessel. With respect to similar passenger activities at airlines or passenger rail travel, those industries are not held responsible for subsequent housing or transportation of passengers denied travel because of COVID-19 illness. We recommend a similar standard for the cruise industry, individual travelers that are denied embarkation due to COVID-19 illness should follow CDC and state requirements for quarantine and travel.

Cruise ship operators should utilize designated quarantine facilities ashore or identified travel services for crew denied boarding at the seaport.

> Question 22 – what precautions should the cruise industry take to safely disembark passengers and crew without transmitting COVID-19 into local seaport communities?

**TEL:** 850.222.8028 | **FAX:** 850.222.7552

502 East Jefferson Street, Tallahassee, Florida 32301 | **www.flaports.org**

  

Answer – the guidelines suggested under question 7 should include protocols to notify the seaport and other federal, state and local officials if there is a COVID-19 confirmed or probable case onboard the vessel. As also suggested in the answer to question 7, those guidelines should include procedures for testing prior to disembarkation, location and duration of any necessary isolation or quarantine, medical testing and surveillance procedures, and procedures for ending isolation or quarantine. Once these guidelines have been established, cruise ship operators and local communities can then develop necessary solutions to implement appropriate procedures.

<u>Question 26a – how should cruise ship operators decrease or eliminate the risk for COVID-19 transmission for both passengers and crew during embarkation and disembarkation?</u>

Answer – Similar to the guidelines suggested for questions 7 and 22, guidelines should be developed by the Florida Department of Health and the CDC to maintain clean cruise terminal facilities and maintain social distancing. Guidelines should include appropriate cleaning and sanitizing procedures, and embarkation and disembarkation procedures to ensure appropriate social distancing and transmission mitigation policies. Once these guidelines have been established, cruise ship operators and others can develop necessary solution to implement appropriate procedures.

Florida cruise terminal operators proactively initiated cleaning protocols directed at mitigating COVID-19 transmission in these terminals as cruise operations were shut down earlier in the year.  These protocols can be adjusted as needed based on any updated required procedures, in coordination with government and industry partners.

Thank you for your consideration of the Florida Ports Council's responses to this request for information. We look forward to working with the CDC and the Florida Department of Health to help ensure the safe resumption of passenger operations at Florida's seaports.

Sincerely,

Doug Wheeler,
President & CEO

  



September 18, 2020

Maritime Unit
Centers for Disease Control and Prevention
1600 Clifton Road NE, MS V18–2
Atlanta, GA 30329

Re: Docket No. CDC–2020–0087

The Tampa Port Authority (dba Port Tampa Bay) is Florida's largest port, handling over 37 million tons of cargo per year and encompassing over 5,000 acres.  One of Port Tampa Bay's major strengths is the diversity of business handled.  The port handles a wide variety of cargoes including liquid bulk, dry bulk, break-bulk, and containers, and is a major shipbuilding/repair center.  Cruise ship activities are also a very important line of business for the port.

With a population in excess of 8 million people and welcoming over 60 million tourists/visitors per year, the Tampa Bay/Orlando I-4 Corridor region is a huge local market and the fastest growing region of the state, as well as a major driver behind Florida overtaking New York as the 3rd largest state by population.  Cruise activity at Port Tampa Bay has surpassed 1 million passengers the past two years and provided significant economic impact to the Tampa Bay region.

Prior to the pandemic, the cruise industry contributed nearly $8.5 billion in direct spending to Florida's economy on an annual basis and supported more than 154,000 Florida jobs, representing $7.7 billion in total wages and salaries.

Port Tampa Bay appreciates the opportunity to provide comments to Docket No. CDC-2020-0087 regarding cruise ship planning and infrastructure and resumption of passenger operations. The cruise industry is a key part of the port's business portfolio, and we support the CDC's efforts to consider appropriate public health measures and ensure the safety of the cruise industry.

In response to the questions posed in the July 21, 2020 request for information, we offer the following responses to questions relevant to our port.

> Question 7. What pre-arrangements should be made to ensure that all U.S. seaport communities will accept a returning ship after a COVID-19 outbreak is identified?

In a collaborative effort with stakeholders including but not limited to cruise lines, local health agencies, healthcare providers, federal agencies (i.e. Unites States Customs and Border Protection, The United States Coast Guard) and port authorities, develop a comprehensive plan to accept a ship that has been determined to have COVID-19 outbreak that includes safe handling and transportation of (infected or affected) cruise guests and crew to designated place of treatment and/or quarantine.

Question 8. What plans should cruise ship operators have for operationalizing shoreside quarantine facilities in the event of a COVID-19 outbreak on board a ship, without exposing the public and without relying on Federal, State, or local resources?

Cruise lines should collaborate with the local port authority for alternative berthing options and to identify private facilities and private transport services that are available and appropriate for quarantine use.

Question 16. g. Should cruise ship operators transport and house passengers and crew denied boarding at the seaport to avoid exposing the public?

Yes. Cruise ship operators should utilize designated quarantine space for crew and/or passengers denied boarding and prearrange private transportation services to transport people to a pre-determined local hotel or similar facility.

Question 22. What precautions should the cruise line industry take to safely disembark passengers and crew without transmitting COVID-19 into local seaport communities?

In conjunction with measures taken onboard cruise ships to mitigate risk of transmitting COVID-19, port terminal facilities should follow CDC safety protocol, as well as, adopt their own protocols for maintaining clean cruise terminal facilities and the recommended social distancing.

Question 26. How should cruise ship operators decrease or eliminate the risk for COVID-19 transmission for both passengers and crew in the following group settings?
a. Embarkation and disembarkation?

Cruise lines should collaborate with local port authorities to adopt protocols for maintaining clean cruise terminal facilities and maintain recommended social distancing.

Thank you for consideration of Port Tampa Bay's responses to this request for information. We stand ready to help the CDC however possible as it considers how to best respond to the COVID-19 pandemic.


Best Regards,

*A. Paul Anderson*

A. Paul Anderson
President and CEO



**PORT EVERGLADES DEPARTMENT – Chief Executive & Port Director's Office**
1850 Eller Drive, Fort Lauderdale, Florida 33316
954-468-0140   FAX 954-523-8713

September 21, 2020


Maritime Unit
Centers for Disease Control and Prevention (CDC)
1600 Clifton Road NE, MS V18-2
Atlanta, GA 30329

**RE: Docket No. CDC-2020-0087**

Dear Director Redfield:

Thank you for providing the opportunity to submit comments on the Request for Information on the restarting of the multi-day cruise industry in the United States. As you may be aware, Broward County's Port Everglades is the third busiest cruise port in the world. Of the 13,000 direct regional jobs supported by businesses at Port Everglades, approximately 6,000 are directly related to the cruise industry. Another 84,254 residents are employed in the local hospitality and tourism industry. Those jobs have been severely affected by the onset of COVID-19.

In addition to the Port's role as an economic engine and job creator for Broward County, we are also keenly aware of our responsibility to the community and our neighbors to do all we can to guard against the spread of the virus. Port Everglades, along with our federal, state and local health and law enforcement partners, began planning for the potential onset of COVID-19 in January 2020, around the same time the first COVID-19 case was identified in the United States. Despite the suspension of multi-day cruises since March 14, 2020, Port Everglades has been working to safeguard our port, our passengers and our neighbors from the COVID-19 virus by enhancing sanitation protocols, implementing touchless procedures wherever possible, installing more hand sanitizing dispensers, enforcing facial coverings and social distancing, ensuring air handling ventilation is operating properly, and adopting the latest guidelines from the CDC and other health organizations worldwide. Most importantly, we are working with our cruise line partners to ensure that cruise passengers can safely visit Broward County to embark and debark their cruises while interacting with local residents.

We believe that cruising can resume safely in the United States and urge the CDC to act quickly to develop standard protocols and guidelines that can be used by our cruise line partners to submit and expeditiously receive approvals from the CDC to resume sailings from U.S. ports. Below are the answers that we believe address questions in the RFI (CDC-2020-0087) that apply to the resumption of cruising at Port Everglades.

Question 6: What should be the medical capacity to manage an outbreak or a severe case of COVID-19 on board the ship?

    Question 6a. What arrangements should cruise ship operators have with private companies to transport and obtain medical care shoreside for passengers and crew with severe COVID-19?
Answer: Cruise ship operators should have standing agreements with private companies to provide transportation to shoreside medical facilities, including the availability of multiple facilities that may be needed to respond to an incident involving a large number of affected passengers and/or crew. The use of government resources should be limited to emergency situations that exceed the capabilities of private providers.

Question 7. What pre-arrangements should be made to ensure that all U.S. seaport communities will accept a returning ship after a COVID-19 outbreak is identified?
Answer: Cruise operators must have an emergency response, quarantine and repatriation plan in place that can be readily implemented by the cruise line in coordination with the local health agency and the seaport's multi-agency Unified Command or similar interagency working group consisting of government agencies and health officials working directly with the cruise line. Part of the plan should include pre-arranged agreements with local medical facilities, ambulance services, and if necessary, air evacuation providers, to transport, treat and quarantine affected passengers and/or crew, without placing a burden on local resources.

Question 8. What plans should cruise ship operators have for operationalizing shoreside quarantine facilities in the event of a COVID-19 outbreak on board a ship, without exposing the public and without relying on Federal, State, or local resources?
Answer: For symptomatic or COVID-positive passengers, cruise operators must implement their CDC-approved emergency response and approved quarantine plan in coordination with the local health agency and the seaport's multi-agency Unified Command or similar interagency working group consisting of government agencies and health officials working directly with the cruise line. Part of the plan should include pre-arranged agreements with local medical facilities and ambulance services to transport, treat and quarantine affected passengers and/or crew. Additionally, cruise operators should ensure that there is adequate space on board the cruise ship for quarantine facilities to isolate persons affected by a COVID-19 outbreak until the ship can return to port and access shoreside facilities.

Question 10: How should cruise ship operators address specific country travel restrictions that emerge as COVID-19 activity increases in geographical areas, such as:

Question 10b. Seaport closures preventing porting of ships?
Answer: Cruise lines should have pre-arranged emergency response, quarantine and repatriation plans with all homeports and planned ports of call, including pre-negotiated arrangements with appropriate local officials, consulates and medical facilities. Cruise lines should also identify alternate ports of call if a diversion is necessary, and make the necessary arrangement with local officials and foreign consulates.

Question: 16. What steps should cruise ship operators take to prevent the introduction of COVID-19 onto ships after resuming passenger operations?

Question 16a. Should cruise ship operators deny boarding to passengers with COVID-like illness or confirmed infection with COVID-19?
Answer: Passengers who have confirmed COVID-19 illness or are symptomatic should be denied boarding.

Question 16b. Should cruise ship operators deny boarding to passengers with known exposure to a person with COVID-19 during the previous 14 days?
Answer: Denial of boarding of any passenger that tests negative for COVID-19 should only be considered for those who have had close contact (as defined by CDC guidance) within the previous 14 days with a person with a confirmed positive COVID-19 test.

Question 16c. What methods should cruise ship operators use to screen for exposures and detect COVID-like illness in passengers seeking to board the ship?
Answer: Consistent with the Florida Ports Council protocol, operators should require screening of all passengers and crew for COVID-19 completed within 72 hours prior to embarkation using a medically approved testing methods temperature checks and screening questionnaires. Shore staff checking in passengers should be trained to identify symptoms and report potential illness to the cruise line's designated health supervisor.

**Question 16d: Should cruise ship operators deny boarding to passengers coming from COVID-19 high-incidence geographic areas?**
Answer: Cruise ship operators should apply the same criteria as is applied to international air transportation at the time of the ship sailing.

**Question 16e. How should cruise ship operators manage embarking crew with COVID-like illness, known exposure, or coming from high-incidence geographic areas after resuming passenger operations?**
Answer: Cruise ship operators should deny boarding for any crew members with possible, probable, or confirmed COVID-like illness, or close contact with any known exposure within the past 14 days. However, crew members with a negative diagnostic test within 72 hours of embarkation should be permitted to board. Crew members should be subject to routine medical screening to mitigate the risk of transmission while aboard the ship.

**Question 16f. Should cruise ship operators test passengers and crew pre-boarding? If yes, what should the testing protocol be?**
Answer: Consistent with the Florida Ports Council protocol, cruise passengers should be tested within 72 hours of embarkation using a medically approved testing method. New crew members should be tested before being allowed to board the ship. A new crew member must not embark until a negative test result.

**Question 16g. Should cruise ship operators transport and house passengers and crew denied boarding at the seaport to avoid exposing the public?**
Answer: Cruise operators should remain responsible for providing transportation and appropriate shore facilities/housing to crewmembers denied boarding.  Cruise operators should also work with local authorities to develop protocols to address passengers denied boarding to minimize the risk of community spread.

**Question 19. Should cruise ship operators limit shore excursions?**

**Question 19a. What precautions should cruise ship operators take during shore excursions to prevent passengers and crew from being exposed to COVID-19?**
Answer: Operators should ensure use of pre-approved tour operators selected by the cruise operator that comply with an approved COVID plan and local protocols and ordinances, whichever is more stringent.

**Question 19b. During shore excursions, how should cruise ship operators prevent transmission of COVID-19 into land-based communities?**
Answer: Cruise operators should emphasize to passengers upon docking that they must use pre-approved, regularly screened vendors that adhere to the ship's sanitation, PPE and COVID-19 plan for excursions to ensure that there is  minimized contact with anyone ashore who may have the COVID-19 virus.

**Question 22. What precautions should the cruise line industry take to safely disembark passengers and crew without transmitting COVID-19 into local seaport communities?**

Answer: As passengers and crew were tested upon embarkation and screened throughout the cruise, operators must continue their COVID-free passenger protocol on land during port-of-call visits using pre-approved tour operators. At homeports, where passengers are disembarking at the end of their cruise, passengers and crew must be screened before disembarkation, and any COVID-19 positive or symptomatic persons must be managed using the approved response plan.
All embarking/disembarking passengers and crew must be informed about the local community's COVID-19 prevention practices and restrictions, including local emergency orders and mandates.

Maritime Unit
Director Redfield
September 21, 2020
Page 4 of 4

Question 26. How should cruise ship operators decrease or eliminate the risk for COVID-19 transmission for both passengers and crew in the following group settings?

Question 26a. Embarkation and disembarkation?
Answer: Cruise ship operators' approved plans should prescribe that passengers and crew practice the CDC guidelines on social distancing, facial coverings, sanitizing, etc. Cruise ship protocols should require testing passengers using a medically approved testing method completed within 72 hours prior to embarkation and employ health screenings prior to disembarkation. In addition, each new crew member assigned to the ship must not embark until a negative test result is received and should be quarantined according to their CDC approved plan.
All disembarking passengers and crew must be informed about the local community's COVID-19 prevention practices and restrictions, including local emergency orders and mandates.

Thank you again for providing us with this opportunity to submit comments for your consideration.

Sincerely,

Jonathan T. Daniels
Chief Executive and Port Director

Cc: Glenn Wiltshire, Deputy Port Director
    Bertha Henry, County Administrator
    Andrew Meyers, County Attorney