**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

STATE OF FLORIDA,

        Plaintiff,

v.

XAVIER BECERRA, Secretary of Health and Human Services, in his official capacity; HEALTH AND HUMAN SERVICES, ROCHELLE WALENSKY, Director of the Centers for Disease Control and Prevention, in her official capacity; CENTERS FOR DISEASE CONTROL AND PREVENTION; The UNITED STATES OF AMERICA, et al.

        Defendants.

_____/

Case No. 8:21-cv-839-SDM-AAS

## *AMICUS CURIAE* BRIEF OF THE AMERICAN SOCIETY OF TRAVEL ADVISORS IN SUPPORT OF PLAINTIFF'S COMPLAINT FOR DECLARATORY AND PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF

The American Society of Travel Advisors, Inc. ("ASTA"), by and through undersigned counsel, submits this *amicus curiae* brief in support of the State of Florida's Complaint for Declaratory and Preliminary and Permanent Injunctive Relief.

## INTRODUCTION

As a result of the COVID-19 pandemic and the federal government's response to it, the travel agency business in the United States has come to an

almost complete halt and has remained there for fifteen months and counting. Among any number of pronouncements and directives either discouraging travel or prohibiting it outright emanating from the Centers for Disease Control and Prevention (CDC) and the U.S. State Department, arguably the most damaging to the industry was the CDC's issuance of a No Sail Order and Suspension of Further Embarkation (the "No Sail Order") for cruise ships. The order, which became effective on March 14, 2020, was based on the belief at the time that cruise ship travel may continue to introduce, transmit, or spread COVID-19. From the mid-March through the end of September 2020, a period of just over six months, the suspension of cruise operations resulted in an estimated loss of 518,000 jobs and $23 billion in wages worldwide.[1]

While it did not equate to the immediate resumption of cruise line operations, the CDC's replacement of its No Sail Order with a framework for a phased resumption of cruise ship operations (the "Conditional Sailing Order" or "CSO") last October was anticipated to be a welcome development and a key milestone in the restart of the travel industry. At the time of the announcement of the CSO, there was no vaccine widely available, and COVID-19 infection and death rates were far higher than they are now. Unfortunately, despite these very

---

[1] *2021 State of the Cruise Industry Outlook*, Cruise Lines International Association (CLIA), p. 26.

Case 8:21-cv-00839-SDM-AAS   Document 54   Filed 05/19/21   Page 3 of 20 PageID 2552

*State of Florida v. Becerra, et al.*
*Case No. 8:21-cv-839-SDM-AAS*
Page | 3
_____

encouraging developments, the Defendants took little, if any, substantive action. Only now – more than six months after the CSO was announced - has the CDC even begun to establish the conditions to permit cruising to safely resume.

As the national trade association for individual travel advisors and travel agencies of all sizes, ASTA is positioned to provide a unique perspective on the economic impact the shutdown of cruise travel has had on an entire industry. In addition, ASTA has long served as an advocate of the traveling public by, among other things, providing its members with training and educational resources to better serve their clients and by promulgating and enforcing a strict code of ethics that all members pledge to adhere to. Accordingly, this brief will detail the effects of the cruise shutdown from the broader viewpoint of the travel advisor industry as well as that of travel-oriented consumers whose freedom to travel as they see fit has been curtailed in a most unprecedented way due to the Defendants' response to the pandemic.

**ARGUMENT**

I. DEFENDANTS' ACTIONS HAVE CAUSED GRAVE ECONOMIC INJURY TO THE TRAVEL ADVISOR INDUSTRY NATIONWIDE

As the largest single distribution channel, travel agencies – whether "brick and mortar" retail establishments, home-based businesses, online-only or one of many hybrid business models in between – play a critical role in the landscape of the U.S. travel and tourism industry. Travel agencies are responsible for the sale of

the majority of airline tickets in the U.S. and, of greater relevance to the subject matter of this action, are also the primary distributors of cruises. In 2019, travel agencies and advisors sold approximately $13 billion worth of cruises in the U.S. – representing 66 percent of the total market.[2] At last count, there were close to 15,000 retail locations in the U.S., employing over 108,000 people, plus an additional 60,000 self-employed travel advisors.

The travel advisor industry is overwhelmingly leisure-focused, with more than 82 percent of travel advisors selling, either exclusively or primarily, leisure travel.[3] In contrast, less than 18 percent of advisors are exclusively or primarily corporate, meaning those advisors who cater to the travel needs of businesses where purchases are governed by a formal travel policy. While advisors in this latter group were admittedly less materially impacted by the shutdown of cruising attributable to the governmental response to the COVID-19 pandemic (though equally impacted by the near-total halt in travel bookings generally), fewer than one in five advisors nationwide are in this category. And among those advisors in the leisure category, 60 percent reported specializing in selling ocean cruises, the

---

[2] *Phocuswright: U.S. Travel Agency Distribution Landscape*: 2016-2021. This comprehensive report on the travel agency marketplace in the United States provides a number of other key data points that underscore the importance of cruise travel to the industry as a whole.

[3] "Leisure travel" refers to travel for leisure or personal purposes, while a "leisure agency," according to the Phocuswright methodology, is one in which sales of leisure travel comprises at least 70 percent of the agency's gross sales volume.

highest rate among any of the specialties from which survey respondents could choose.[4] And among those operating retail storefront agencies, 63 percent – more than five out of every eight – claim ocean cruises as their number one specialty.

The travel agency industry as a whole continues to be heavily reliant on the commissions paid by travel suppliers for bookings made by the advisor to his or her clients. While most travel suppliers, such hotel chains, car rental companies, tour operators and, to a lesser extent, the airlines, pay advisors commissions on the sale of travel, leisure agencies are particularly reliant upon the sale of cruises. There are two primary reasons for this.

First, the percentage of the transaction price paid in connection with a booking, *i.e.*, the commission rate, is generally higher for cruises than for other forms of travel. Among those advisors reporting the receipt of commission income from cruises, the average commission rate was 15 percent.[5] This compared quite favorably with the average rates received in connection with hotel, air ticket, car rental and rail bookings, which stood at 10 percent, 7 percent, 6 percent and 5 percent, respectively.[6] Based on 2018 data, the average price paid per traveler for an ocean cruise booking, exclusive of any onboard spending, was $1,217, resulting

---

[4] *Id.*at 45.
[5] *2013 Financial Benchmarking*, American Society of Travel Agents, p. 36.
[6] *Id.*

in an average commission of $223.[7]

Second, the typical leisure agent books more cruises than any other single travel product. According to a 2020 survey by travel advisor website *Host Agency Reviews*, cruises – specifically, ocean cruises – have been the top-selling product four years running with, between 32 percent and 41 percent of the survey respondents stating that cruises were their number one product between 2016 and 2019.[8] In addition, nearly all of the major cruise lines offer travel advisors and travel agencies incentives when certain sales volume or sales growth targets are achieved. These incentives, often referred to in the industry as bonus commissions or overrides, typically range from 0.5 percent to 2.0 percent or more.

To lessen to a certain extent their reliance on commissions paid by suppliers, some leisure agencies charge service or consultation fees to their clients for assisting them with the trip planning and booking processes. However, the number of those doing so is relatively small, with only about 18 percent reporting that they did.[9] Similarly, few advisors – only about nine percent – elect to mark up the price of the travel they sell to their clients as a means of generating additional income, meaning that the commission remains the predominant source

---

[7] https://cruisemarketwatch.com/financial-breakdown-of-typical-cruiser/ (accessed May 3, 2021).
[8] *The Hosted Travel Agent Longitudinal Report, 2020*, https://hostagencyreviews.com/blog/host-travel-agent-longitudinal-report-2020 (accessed May 3, 2021).
[9] *Phocuswright: U.S. Travel Agency Distribution Landscape: 2016-2021*, p. 51.

___

of business income for the overwhelming number of leisure agencies.[10] The foregoing statistics make evident that the operation of the cruise industry is vital to the financial health of the travel agency sector.

It is no exaggeration to state that the effects of the Defendants' actions with respect to the travel and tourism industry have been devastating. Indeed, few if any sectors of the American economy have been as hard hit by the COVID-19 pandemic as travel has, and the suspension of cruise operations in the U.S. has been a key factor in the decimation of the travel agency sector in particular. ASTA member surveys conducted last August revealed that business income of 94.3 percent of agencies - nearly 19 out of every 20 - was down at least 75 percent as compared with 2019. Further, even factoring in the financial relief made available to businesses generally under the CARES Act[11] and successor legislation, close to 64 percent of travel agencies surveyed have laid off at least half their staff. All told, 73 percent of ASTA members predicted they would be out of business within six months if travel did not meaningfully improve or additional federal relief was not made available.[12]

Moreover, while the travel industry appears poised for a strong recovery

---

[10] *Id.*
[11] Coronavirus Aid, Relief, and Economic Security Act (P.L. 116-136).
[12] American Society of Travel Advisors (2020, August 6). *Over Seventy Percent of Travel Agencies Will Be Out of Business in Six Months or Less Without Additional Federal Relief* [Press release].

once COVID-19 abates given the pent-up consumer demand for travel, that optimism is tempered in recognition of the fact that economic recovery for travel advisors will lag that of the industry as a whole by months, if not a year or more. Indeed, 62 percent of respondents to an ASTA survey earlier this year expected business income to lag the return of travel bookings by at least six months. This is because travel suppliers – cruise lines, in addition to hoteliers, tour operators, airlines, and others – do not issue full commission payments to the booking agencies until their clients have actually completed their travel, which could be, and often is, many months if not a year or more later. As such, a sale made today often generates no immediate income for the agency despite the effort the advisor expended on behalf of the traveler.

Worse, should the previously booked client for whatever reason be unable to travel, in many cases the commission is lost in its entirety, this despite the fact that the advisor has already delivered to the supplier a client ready, willing and able buyer on the seller's terms and would therefore be entitled to receive the commission under the prevailing common-law rule.[13] As the governmental response to the pandemic caused nearly all cruise itineraries to be cancelled beginning in mid-March 2020, this is exactly what happened on an unprecedented

---

[13] See, e.g., *Strout Farm Agency v. Hollingsworth*, 92 Fla. 673, 110 So. 267 (1926).

scale, and to date advisors still await commissions in connection with sales made months, and in some cases years, before the shutdown.

And while new business and the revenue associated with it came to a standstill, the work did not. Ironically, advisors have been busier than ever, working around the clock to accommodate clients whose plans were unexpectedly disrupted and needed assistance with rebooking travel, in some cases multiple times, and securing refunds from suppliers. This is the situation most travel advisors find themselves in today – working harder than ever before but essentially without pay.

A final point we wish to emphasize with respect to the economic impact of cruise industry lockdown is its disproportionate effect on small, female-owned business enterprises. This is a function of the industry's demographics, as the typical travel advisor today is a female over the age of 55 whose travel bookings are predominantly leisure. A substantial percentage of advisors today are home-based, and their numbers are growing, although the more familiar traditional storefront retail agencies are still well represented. Fully 98 percent of travel agencies are classified as small businesses according to the Small Business Administration's standards. It is respectfully submitted that of all of the stakeholders impacted by the Defendants' actions, it is these business owners who are the least equipped to weather the continued shutdown of the cruise industry.

...

## II. DEFENDANTS' ACTIONS HAVE HAD A SUBSTANTIAL ADVERSE IMPACT ON THE PUBLIC AND INFRINGES UPON THE RIGHT TO TRAVEL

A preliminary and/or permanent injunction enjoining the Defendants from enforcing the Conditional Sailing Order would be consistent with the public interest insofar as it has already been established that cruising can be conducted safely with reasonable health protocols in place. Since September 2020, cruise ships have resumed sailings in several major markets outside of the United States. In that time, over 400,000 passengers have cruised in Europe, Asia and the South Pacific, with fewer than 50 reported coronavirus cases, an exceedingly low infection rate, and no fatalities.[14]

While the State of Florida will have the burden of establishing that the injunction, if issued, will "not be adverse to the public interest,"[15] it is respectfully submitted that this burden can be sustained given the demonstrated effectiveness of these protocols in conjunction with the substantial reduction in COVID-19 infection and mortality rates that has been observed over the past several months. The widespread availability of effective COVID-19 vaccines, coupled with higher-than-anticipated vaccination rates nationwide, are additional factors weighing heavily in favor of enjoining Defendants from continuing to enforce the CSO.

---

[14] *Cruise Lines Ready to Sail Again in the United States,* Cruise Lines International Association, press release (March 24, 2021).
[15] *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000).

Moreover, allowing the CSO to stand indefinitely deprives American citizens of their right to travel freely.  The U.S. Supreme Court has long recognized the existence of a fundamental right to travel, though the precise origin of this right is not altogether clear in the absence of express language affirming such a right within the Constitution itself.  As expressed by the Court in *Saenz v. Roe*,

> The word "travel" is not found in the text of the Constitution. Yet the "constitutional right to travel from one State to another" is firmly embedded in our jurisprudence. Indeed, as Justice Stewart reminded us in *Shapiro v. Thompson*, the right is so important that it is "assertable against private interference as well as governmental action . . . a virtually unconditional personal right, guaranteed by the Constitution to us all."[16]

Where the Supreme Court recognizes a right as fundamental, it is entitled to a high degree of protection from encroachment by the government.  Specifically, in assessing the validity of governmental actions challenged on the basis of an alleged infringement of a fundamental right "explicitly or implicitly protected by the Constitution," courts will apply the strict scrutiny standard.[17]  Under this standard of review, it is well established that for a governmental action to be upheld, the government must demonstrate that:  i) it has a compelling governmental interest and ii) the law is narrowly tailored to further that interest.[18]

---

[16] *Saenz v. Roe*, 526 U.S. 489 (1999) (internal citations omitted).
[17] *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 17, 93 S. Ct. 1278, 1288 (1973).
[18] *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 783, 127 S. Ct. 2738, 2789 (2007).

___

And while admittedly the leading cases amplifying the fundamental nature of the right to travel focus on restrictions implemented by governments at the state level, there is no logical basis to exclude actions of the federal government, such as those at issue here, from the strict scrutiny analysis. Indeed, strict scrutiny review seems particularly appropriate here insofar as the Defendants are Executive Branch agencies that have not been vested with *any* legislative authority under Article I of the Constitution and as such are largely unaccountable to voters for their deeds. In contrast, the actions taken by state governments in response to COVID-19 and earlier public health emergencies are typically grounded in the general police power vested in the states under the Tenth Amendment, and as such can point to a clear constitutional basis.

Having established that the right to travel has been recognized as a fundamental right, and that strict scrutiny review is applicable, it follows then that the abridgment of that right by the Defendants' policies in response to the COVID-19 pandemic – which again resulted in the shutdown of an entire industry for well over a year – must not be upheld unless they can establish both a compelling interest and that the action taken was narrowly tailored to advance that interest. To satisfy the "narrowly tailored" element of the test, courts will generally require

___

the government to show that it adopted the least restrictive means available to further the compelling interest.[19]

To be fair, most observers would find the necessity of containing a global contagion to constitute a compelling governmental interest, at least with respect to the situation as it existed in the very early stages of the COVID-19 pandemic in the United States.[20] Indeed, in the weeks immediately following the CDC's announcement of the No Sail Order in March 2020, the number of reported new COVID-19 cases in the U.S. rose sharply. The statistics, coupled with the uncertainty and fear surrounding the pandemic situation at the time and, significantly, the lack of a vaccine, arguably could support a finding that the Defendants had a compelling interest to protect that justified taking drastic action.

That being said, however, the public health situation in the United States has improved dramatically in the fifteen months since the No Sail Order first went into effect. By the CDC's own accounting, since its peak in early January 2021, the number of reported new cases has been in a virtual freefall, with the seven-day

---

[19] *Doe v. Reed*, 561 U.S. 186, 232, 130 S. Ct. 2811, 2839 (2010), quoting *Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182, 206, 119 S. Ct. 636, 142 (1999).

[20] For a general discussion of the impact of federal and state coronavirus-related restrictions on the right to travel, see *Travel Restrictions During Coronavirus*, Harvard Law: COVID 19 and the Law, https://covidseries.law.harvard.edu/travel-restrictions-during-coronavirus/ (accessed May 4, 2021).

moving average of such cases down nearly 81 percent over that timeframe.[21] This drastic improvement is, of course, attributable in no small measure to the development and widespread distribution of several effective COVID-19 vaccines, none of which existed at this time last year. So, to the extent that the government may have previously had a compelling interest in taking extreme action to protect public health, which is clearly no longer the case.

Even assuming, *arguendo*, that this Court should find that the Defendants had and still have a compelling governmental interest, they will be unable to demonstrate that they used the less restrictive means to achieve their expressed public health objectives. To the contrary, any number of less-restrictive means to achieve the same ends were, and are, available. In lieu of the total suspension of cruise travel, the CDC could have, for example, permitted cruise lines to operate at 25 percent of capacity or whatever other percentage of capacity it deemed appropriate. Alternatively, passengers could have been required to provide a negative COVID-19 test result in order to board the ship or, if that was not deemed sufficient, to present proof of vaccination prior to boarding. Similarly, the CDC could have required daily temperature checks of all cruise passengers, with those exhibiting any concerning symptoms to be quarantined for the duration of the

---

[21] The seven-day moving average of reported new cases was 249,669 on January 8 and was 47,603 on May 4. https://covid.cdc.gov/covid-data-tracker/#trends_dailytrendscases (accessed May 6, 2021).

cruise. Apart from passenger screening, compliance with specific on-board social distancing or sanitation protocols could also have been mandated as a condition of sailing. It is beyond dispute that all of these actions are effective in combating the spread of COVID-19, as airlines, hotels, theme parks, restaurants, and businesses in scores of other industries have all safely resumed operations utilizing these measures. Because the Defendants cannot show that they adopted the least restrictive means available to further their legitimate public health interests, their actions cannot satisfy strict scrutiny and Plaintiff is therefore entitled to the relief it seeks.

It must be stressed that the denial of the right to travel via cruise ship that has been occasioned by the Defendants' actions is anything but theoretical, as a substantial percentage of consumers are ready and willing to resume travel, including cruising, again immediately. According to public opinion insights gleaned from the April 12, 2021 "Back-to-Normal Barometer"[22] survey, fully 23 percent of respondents stated that they had taken a trip at least fifty miles from home that included an overnight hotel stay within the past month. Similarly, 20

---

[22] Bonjean, Ron, et al. (2021). *Back-to-Normal Barometer: Are We There Yet?* The Back-to-Normal Barometer consists of a series of public opinion surveys intended to gauge consumer sentiment with respect to a wide variety of issues relating to the disruption caused by the COVID-19 pandemic. Approximately two such surveys are fielded each month, beginning midway through last year. The use of multiple surveys asking the same questions permits the researchers to identify emerging trends in public opinion as it pertains to activities impacted by the pandemic, including travel, among other things.

percent – one in five – consumers reported having taken a commercial airline flight over the same period, while one-third indicated that they planned to take a vacation by June 2021.[23] And even before the COVID vaccines began to be distributed in earnest in early 2021, consumers were already expressing a longing for travel outside the U.S. 53 percent of respondents to the December 2020 Back-to-Normal survey indicated that they "strongly" agreed or "somewhat" agreed with the statement that their desire to travel internationally is greater now than it was prior to the pandemic.[24]

With respect to cruise travel specifically, a solid majority of Back-to-Normal respondents stated that they are "ready to go" on a cruise vacation now. While the percentage of consumers stating that that response reflects their current point of view has fluctuated between 51 percent and 78 percent in the first four months of 2021, it is interesting to note that the number has been at or above 50 percent in every iteration of the survey since late July 2020.[25] These numbers can only be expected to continue to rise as an ever-greater share of the U.S. population becomes fully vaccinated against COVID.

Moreover, it appears that most consumers do not believe that the CDC's action in singling out cruise travel for continued lockdown is warranted by the

---

[23] *Id*. at 9.
[24] *Id*. at 42.
[25] *Id*. at 36.

actual health risks presented. Indeed, more than half of the consumers responding to the most recent survey agreed with the statement that "the cruise industry is being unjustifiably punished by the extension of the no-sail order to November of 2021."[26] This is, frankly, unsurprising given that in late April the CDC lifted testing and quarantine requirements for fully vaccinated persons traveling domestically but declined to issue corresponding guidance to permit cruising to resume.[27] It strains credulity to announce that that fully vaccinated persons "can travel safely within the United States" while at the same time maintain that <u>all</u> cruising, regardless of what precautions may be taken, continues to pose an unacceptable risk to public health and safety. And having failed to disclose the existence of any defensible scientific rationale for the disparate treatment, it is not unreasonable for one to conclude that there is none.

## **CONCLUSION**

For the foregoing reasons, American Society of Travel Advisors, Inc. respectfully requests that the relief Plaintiff seeks in its complaint should be granted, along with such other and further relief as the Court deems equitable and just.

---

[26] *Id.* at 46.
[27] https://www.cdc.gov/coronavirus/2019-ncov/travelers/travel-during-covid19.html (accessed May 5, 2021).

*State of Florida v. Becerra, et al.*
*Case No. 8:21-cv-839-SDM-AAS*
Page | 18

_____

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 19th day of May 2021, the foregoing document was filed via electronic filing using the CM/ECF system, which sent e-mail notification of such filing to all CM/ECF participants and via electronic mail on all counsel or parties of record on the attached Service List.

Respectfully submitted,

By: */S/ Eric J. Stockel*

**ERIC J. STOCKEL, ESQUIRE**
Florida Bar No. 188905
EStockel@sbsblaw.com
**SCHOUEST, BAMDAS, SOSHEA & BENMAIER, PLLC**
*Local Counsel for ASTA*
750 Park of Commerce Boulevard
Suite 301
Boca Raton, FL 33487
(561) 990-1699 – Phone
(561) 283-3383 – Facsimile

- and -

**PETER. N. LOBASSO, ESQUIRE** (*pro hac vice*)
Virginia Bar No. 66348
plobasso@asta.org
**American Society of Travel Advisors, Inc.**
675 N. Washington Street, Suite 490
Alexandria, VA 22314
Telephone: (703) 739-6854
Facsimile: (703) 684-8319

---

## SERVICE LIST

**United States District Court for the Middle District of Florida**

*State of Florida v. Becerra, et al.*

**Case No. 8:21-cv-839-SDM-AAS**

**James Hamilton Percival, II, Esq.**
**Anita J. Patel, Esq.**
**Jason H. Hilborn, Esq**.
Office of the Florida Attorney General
PL-01, The Capitol
Tallahassee, FL 32399
Emails:
James.percival@myfloridalegal.com,
Anita.Patel@myfloridalegal.com, and
jason.hilborn@myfloridalegal.com

*Attorneys for Plaintiff State of Florida*
_____

**David S. Harvey , Jr., Esq.**
Lewis Brisbois Bisgaard & Smith
401 E. Jackson Street Suite 3400
Tampa, FL 33602
Email: david.harvey@lewisbrisbois.com

**Kimberly Fuchs**
Office of the Attorney General of Texas
Administrative Law Division
300 W. 15th Street
Austin, TX 78701
Email: kimberly.fuchs@oag.texas.gov

**Ryan G. Kercher**
Office of the Attorney General
PO Box 12548, Capital Station (MC 019)
Austin, TX 78711

**Amy Powell, Esq.**
DOJ-Civ
150 Fayetteville St., Suite 2100
Raleigh, NC 27601
Email: amy.powell@usdoj.gov,
eric.beckenhauer@usdoj.gov and
liam.c.holland@usdoj.gov

*Attorney for Defendants Xavier Becerra, Department of Health and Human Services, Rochelle Walensky, Centers for Disease Control and Prevention and United States of America*
_____

**Edward Wenger, Esq.**
Hopping, Green & Sams
119 S. Monroe St., Suite 300
Tallahassee, FL 32301-1591
Email: edw@hgslaw.com

**Jessica M. Alloway, Esq.**
State of Alaska
1031 W. 4th Avenue, Ste 200
Anchorage, AK 99501
Email: jessie.alloway@alaska.gov

**Lael A. Harrison, Esq.**
State of Alaska
P.O. Box 110300
Juneau, AK 99811

*State of Florida v. Becerra, et al.*
*Case No. 8:21-cv-839-SDM-AAS*
*Page | 20*

_____

Email: ryan.kercher@oag.texas.gov

*Attorneys for Intervenor State of Texas*
_____

**Marc S. Young, Esq.**
PO Box 1693
Sealy, TX 77474
Email: marc.young.pe@gmail.com
*Pro se*

Email: lael.harrison@alaska.gov

*Attorneys for Intervenor State of Alaska*