UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

STATE OF FLORIDA,

Plaintiff

v.

XAVIER BECERRA, Secretary of the
Dep't of Health and Human Services,
*et al.*,

Defendants.

Case No. 8:21-cv-839-SDM-AAS

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION
TO TEXAS'S MOTION TO INTERVENE**

**INTRODUCTION**

The State of Texas, bypassing courts in its home state, seeks to join this lawsuit brought by the State of Florida against the Atlanta-based Centers for Disease Control and Prevention (CDC) in the Middle District of Florida. Texas, much like Florida, declined to challenge the Conditional Sail Order and related CDC orders for over a year, but now asks this Court to authorize the unconditional resumption of cruise ship operations, without enforceable restrictions to prevent the spread of COVID-19.

Early in the pandemic, several deadly outbreaks were clustered on cruise ships, and these outbreaks required vast expenditures of government resources to evacuate, quarantine, isolate, house, and treat passengers. These experiences

1

demonstrated that cruise ships are uniquely suited to spread COVID-19, likely due to their close quarters for passengers and crew for prolonged periods, and other factors. As a result of these outbreaks, on March 13, 2020, the cruise ship industry's principal trade group, the Cruise Line International Association ("CLIA"), voluntarily suspended passenger operations, and repeatedly extended that voluntary suspension. Not all cruise operators, however, are members of CLIA, and accordingly, many countries, including the United States, paused operations of these high-risk ships while their operators completed plans to ensure a safe environment for travel.

In the United States, the "No Sail Orders" of last year have been superseded by a framework for re-opening known as the "Conditional Sailing Order," or "CSO," which sets reasonable conditions for the operation of cruise ships based on the best available scientific evidence. The CSO provides for a phased re-opening, and as of May 5, 2021, the CDC has provided ship operators all of the necessary information to ultimately resume sailing. This framework is needed to ensure the safe re-opening of cruise operations in the United States, and it is based on the CDC's plain authority to regulate ships in U.S. waters to prevent the spread of disease.

While Texas's intervention motion is flawed for a number of reasons, the Court should simply defer resolution of the motion until it decides whether the State of Florida has standing. It would not be appropriate to allow Texas to intervene in a matter in which the Court lacks jurisdiction over the original Plaintiff's claims. And deferring resolution of the motion would cause no prejudice: unlike Florida, Texas

has not sought a preliminary injunction, and as Alaska appears to have recognized, the additional guidance the CDC issued on May 5 makes intervention less urgent, if not unnecessary. *See* ECF No. 35 (Alaska's motion to stay briefing on its intervention motion).

In any event, Texas's motion should be denied. To start, Texas lacks standing to raise these claims on its own. Like Florida, Texas cannot rely on alleged economic injury to its residents to establish standing, and has not met its burden to establish a cognizable injury to the State itself, let alone one fairly traceable to the challenged actions. Regardless, even if Texas could establish standing, it cannot meet the standards for intervention as of right. It has not identified a legal right that will necessarily be impaired, given its ability to file suit separately, in its home state, and fails to show how Florida's prosecution of this suit would be inadequate.

## **BACKGROUND**

A comprehensive background, including description of the CDC's authorities and actions in this matter, is set forth in Defendants' Memorandum in Opposition to Plaintiff's Motion for a Preliminary Injunction, *see* ECF No. 31 ("Defs.' PI Opp."), at 4-12, and the Declaration of Capt. Aimee Treffiletti, submitted in support of that opposition, *see* ECF No. 31-1 ("Treffiletti Decl.).

**Statutory and Regulatory Authority**. Section 361 of the Public Health Service Act ("PHSA") authorizes Defendants "to make and enforce such regulations as in [the Secretary's] judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases from foreign countries into the

States or possessions, or from one State or possession into any other State or possession." 42 U.S.C. § 264(a).[1]  The CDC Director implements this authority through regulations at 42 C.F.R. parts 70 and 71 that regulate vessels arriving in U.S. ports and permit CDC to act when state or local control is inadequate. *See* Control of Communicable Diseases, 82 Fed. Reg. 6890, 6892 (Jan. 17, 2017); 42 C.F.R. § 71.32(b); *id*. § 71.31(b); *id*. § 70.2.  Among other authorities, the CDC "may issue a controlled free pratique [i.e., permission for a carrier to enter a U.S. port, disembark, and begin operations under certain stipulated conditions] to the carrier stipulating what measures are to be met." *Id*. § 71.32(b); *see also id*. § 71.1(b).

**The Conditional Sailing Order**.  On Oct. 30, 2020, the CDC issued the *Framework for Conditional Sailing and Initial Phase COVID–19 Testing Requirements for Protection of Crew*, 85 Fed. Reg. 70153-01 (Nov. 4, 2020).  The CSO announced that "[a]fter expiration of CDC's No Sail Order ["NSO"] on October 31, 2020, CDC will take a phased approach to resuming cruise ship passenger operations in U.S. waters." *Id*.[2] The CDC reviewed the NSO extensions and the evidence gathered to

---

[1] Although the statute assigns this authority to the Surgeon General, Reorganization Plan No. 3 of 1966 transferred all statutory powers and functions of the Surgeon General to the Secretary of Health, Education, and Welfare, now the Secretary of Health and Human Services, 31 Fed. Reg. 8855, 80 Stat. 1610 (June 25, 1966), *see also* An Act to Establish a Dep't of Educ., Pub. L. No. 96-88, § 509, 93 Stat. 695 (October 17, 1979) (codified at 20 U.S.C. 3508(b)). Although the Office of the Surgeon General was later re-established, the Secretary retains these authorities.

[2] On March 14, 2020, the CDC issued an order entitled "*No Sail Order and Suspension of Further Embarkation.*" *See* 85 Fed. Reg. 16628-03 (Mar. 24, 2020) ("NSO"). The NSO contained several requirements for cruise ships that operate in U.S. waters or intend to arrive in U.S. waters during the effective period of the NSO; most relevant here, the NSO required all disembarkation of passengers to be undertaken in coordination with relevant agencies, and prevented any embarkation or operations except as specifically permitted in consultation with the CDC. *Id*. at 16631. The CDC extended the NSO three times, and made additional data-based findings in each extension about the

4

date regarding mitigation of risk on board cruise ships, including the results of scientific studies of onboard transmission, progress made by cruise lines, and public comments received in response to a request for information. *Id.* at 70154-57.[3] *See also* Treffiletti Decl. ¶¶ 33-45.

Based on this record, the CDC determined that a phased approach to granting controlled free pratique was appropriate:

- Phase 1: Crew testing. Ship operators to conduct shoreside testing of crew, develop on-board testing capacity, begin testing crew weekly, and submit results to the CDC.

- Phase 2: Simulated voyages. These are designed to test ship operators' protocols for mitigating COVID–19 onboard, and require them to "document the approval of all U.S. port and local health authorities where the ship intends to dock or make port," including adequate agreements to deal with housing and medical care in event of an outbreak.

- Phase 3: Certification. After successfully completing simulated voyages, ship operators may apply for a Conditional Sailing Certificate.

- Phase 4: Return to passenger voyages, in a manner that mitigates the risk of COVID-19 spread.

85 Fed. Reg. at 70153, 70158-59; Treffiletti Decl. ¶ 33.

---

continued transmission of COVID-19 on board cruise ships, and the continued need for federal action in light of the inadequacy of local control. *See No Sail Order and Suspension of Further Embarkation: Notice of Modification and Extension and Other Measures Related to Operations*, 85 Fed. Reg. 21004 (Apr. 15, 2020); *No Sail Order and Suspension of Further Embarkation; Second Modification and Extension of No Sail Order and Other Measures Related to Operations*, 85 Fed. Reg. 44085-01 (July 21, 2020); *No Sail Order and Suspension of Further Embarkation; Third Modification and Extension of No Sail Order and Other Measures Related to Operations*, 85 Fed. Reg. 62732-01 (Oct. 5, 2020).
[3] *See also* CDC Regulations.gov, *RFI* Cruise Ship Planning, Comments (July 21, 2020), *available at* https://www.regulations.gov/document/CDC-2020-0087-0001/comment (last visited around May 5, 2021) (around 13000 comments received); Treffiletti Decl. Ex. A (selected comments).

**Subsequent Developments**. Although Phase 1 was originally planned to last 60 days, ship operators reported that supply issues prevented them from procuring onboard laboratory equipment, and the CDC extended the time for compliance, and worked on the guidance for the next phases. *See* Treffiletti Decl. ¶¶ 46-50.

On April 2, 2021, after consulting extensively with other health authorities, the CDC announced the guidance for the next phase. In Phase 2(a), ship operators are preparing to conduct simulated voyages, including by complying with new technical instructions for crew testing and negotiating agreements with port and local health authorities.[4] *See id*. ¶¶ 50-55. On April 28, 2021, following multiple meetings with industry representatives, the CDC sent a letter to cruise ship operators, emphasizing the agency's commitment to the phased resumption of passenger operations around mid-summer, and clarifying several aspects of the Phase 2(a) guidance. *Id.* ¶ 52 & Ex. B. Among other things, that letter explains that the CDC will respond to an application within five business days, clarifies that multiport agreements are acceptable, updates the vaccination and testing requirements, and provides that "[i]n lieu of conducting a simulated voyage," ship operators may attest "that 98 percent of crew are fully vaccinated" and that "95 percent of passengers" will be "verified by the cruise ship operator as fully vaccinated prior to sailing." *Id.*

---

[4] *See* CDC, *Technical Instructions for Mitigation of COVID-19 Among Cruise Ship Crew*, https://www.cdc.gov/quarantine/cruise/management/technical-instructions-for-cruise-ships.html (last visited May 7, 2021); CDC, *Technical Instructions for a Cruise Ship Operator's Agreement with Port and Local Health Authorities under CDC's Framework for Conditional Sailing Order*, https://www.cdc.gov/quarantine/cruise/instructions-local-agreements.html (last visited May 7, 2021)

On May 5, 2021, the CDC released guidance regarding simulated voyages, providing specific instructions for how cruise ship operators may test their health and safety protocols in U.S. waters through such voyages. Treffiletti Decl. ¶ 58 & Exs. C, D.[5] CLIA is publicly advocating for a "phased resumption" of cruising to begin in early July, which is consistent with current CDC guidance and the April 28 letter.[6]

**This Litigation**.   The State of Florida filed suit in this district in a Complaint raising five counts against Defendants, and seeking a permanent injunction against the CSO in its entirety. Plaintiff has filed a motion for a preliminary injunction as well, and on May 12, 2021, this Court held a hearing on that motion.

On May 5, 2021, the State of Texas filed a motion to intervene. The proposed intervenor complaint raises five counts and also seeks a permanent injunction against the CSO. Count 1 is similar Florida's Count 1, and argues that the CDC lacks authority to set public health conditions on the operation of cruise ships. Count 2, similar to Florida's Count 2, argues that the CSO is arbitrary and capricious. Count 3, just like Florida's Count 3, raises a claim that the CDC has unreasonably delayed agency action. Count 4, like Florida's Count 4, argues that the CDC was required to

---

[5] *See* Defs.' PI Exs. 4, 5 (*COVID-19 Operations Manual for Simulated and Restricted Voyages under the Framework for Conditional Sailing Order*, https://www.cdc.gov/quarantine/cruise/covid19-operations-manual-cso.html (last visited May 7, 2021); *Technical Instructions for Simulated Voyages by Cruise Ship Operators under CDC's Framework for Conditional Sailing Order*, https://www.cdc.gov/quarantine/cruise/ti-simulated-voyages-cso.html (last visited May 7, 2021)).
[6] *See* Defs.' PI Ex. 8 (CLIA, *Cruise Industry COVID-19 Facts and Resources*, https://cruising.org/en/cruise-industry-covid-19-facts-and-resources (last visited May 7, 2021)).

go through notice-and-comment rule-making. Finally, Count 5, similar to Florida's

Count 5, argues that the CSO is an unconstitutional exercise of legislative power.[7]

## LEGAL STANDARDS FOR INTERVENTION

"Any party, whether original or intervening, that seeks relief from a federal

court must have standing to pursue its claims." *Dillard v. Chilton Cty. Comm'n*, 495

F.3d 1324, 1330 (11th Cir. 2007). "The doctrine of standing is an essential and

unchanging part of the case-or-controversy requirement embodied in Article III of

the Constitution." *Flat Creek Transp., LLC v. Fed. Motor Carrier Safety Admin.*, 923 F.3d

1295, 1300 (11th Cir. 2019) (citation omitted). In the Eleventh Circuit, if there is an

ongoing Article III case or controversy, intervenors "may in some cases be permitted

to 'piggyback' upon the standing of original parties to satisfy the standing

requirement." *Dillard,* 495 F.3d at 1330. This "piggyback" theory, of course, can

apply only if the original Plaintiff has standing. *Id*. The Supreme Court has placed an

additional strict limit on that "piggyback" theory: "*[A]t the least*, an intervenor of right

must demonstrate Article III standing when it seeks additional relief beyond that

which the plaintiff requests." *Town of Chester v. Laroe Ests., Inc.*, 137 S. Ct. 1645, 1651

(2017) (emphasis added); *see also Little Sisters of Poor Saints Peter & Paul Home v.*

*Pennsylvania*, 140 S. Ct. 2367, 2379 n.6 (2020) ("An intervenor of right must

---

[7] On April 20, 2021, the State of Alaska moved to intervene. But on May 6, 2021, after Defendants filed their memorandum in opposition to Plaintiff's motion for a preliminary injunction, Alaska moved to stay briefing on its motion to intervene. Construing Alaska's motion as one for leave to amend, this Court granted Alaska until May 21, 2021 to amend its motion to intervene.

independently demonstrate Article III standing if it pursues relief that is broader than or different from the party invoking a court's jurisdiction.").[8]

Under Federal Rule of Civil Procedure 24(a)(2), a party may intervene as a matter of right if:

> (1) the application to intervene is timely; (2) the applicant has an interest relating to the property or transaction which is the subject of the action; (3) the applicant is so situated that the disposition of the action, as a practical matter, may impede or impair his ability to protect that interest; and (4) the applicant's interest will not be represented adequately by the existing parties to the suit.

*Sierra Club, Inc. v. Leavitt*, 488 F.3d 904, 910 (11th Cir. 2007) (citation omitted). The party's interest must be "direct, substantial and legally protectable." *Georgia v. U.S. Army Corps of Engineers*, 302 F.3d 1242, 1249 (11th Cir. 2002). It must derive from a "legal right" and not be "purely economic." *Mt. Hawley Ins. Co. v. Sandy Lake Properties, Inc.*, 425 F.3d 1308, 1311 (11th Cir. 2005).

Federal Rule of Civil Procedure 24(b) provides for permissive intervention when an applicant's claim or defense and the main action share a common question of law or fact and the intervention will not unduly prejudice or delay the adjudication of the rights of the original parties. Fed. R. Civ. P. 24(b); *Georgia*, 302 F.3d at 1249–50. Ultimately, the decision whether a party should be allowed to permissively

---

[8] A court in this district held that this admonition from the Supreme Court did not apply to permissive intervention. *See Vazzo v. City of Tampa*, No. 8:17-CV-2896-T-36AAS, 2018 WL 1629216, at *4 (M.D. Fla. Mar. 15, 2018), *report and recommendation adopted*, 2018 WL 1620901 (M.D. Fla. Apr. 4, 2018). It is true that the Supreme Court was not addressing permissive intervention, but the Court reasoned that the standing requirements are deeply rooted in our constitutional structure, and that it is always the case that "[a]t least one plaintiff must have standing to seek each form of relief requested[.]" *Laroe Estates*, 137 S. Ct. at 1650-51. Those constitutional requirements apply regardless of the form of intervention sought.

intervene is left to the district court's "full discretionary powers." *United States v. S. Fla. Water Mgmt. Dist.*, 922 F.2d 704, 712 (11th Cir. 1991); *see also Purcell v. BankAtlantic Fin. Corp.*, 85 F.3d 1508, 1513 (11th Cir. 1996) (holding that permissive intervention is "wholly discretionary" and may be denied even if all standards are met).

## **ARGUMENT**

## I.    **THE COURT SHOULD HOLD THIS MOTION IN ABEYANCE UNTIL IT DECIDES WHETHER FLORIDA HAS STANDING.**

The State of Texas purports to seek the same relief that Plaintiff does—a nationwide injunction that would permit unrestricted cruising without enforceable COVID-19 precautions. As Defendants have argued, Florida lacks standing to bring these claims, and it certainly lacks standing to seek relief beyond the State of Florida. Defs.' PI Opp. at 13-18, 45; *see also DHS v. New York*, 140 S. Ct. 599, 600 (Gorsuch, J., concurring) (explaining that party lacks standing to "direct how the defendant[s] must act toward persons who are not parties to the case"); *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018) ("A plaintiff's remedy must be tailored to redress the plaintiff's particular injury."). The Court should determine whether Florida has standing for each claim it seeks to press and for each form of relief sought before deciding whether Texas may join it.

## II.    **TEXAS LACKS ARTICLE III STANDING TO BRING THIS ACTION**

For its own part, Texas cannot establish Article III standing to seek relief with respect to Texas, much less more broadly. To obtain prospective injunctive relief, a

movant must show that it "'is immediately in danger of sustaining some direct injury'" and that "the injury or threat of injury [is] both 'real and immediate,' not 'conjectural' or 'hypothetical.'" *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (citation omitted). The movant must also show a "causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (citation omitted). And the movant must show that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* (citation omitted).

Texas fails to make these required showings for many of the same reasons as Florida. Defs.' PI Opp., at 13-18, 45. First, Texas mistakenly suggests that it may invoke a "quasi-sovereign interest 'in the health and well-being . . . of its residents,'" ECF No. 26 ¶ 26 (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 607 (1982)), but "it is no part" of a State's "duty or power to enforce [its residents'] rights in respect of their relations with the Federal Government," *Alfred L. Snapp & Son*, 458 U.S. at 610 n.16 (quoting *Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923)).[9]

---

[9] Texas relies on cases asserting materially different kinds of injuries. In *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007), the Court found standing for the State to sue to protect its sovereign territory—land and air, including land owned by the State—in light of the State's quasi-sovereign interest in its territory, based explicitly on its injury as landowner. *See id.* at 522 (Massachusetts "has alleged a particularized injury in its capacity as a coastal landowner"). Another case cited by Plaintiff, *Georgia v. Tennessee Copper Co.* 206 U.S. 230 (1907), also involves injury to the physical territory of the State, but is further afield because it does not involve a Federal defendant. In *Texas v. United States*, 809 F.3d 134 (2015), the Fifth Circuit stretched that reasoning to find standing for States to challenge certain federal immigration policies that supposedly invaded a "quasi-sovereign interest" by "imposing substantial pressure on them to change their laws," namely, laws concerning drivers licenses. *Id.* at 150-55. Here, Texas has alleged no such "pressure" to change its laws. Regardless,

Texas cannot bypass this rule by claiming injury not to itself but to its "economy." ECF No. 26 ¶ 28. "The alleged injuries to the state's economy and the health, safety, and welfare of its people clearly implicate the parens patriae rather than the proprietary interest of the state." *Pennsylvania v. Kleppe*, 533 F.2d 668, 671 (D.C. Cir. 1976); *see also Hawaii v. Standard Oil Co.*, 405 U.S. 251, 257-59 (1972) (holding that a state's lawsuit on behalf of its economy is a *parens patriae* suit on behalf of its citizens). Moreover, Texas's "single cruise port," ECF No. 26 ¶ 23, submitted public comments to the CDC that were considered in the creation of the CSO; the port advocated in favor of some of the very CDC-imposed conditions that the State now purports to challenge on its residents' behalf. *See* Exhibit 1, Public Comment, Rodger Rees, Port Director/CEO, Galveston Wharves, CDC-2020-0087 (Sept. 22, 2020) ("Ex. 1").

Second, Texas claims injury in the form of impairment of state tax revenue. ECF No. 26 ¶ 29-30. But Texas's attempt to establish standing on this basis faces many of the same barriers as Florida's. *See* Defs.' PI Opp. at 14-15. To start, "loss of general tax revenues as an indirect result of federal policy is not a cognizable injury in fact." *El Paso Cty., Texas v. Trump*, 982 F.3d 332, 339 (5th Cir. 2020) (citing *Kleppe*, 533 F.2d at 671-73); *see also Florida v. Mellon*, 273 U.S. 12, 17-18 (1927) (holding that

*Texas* is plainly inconsistent with the Supreme Court precedent discussed above and general principles of standing law, as other courts have recognized, *see, e.g.*, *Maryland v. U.S. Dep't of Educ.*, 474 F. Supp. 3d 13, 40-43 (D.D.C. 2020) (criticizing *Texas* and reaching a contrary conclusion), *vacated and remanded as moot*, No. 20-5268, 2020 WL 7868112 (D.C. Cir. Dec. 22, 2020), and Texas is not entitled to the sort of "special solicitude" accorded in *Massachusetts* simply because it refers cryptically to a "quasi-sovereign" interest in regulating ports. Texas is not asserting a similar physical injury to its territory.

federal policy "diminishing the subjects upon which the state power of taxation may operate" insufficient for standing). But even if it were, Texas fails to "'clearly allege facts demonstrating' each element" of standing in its proposed Complaint, namely, that its purported injuries are fairly traceable to the challenged action. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)); *see* ECF No. 26-1. Texas alleges little more than that it "has suffered decreased tax revenues and incurred increased costs due to the payment of unemployment benefits" since the onset of the pandemic. ECF No. 26-1 ¶ 42. But these past injuries are not traceable to Defendants' conduct and are not redressable by this Court, *see Lyons*, 461 U.S. at 103 ("past wrongs do not in themselves amount to that real and immediate threat of injury necessary to make out a case or controversy"), and Texas has made no effort to ascertain or quantify the injury that this Court could in theory avert, especially given the impending phased resumption of cruising under the CSO.[10] Indeed, in the absence of enforceable federal guidance, cruise lines may not be able to restart more quickly, passengers may be less willing to sail, and state and local authorities may face additional expenditures related to outbreaks or the creation and enforcement of public health guidelines.

---

[10] Although neither plaintiff nor proposed intervenors have introduced any evidence of what would happen without the CSO, there is news reporting that cruise lines anticipate re-opening under current conditions in Texas and Florida. *See* Morgan Hines, *Carnival Cruise Line aims for July restart from Florida and Texas, cancels other sailings through July*, USA Today, May 11, 2021, https://www.usatoday.com/story/travel/cruises/2021/05/11/carnival-cruise-line-eyes-july-restart-3-ships-florida-texas/5043111001/

A state's impaired tax revenues during an ongoing pandemic are "driven by countless variables, from performance of the broader economy" to whether or not a resurgence of COVID-19 will occur, as well as independent decisions of cruise ship operators, tourists, airlines, and businesses in in state—as well as independent decisions of the state government itself. *See XY Planning Network, LLC v. SEC*, 963 F.3d 244, 253 (2d Cir. 2020); *see also Simon v. E. Kentucky Welfare Rights Org.*, 426 U.S. 26, 42-43 (1976); *Warth*, 422 U.S. at 505. Because of the "guesswork as to how independent decisionmakers will exercise their judgment" but for CDC action, Texas fails to plausibly allege concrete imminent injury fairly traceable[11] to the challenged CDC order. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 413 (2013).[12] Like Florida, Texas makes no effort to describe the regulatory landscape that would take shape if it were successful in its claims, let alone compare its likely purported economic injury under that hypothetical regime to its purported injury if the CDC is

---

[11] "The injury must be 'fairly' traceable to [each] challenged action," a "term[ that] cannot be defined so as to make application of the constitutional standing requirement a mechanical exercise," but must incorporate "[t]he idea of separation of powers that underlies standing doctrine." *Allen v. Wright*, 468 U.S. 737, 751, 759 (1984). Standing cannot be based on interests and theories permitting states to sue any time they disagree with federal policy, overriding the Constitution's assignment of policy-making duties to the other branches of government and ignoring the states' representation in the Congress; "to find standing based upon that kind of interest 'would significantly alter the allocation of power at the national level, with a shift away from a democratic form of government.'" *See Carney v. Adams*, 141 S. Ct. 493, 499 (2020) (quoting *United States v. Richardson*, 418 U.S. 166, 188 (1974) (Powell, J., concurring)).

[12] Unpredictable state actions are also a factor in the decision-making process of independent cruise operators not before the Court. *See, e.g.*, Suzanne Rowan Kelleher, *Why Ron DeSantis' Ban On Vaccine Passports Could Cost Florida Billions of Dollars*, Forbes, May 7, 2021 ("If Florida won't let cruise lines perform vaccine verifications, they will simply move their ships elsewhere") (quoting Frank Del Rio, CEO of Norwegian Cruise Line Holdings Ltd.").

permitted to seek resumption of cruise ship passenger operations on its current path. *See* Defs.' PI Opp. at 15-18. Its claims to standing should similarly be rejected.

## III.    TEXAS OTHERWISE CANNOT INTERVENE AS OF RIGHT UNDER RULE 24(a).

Texas's motion may be timely, notwithstanding the State's failure to challenge the CSO for six months, but it fails on all other prongs for intervention as of right. With respect to the second prong, Texas lacks the requisite interest in the outcome of this lawsuit, because it has not described a cognizable injury redressable here, as discussed above. Its alleged economic injuries do not suffice to support intervention as of right because they are not the basis of specific legal right. *See Mt. Hawley Ins. Co.*, 425 F.3d at 1311; *S. Fla. Water Mgmt. Dist.*, 922 F.2d at 710-11 (intervenors injured by alleged actions lacked legal rights).

This inquiry as to whether the proposed intervenor has a "legally protectable right" is akin to the zone of interests test. *See, e.g., In re Vitamins Antitrust Class Actions*, 215 F.3d 26, 29 (D.C. Cir. 2000) (requiring intervenors to show, in addition to constitutional standing, that their interests are "arguably within the zone of interests to be protected or regulated by the statute"). The APA's grant of standing to persons "adversely affected or aggrieved by agency action within the meaning of a relevant statute," 5 U.S.C. § 702, does not extend to the full reach of Article III, and is satisfied only if the plaintiff's interests are "arguably within the zone of interests to be protected or regulated by the statute" that the plaintiff says was violated. *See Ass'n of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150, 153 (1970); *Lexmark Int'l, Inc. v.*

15

*Static Control Components, Inc.*, 572 U.S. 118, 129-30 (2014). Here, Texas's alleged

injury is not within the zone of interests of the applicable statute or regulation. It

cannot reasonably be assumed that, in "[t]he particular language of" Section 264(a),

"Congress intended to protect" a State government's general tax revenue. *See Air

Courier Conference of Am. v. Am. Postal Workers Union AFL-CIO*, 498 U.S. 517, 524-25

(1991). And the APA does not permit a suit in *parens patriae*. *Gov't of Manitoba v.

Bernhardt*, 923 F.3d 173, 181 (D.C. Cir. 2019) ("the APA evinces no congressional

intent to authorize a State as *parens patriae* to sue the federal government"). The

regulations are aimed at public health conditions on board vessels. And while the

CSO explicitly takes into account the public health burden on state and local

governments, it is not designed to protect, or even consider, state tax revenues,

"however much" Texas's "economic interests may depend on those" revenues. *See S.

Fla. Water Mgmt. Dist*, 922 F.2d at 711.

With respect to the third prong, the outcome of this suit would not in any way

impair Texas's ability to protect any interest it may have, because the State is equally

capable of challenging the CSO in district court in Texas. *Burke v. Ocwen Fin. Corp.*,

833 F. App'x 288, 292 (11th Cir. 2020) ("the ability to separately litigate defeats the

impairment element"). In circumstances where a proposed intervenor could bring a

separate lawsuit in the *same* Circuit or district, some courts have held that the *stare

decisis* effect of a decision may be sufficient to warrant intervention under this third

element, particularly because judges in the that district are likely to persuade one

another. *See Chiles v. Thornburgh*, 865 F.2d 1197, 1214 (11th Cir. 1989) (finding that detainees at a facility that was properly the subject of an action by the County could intervene in the County's lawsuit rather than bring a separate lawsuit); *Stone v. First Union Corp.*, 371 F.3d 1305, 1310 (11th Cir. 2004) (employees suing the same Florida employer on related theories could intervene in suit by other employee after class decertification). But the Eleventh Circuit has emphasized that intervention in such matters is motion-specific, and "the potential for negative stare decisis effects does not automatically grant plaintiffs the right to intervene," *Stone*, 371 F.3d at 1310; *see also Worlds v. Dep't of Health & Rehab. Servs., State of Fla.*, 929 F.2d 591, 594 (11th Cir. 1991) (holding that a separate suit would actually assist the proposed intervenor in proving his claims); *Burke*, 833 F. App'x at 292. The Court of Appeals does not appear to have ever ruled on a situation analogous to this one—where the prospective intervenor is a State in another Circuit just as capable of bringing suit in its own district courts. And courts in the Fifth Circuit court are unlikely to feel bound, as a practical matter, by a decision in this Court, especially if, as Texas maintains, it has unique arguments related to local conditions. [13]

---

[13] Although Defendants do not dispute the timeliness factor, Texas's arguments as to why denying their motion would prejudice Texas make little practical sense. First, Texas complains that the CSO's framework "do[es] not differ from state to state." ECF No. 26 ¶ 23. But that is not a reason that Texas needs to join Florida's lawsuit as opposed to file its own. Moreover, Texas makes no effort to explain how state-level-only COVID-19 cruise operation mitigation requirements would work in practice, as cruise ships voyages are both interstate and international. To the extent that Texas is referring to the requirement that a cruise ship operator negotiate an agreement with local port and health authorities in each jurisdiction in which they intend to dock, Texas's argument misrepresents the nature of the requirement. The purpose of this requirement is to ensure that cruise operators have pre-arranged with port authorities how operations and outbreaks will be handled during the pandemic. Nothing in the CSO or technical instructions requires state or local authorities to agree to such plans or provide housing and care; nor does the CSO impose any penalties on state

Texas fails to establish the last element as well because its interests in challenging the CSO appear to be identical to Florida's. Both States seek the exact same relief here, and the Court will "presume adequate representation when an existing party seeks the same objectives as the would-be interveners." *Clark v. Putnam Cty.,* 168 F.3d 458, 461 (11th Cir. 1999); *Sierra Club, Inc. v. Leavitt*, 488 F.3d 904, 910 (11th Cir. 2007). This presumption may be "weak," but it still imposes upon the applicant for intervention "the burden of coming forward with some [rational] evidence to the contrary." *Clark*, 168 F.3d at 461 (citation omitted). Here, Texas claims its interests are unique from Florida's because of its claim that 42 C.F.R. § 70.2 requires a specific "determination that Texas'[s] measures to control the spread of COVID-19 are inadequate," and "Florida's various ports will likely have substantial differences from Texas'[s] Port of Galveston." ECF No. 26 ¶ 33; *see also id*. ¶ 34 (discussing another purported § 70.2 local factor). But the CDC's finding that State and local measures are inadequate to control the threat of disease on board cruise ships is premised on the fact that "[c]ruise ships by their very nature travel

---

and local authorities. *See* Treffiletti Decl. ¶ 53. If a local community would welcome the resumption of cruise ships, the requirement ensures that the community has a seat at the table during a cruise ship operator's emergency response planning. Without the requirement, cruise ship operators may seek to shift the burden addressing a major COVID-19 outbreak onto shore-side and local facilities without their consent. Nowhere does the CSO impose a one-size fits all solution for agreements. If, indeed, "Texas's single cruise port in Galveston is a stone's throw from world-class medical facilities," ECF No. 26 ¶ 23, the CSO empowers Texas to require that cruise lines transport critically ill persons to those facilities and consider whether those facilities will have sufficient capacity to address a COVID-19 outbreak. Indeed, Texas's "single cruise port in Galveston," *see id*., submitted public comments to the CDC that were considered in the creation of the CSO; the port advocated in favor of some of the these very requirements that the State now purports to challenge on its residents' behalf, *see* Ex. 1.

interstate and internationally and can move beyond the boundaries of any single state of local health authority." *See* 85 Fed. Reg. at 70,157; Defs.' PI Opp. at 25-26. Texas points to no COVID-19 public health measure that state or local authorities have undertaken at the Port of Galveston that would undermine the CDC's judgment on that score.[14] Beyond this issue, Texas seeks the same relief and asserts the same types of economic and tax injuries as Florida.[15] And if Texas actually has separate arguments based on these supposed factual differences, that is all the more reason for it to bring a separate suit in its home state. The Court should deny the motion to intervene as of right.

---

[14] Indeed, just yesterday, the Texas Governor "issued an Executive Order prohibiting governmental entities in Texas—including counties, cities, school districts, public health authorities, or government officials—from requiring or mandating mask wearing." Press Release, Office of the Texas Governor, *Governor Abbott Issues Executive Order Prohibiting Government Entities From Mandating Masks* (May 18, 2021), https://gov.texas.gov/news/post/governor-abbott-issues-executive-order-prohibiting-government-entities-from-mandating-masks. That Executive Order contains exemptions for jails, schools, and hospitals—presumably recognizing the continued risk of COVID-19 spread—but otherwise had immediate effect. *See* Exec. Order No. GA 36, §§ 1 – 3, https://gov.texas.gov/uploads/files/press/EO-GA-36_prohibition_on_mandating_face_coverings_response_to_COVID-19_disaster_IMAGE_05-18-2021.pdf.

[15] The fact that the underlying basis of the economic or tax injuries to Texas might stem from a different economic industrial structure than Florida, *see* ECF No. 26 ¶ 34, does not make Texas's interest here unique from Florida's. Moreover, Defendants involvement in Texas's theory of injury based on indirect impacts on its oil-related tax revenue in light of cruise ships sailing less during the pandemic is even more remote and speculative than Defendants' involvement in Florida's claimed tax losses. The theory seems to be that if cruising cannot resume just as quickly under the CSO as it would without the CSO, then Texas businesses will sell less fuel to the cruise ships, and could cause some indirect economic loss to the State of Texas. This speculative chain of causation, not supported by any estimates in the record as to how revenues would change without the CSO, is at best, an alternate theory of standing. It does not mean that Texas's interests in vacatur of the CSO are substantively different than Florida's.

## III.    THE COURT SHOULD DENY PERMISSIVE INTERVENTION.

The Court should deny permissive intervention as well.  Even if the standards were met, permissive intervention remains wholly at the Court's discretion, and the Court should deny the motion for at least two reasons.

First, the adequacy of a separate lawsuit is a sufficient reason to deny permissive intervention, *see Burke*, 833 F. App'x at 294, and Texas is free to file suit in its home state. Second, the public interest would be disserved by having a single district court in one Circuit decide the fate of the CSO. For example, in the context of considering nationwide injunctions, the Supreme Court has repeatedly emphasized the benefits of percolating important questions of law in multiple forums. *See Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) (highlighting that nationwide injunctions "have a detrimental effect by foreclosing adjudication by a number of different courts and judges"); *see also Trump v. Hawaii*, 138 S. Ct. 2392, 2425 (2018) (Thomas, J., concurring) (explaining that universal injunctions "take a toll on the federal court system—preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch"); *Arizona v. Evans*, 514 U.S. 1, 23 n.1 (1995) (Ginsburg, J., dissenting) (recognizing benefits of "periods of 'percolation' in, and diverse opinions from, state and federal appellate courts"). Those benefits would be lost by permitting intervention here.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny the motion to intervene.

Dated: May 19, 2021                     Respectfully submitted,

                                        BRIAN D. NETTER
                                        Deputy Assistant Attorney General

                                        ERIC BECKENHAUER
                                        Assistant Branch Director
                                        Federal Programs Branch, Civil Division

                                        s/ Amy E. Powell
                                        AMY ELIZABETH POWELL
                                        Senior Trial Counsel
                                        Federal Programs Branch
                                        Civil Division, Department of Justice
                                        150 Fayetteville St, Suite 2100
                                        Raleigh, NC 27601
                                        Phone: 919-856-4013
                                        Email:  amy.powell@usdoj.gov

                                        /s/ Liam C. Holland
                                        LIAM C. HOLLAND
                                        Trial Attorney
                                        Federal Programs Branch
                                        Civil Division, Department of Justice
                                        1100 L. Street, NW
                                        Washington, DC 20530
                                        Phone: 202-514-4964
                                        Email: Liam.C.Holland@usdoj.gov

                                        Counsel for Defendants

21