UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| STATE OF FLORIDA,<br><br>    Plaintiff<br><br>    v.<br><br>XAVIER BECERRA, Secretary of the Dep't of Health and Human Services, *et al.*,<br><br>    Defendants. | Case No. 8:21-cv-839-SDM-AAS |

### DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO ALASKA'S MOTION TO INTERVENE

### INTRODUCTION

The State of Alaska, bypassing courts in its home state, seeks to join this lawsuit brought by the State of Florida against the Atlanta-based Centers for Disease Control and Prevention (CDC) in the Middle District of Florida. Alaska, much like Florida, declined to challenge the Conditional Sail Order ("CSO") and related CDC orders for over a year. Recently, Congress passed the Alaska Tourism Restoration Act, Pub. L. No. 117–14, 117th Cong. (May 24, 2021) ("ATRA"), making the operation of "covered cruise ship[s]" in Alaska legally viable during the COVID-19 pandemic only if the cruise ship "has been issued, operates in accordance with, and retains a COVID-19 Conditional Sailing Certificate of the [CDC]." ATRA § 2(a). Alaska now seeks to intervene to ask this Court for declaration that "all or part of the

1

CDC's Conditional Sailing Order"—the very order under which COVID-19 Conditional Sailing Certificates are issued—"is invalid." *See* Alaska's Complaint, ECF No. 68–1. Although Alaska originally contended that it had an absolute right to intervene in this case, *see* ECF No. 8, in light of recent CDC guidance, *see* ECF No. 35, it now seeks only permissive intervention "in support of plaintiff, the State of Florida," ECF No. 68 at 1.

While Alaska's intervention motion remains flawed for several reasons, the Court should simply defer resolution of the motion until it decides whether the State of Florida has standing. It would not be appropriate to allow Alaska to intervene in a matter in which the Court lacks jurisdiction over the original Plaintiff's claims. And deferring resolution of the motion would cause no prejudice; Alaska has recognized that "recent developments" make intervention less urgent, *see* ECF No. 68 at 11, and Alaska's concerns appear to be based largely on hypothetical future action, *see id*. at 12–13.

Nevertheless, the Court should deny Alaska intervention. To start, like Florida and Texas, Alaska lacks standing, as it has not met its burden to establish a cognizable injury to the State itself and cannot rely on alleged economic injury to its residents. Even if Alaska had met that burden, its alleged injuries are uniquely not redressable by an order granting Alaska the relief it seeks. Actions taken by Canada, together with the Passenger Vessel Services Act ("PVSA") and ATRA, effectively prevent the resumption of cruising in Alaska anytime this year if the Court were to declare the CSO invalid.

Regardless, even if Alaska could establish standing, the Court should still deny permissive intervention. Alaska's attempt to join a suit by Florida on the opposite side of the continent raises an appearance of forum shopping that should not be rewarded. The public interest is not served by focusing litigation about cruise ship COVID-19 standards nationwide in one district court. And denying intervention would not prevent Alaska from suing in a more appropriate forum, or from presenting its own views as amicus in this matter.[1]

## BACKGROUND

A comprehensive background, including a description of the CDC's authorities and actions in this matter, is set forth in Defendants' Memorandum in Opposition to Plaintiff's Motion for a Preliminary Injunction, *see* ECF No. 31 ("Defs.' PI Opp."), at 4–12; the Declaration of Capt. Aimee Treffiletti, submitted in support of that opposition, *see* ECF No. 31–1 ("Treffiletti Decl."); Defendants' Supplemental Brief, *see* ECF No. 72; and the Supplemental Declaration of Capt. Aimee Treffiletti, submitted in support of that supplemental brief, *see* ECF No. 72–1 ("Treffiletti Supp. Decl.").

---

[1] Throughout its brief, Alaska improperly postulates that CDC policy has changed "apparently in direct response to this litigation." *See, e.g.*, ECF No. 68 at 2. But the record explains that "CDC continues to consult with and provide technical assistance to the cruise ship operators and update its technical instructions under the CSO to reflect the current state of the pandemic. . . . Each of these updates and revisions were made to align with changes in CDC guidance or based on information gathered from individual cruise lines during twice-weekly industry and U.S. government interagency calls. These updates and revisions have reduced burdens or alleviated restrictions on cruise lines to better reflect the improved public health situation, including increasing U.S. vaccination rates and decreasing U.S. deaths and case counts." Supp. Decl. of Capt. Aimee Treffiletti, ECF No. 72-1 ¶ 5.

**Statutory and Regulatory Authority**. Section 361 of the Public Health Service Act ("PHSA") authorizes Defendants "to make and enforce such regulations as in [the Secretary's] judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases from foreign countries into the States or possessions, or from one State or possession into any other State or possession." 42 U.S.C. § 264(a). The CDC Director implements this authority through regulations at 42 C.F.R. parts 70 and 71 that regulate vessels arriving in U.S. ports and permit CDC to act when local or state control is inadequate. *See* Control of Communicable Diseases, 82 Fed. Reg. 6,890, 6,892 (Jan. 17, 2017); 42 C.F.R. §§ 71.32(b), 71.31(b), 70.2. Among other authorities, the CDC "may issue a controlled free pratique [i.e., permission for a carrier to enter a U.S. port, disembark, and begin operations under certain stipulated conditions] to the carrier stipulating what measures are to be met." 42 C.F.R. § 71.31(b); *see also id.* § 71.1(b).

**The Conditional Sailing Order**. On Oct. 30, 2020, the CDC issued the *Framework for Conditional Sailing and Initial Phase COVID–19 Testing Requirements for Protection of Crew*, 85 Fed. Reg. 70,153–01 (Nov. 4, 2020). The CSO announced that "[a]fter expiration of CDC's No Sail Order ["NSO"] on October 31, 2020, CDC will take a phased approach to resuming cruise ship passenger operations in U.S. waters." *Id.*[2] The CDC reviewed the NSO extensions and the evidence gathered to

---

[2] On March 14, 2020, the CDC issued an order entitled "*No Sail Order and Suspension of Further Embarkation.*" *See* 85 Fed. Reg. 16,628-03 (Mar. 24, 2020) ("NSO"). The NSO contained several requirements for cruise ships that operate in U.S. waters or intend to arrive in U.S. waters during the effective period of the NSO; most relevant here, the NSO required all disembarkation of passengers

date regarding mitigation of risk on board cruise ships, including the results of scientific studies of onboard transmission, progress made by cruise lines, and public comments received in response to a request for information. *Id*. at 70,154–57.[3] *See also* Treffiletti Decl. ¶¶ 33-45.

Based on this record, the CDC determined that a phased approach to granting controlled free pratique was appropriate:

- Phase 1: Crew testing. Ship operators to conduct shoreside testing of crew, develop on-board testing capacity, begin testing crew weekly, and submit results to the CDC.

- Phase 2: Simulated voyages. These are designed to test ship operators' protocols for mitigating COVID–19 onboard, and require them to "document the approval of all U.S. port and local health authorities where the ship intends to dock or make port," including adequate agreements to deal with housing and medical care in event of an outbreak.

- Phase 3: Certification. After successfully completing simulated voyages, ship operators may apply for a Conditional Sailing Certificate.

- Phase 4: Return to passenger voyages, in a manner that mitigates the risk of COVID-19 spread.

---

to be undertaken in coordination with relevant agencies, and prevented any embarkation or operations except as specifically permitted in consultation with the CDC. *Id*. at 16631. The CDC extended the NSO three times, and made additional data-based findings in each extension about the continued transmission of COVID-19 on board cruise ships, and the continued need for federal action in light of the inadequacy of local control. *See No Sail Order and Suspension of Further Embarkation: Notice of Modification and Extension and Other Measures Related to Operations*, 85 Fed. Reg. 21,004 (Apr. 15, 2020); *No Sail Order and Suspension of Further Embarkation; Second Modification and Extension of No Sail Order and Other Measures Related to Operations*, 85 Fed. Reg. 44,085-01 (July 21, 2020); *No Sail Order and Suspension of Further Embarkation; Third Modification and Extension of No Sail Order and Other Measures Related to Operations*, 85 Fed. Reg. 62,732-01 (Oct. 5, 2020).
[3] *See also* CDC Regulations.gov, *RFI* Cruise Ship Planning, Comments (July 21, 2020), *available at* https://www.regulations.gov/document/CDC-2020-0087-0001/comment (last visited around May 5, 2021) (around 13000 comments received); Treffiletti Decl. Ex. A (selected comments).

85 Fed. Reg. at 70,153, 70,158–59; Treffiletti Decl. ¶ 33. CDC has issued and—working directly with cruise ship operators—continues to review and update implementing guidance. *See*, *e.g.*, Treffiletti Decl. ¶¶ 50–55, 58, 60; Treffiletti Supp. Decl. ¶ 5. CDC has already approved two applications for COVID-19 Conditional Sailing Certificates under the CSO and anticipates sailing to resume by mid-summer. *See* Treffiletti Supp. Decl. ¶ 2–5.

**This Litigation**. The State of Florida filed suit in this district in a Complaint raising five counts against Defendants, and seeking a permanent injunction against the CSO in its entirety. Plaintiff has filed a motion for a preliminary injunction as well, a hearing was held May 12, 2021, and an additional hearing is set for June 10, 2021.

The State of Alaska moved to intervene on April 20, 2021, and with the Court's leave, amended its motion on June 2, 2021. While Alaska's original proposed complaint raised four claims and sought both declaratory relief and preliminary and permanent injunctive relief, *see* ECF No. 8–3 at ¶ 53–76 & pp. 22–23, its revised proposed complaint contains only a single claim and a request for declaratory relief alone, *see* ECF No. 68–1 at ¶¶ 35–39 & p. 9. That claim summarily alleges that the "Conditional Sailing Order and technical guidance" violate the Administrative Procedure Act ("APA") because they exceed the CDC's statutory and regulatory authority, are arbitrary and capricious, and were issued without notice and comment. *Id*. ¶¶ 35–39. In marked contrast to its original proposed complaint, Alaska no longer makes any attempt to explain what portions of the CSO

or guidance are allegedly unauthorized or arbitrary, much less why. *Compare id. with* ECF No. 8–3 at ¶ 53–73. Alaska has also abandoned its nondelegation claim. *See* ECF No. 8–3 at ¶¶ 74–76.

## LEGAL STANDARDS FOR INTERVENTION

"Any party, whether original or intervening, that seeks relief from a federal court must have standing to pursue its claims." *Dillard v. Chilton Cty. Comm'n*, 495 F.3d 1324, 1330 (11th Cir. 2007). "The doctrine of standing is an essential and unchanging part of the case-or-controversy requirement embodied in Article III of the Constitution." *Flat Creek Transp., LLC v. Fed. Motor Carrier Safety Admin.*, 923 F.3d 1295, 1300 (11th Cir. 2019) (citation omitted). In the Eleventh Circuit, if there is an ongoing Article III case or controversy, intervenors "may in some cases be permitted to 'piggyback' upon the standing of original parties to satisfy the standing requirement." *Dillard*, 495 F.3d at 1330. This "piggyback" theory, of course, can apply only if the original Plaintiff has standing. *Id*. The Supreme Court has placed an additional strict limit on that "piggyback" theory: "*[f]or all relief sought*, there must a litigant with standing, whether that litigant joints the lawsuit as a plaintiff, a coplaintiff, or an intervenor of right." *Town of Chester v. Laroe Ests., Inc.*, 137 S. Ct. 1645, 1651 (2017) (emphasis added). "[T]he same principle extends to a permissive intervenor." *United States v. Bayer Cropscience LP*, No. 2:15–CV–13331, 2018 WL 3553413, at *9 (S.D.W.V. July, 24, 2018); *see also Seneca Resources Corp. v. Highland Township*, No. 16–CV–289, 2017 WL 4171703, at *6 (W.D. Pa. Sept. 20, 2017)

(holding that because movants had "not established standing, this Court will deny their request for permissive intervention"); *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 519 F. Supp. 2d 89, 93 (D.D.C. 2007) (denying permissive intervention when movant "fails to specify the grounds for independent subject-matter jurisdiction it claims to enjoy").[4]

Federal Rule of Civil Procedure 24(b) provides for permissive intervention when an applicant's claim or defense and the main action share a common question of law or fact and intervention will not unduly prejudice or delay the adjudication of the rights of the original parties. Fed. R. Civ. P. 24(b); *Georgia v. U.S. Army Corps of Eng'rs*, 302 F.3d 1242, 1249–50 (11th Cir. 2002). Ultimately, the decision whether a party should be allowed to permissively intervene is left to the district court's "full discretionary powers." *United States v. S. Fla. Water Mgmt. Dist.*, 922 F.2d 704, 712 (11th Cir. 1991); *see also Purcell v. BankAtlantic Fin. Corp.*, 85 F.3d 1508, 1513 (11th

---

[4] A court in this district held that the Supreme Court's admonition in *Laroe Estates* did not apply to permissive intervention. *See Vazzo v. City of Tampa*, No. 8:17-CV-2896-T-36AAS, 2018 WL 1629216, at *4 (M.D. Fla. Mar. 15, 2018), *report and recommendation adopted*, 2018 WL 1620901 (M.D. Fla. Apr. 4, 2018). While the Supreme Court was not addressing permissive intervention, it reasoned that the standing requirements are "deeply rooted" in our constitutional structure, and that it is always true that "[a]t least one plaintiff must have standing to seek each form of relief requested[.]" *Laroe Estates*, 137 S. Ct. at 1650-51. Those constitutional requirements apply regardless of the form of intervention sought. Moreover, any party—regardless of the Rule 24 subsection it relies on to seek party status—must establish that it has standing to invoke a federal court's jurisdiction before the court may enter relief in its favor or, indeed, proceed against the defendant at all. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (quoting *Ex parte McCardle*, 7 Wall. 506, 514 (1868)) ("Without jurisdiction the court cannot proceed at all in any cause."). Thus, Alaska must have standing for this Court to entertain its requests as a party as opposed to an amicus curiae with respect to Defendants in this litigation.

Cir. 1996) (holding that permissive intervention is "wholly discretionary" and may be denied even if all standards are met).

## ARGUMENT

### I. THE COURT SHOULD HOLD THIS MOTION IN ABEYANCE UNTIL IT DECIDES WHETHER FLORIDA HAS STANDING.

The State of Alaska purports to seek similar relief to that of Plaintiff—an order that would invalidate the CSO and permit unrestricted cruising without enforceable COVID-19 precautions. As Defendants have argued, Florida lacks standing to bring such claims, and it certainly lacks standing to seek relief on a nationwide basis. Defs.' PI Opp. at 13–18, 45; *see also DHS v. New York*, 140 S. Ct. 599, 600 (Gorsuch, J., concurring) (explaining that party lacks standing to "direct how the defendant[s] must act toward persons who are not parties to the case"); *Gill v. Whitford*, 138 S. Ct. 1916, 1931, 1934 (2018) ("A plaintiff's remedy must be tailored to redress the plaintiff's particular injury."). The Court should determine whether Florida has standing for each claim it seeks to press and for each form of relief sought before deciding whether Alaska may join it. *See Korioth v. Brisco*, 523 F.2d 1271, 1279 (5th Cir. 1975) (denial of motion to intervene proper when initial plaintiff lacks standing).

### II. ALASKA LACKS ARTICLE III STANDING TO BRING THIS ACTION

For its own part, Alaska cannot establish Article III standing to seek relief with respect to its home jurisdiction, much less more broadly. Because "[s]tanding is not dispensed in gross," *Davis v. FEC*, 554 U.S. 724, 734 (2008) (quoting *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996)), Alaska "must demonstrate standing for each

9

claim [it] seeks to press" and for "each form of relief sought," *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) (quotation omitted). To obtain prospective relief, a movant must show that it "'is immediately in danger of sustaining some direct injury'" and that "the injury or threat of injury [is] both 'real and immediate,' not 'conjectural' or 'hypothetical.'" *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (citation omitted); *see also Clapper v. Amnesty Int'l, USA*, 568 U.S. 398, 409 (2013). "The injury must be 'fairly' traceable to the challenged action, and relief from the injury must be 'likely' to follow from a favorable decision." *Allen v. Wright*, 468 U.S. 737, 751 (1984). "These terms cannot be defined so as to make application of the constitutional standing requirement a mechanical exercise[,]" but must incorporate "[t]he idea of separation of powers that underlies standing doctrine." *Id.* at 751, 759. And it is a plaintiff's burden to "'clearly allege facts demonstrating' each element" of its standing. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)); *see also Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 924 (11th Cir. 2020).

Alaska fails to make these required showings for many of the same reasons as Florida and Texas. *See* Defs.' PI Opp., at 13–18, 45; Defs' Opp. to Texas's Motion to Intervene at 11–14, ECF No. 57. First, Alaska alleges injury in the form of impairment of state tax revenue. ECF No. 8–3 ¶ 34 ("More cruise ships and cruise passengers visiting Alaska this summer means more direct revenues to the State of Alaska"). But, as Defendants have explained, *see* Defs.' PI Opp. at 14–15, the "loss of general tax revenues as an indirect result of federal policy is not a cognizable injury

10

in fact," *El Paso Cty., Texas v. Trump*, 982 F.3d 332, 339 (5th Cir. 2020) (citing *Pennsylvania v. Kleppe*, 533 F.2d 668, 671–73 (D.C. Cir. 1976)); *see also Florida v. Mellon*, 273 U.S. 12, 17–18 (1927) (holding that federal policy "diminishing the subjects upon which the state power of taxation may operate" is insufficient for standing). And even if it were, Alaska fails to "'clearly allege facts demonstrating' each element" of standing in its proposed Complaint, namely, that its purported injuries are fairly traceable to the challenged action. *See Spokeo*, 136 S. Ct. at 1547 (quoting *Warth*, 422 U.S. at 518).

Alaska makes no showing that it is the CSO itself that has allegedly depressed its cruise-related tax revenues, much less that they would be higher if the CSO were invalidated. A state's impaired tax revenues during an ongoing pandemic are "driven by countless variables, from performance of the broader economy" to whether or not a resurgence of COVID-19 will occur, as well as independent decisions of cruise ship operators, tourists, airlines, and businesses in the state. *See XY Planning Network, LLC v. SEC*, 963 F.3d 244, 253 (2d Cir. 2020); *see also Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 42–43 (1976). Alaska does not explain how an order from this Court could in theory avert these alleged injuries, especially given the impending resumption of cruising under the CSO. Indeed, Alaska admits that "several cruise lines [have] scheduled and began to market Alaska cruises for vaccinated passengers for late July-September of 2021." ECF No. 68 at 7. While Alaska notes that these ships have not yet received a Conditional Sailing Certificate, *id.* at 8, it does not even suggest that any such applications are likely to be denied. To the contrary, the record

11

indicates that the CDC will expeditiously process applications, some of which have already been approved. *See* Treffiletti Supp. Decl. ¶¶ 2–4 (explaining that CDC has approved port agreements at 5 ports of call and has provisionally approved the only 2 conditional sailing certificates for highly vaccinated cruises received). "Absent evidence showing that the type of impact [a State] fears is impending, [its] arguments about all of the direct harms it will suffer as a result of that impact—like decreased tax revenues or increased costs . . . —are insufficient" to show standing. *See Washington v. HHS*, 482 F. Supp. 3d 1104, 1118 (W.D. Wash. 2020). Here, Alaska's submissions do not attempt to estimate what its revenues would be absent CDC action—i.e., if cruising were legally permitted to resume without federal public health oversight and against CDC advice.

Alaska speculates that "if the CDC imposes onerous requirements, fewer people may choose to cruise to Alaska due to the difficulty or discomfort of complying with these requirements." ECF No. 68 at 12. But it is equally if not more plausible that if the CSO were invalidated, fewer people may choose to cruise due to fear that the cruise industry will take short cuts that would increase their risk of contracting the virus or spreading it to others. *See* Treffiletti Decl. ¶ 38; 85 Fed. Reg. at 70,156. Moreover, Alaska's proposed complaint identifies no "onerous" requirements in the CDC's current guidance; thus, by its own theory, Alaska's purported injury does not stem from any concrete agency action that has actually occurred, but instead hypothetical future requirements. *See* ECF No. 68 at 12. There is no basis for Alaska's speculation, which is based on nothing but past guidance that

CDC has since updated to reflect changing pandemic conditions and was not in effect as of the date of their proposed Complaint. ECF No. 68 at 12 n.17; *see Lyons*, 461 U.S. at 103 ("past wrongs do not in themselves amount to that real and immediate threat of injury necessary to make out a case or controversy"). And even if Alaska had identified any particular flaw in the current guidance—and it has not— Alaska does not and cannot challenge hypothetical future agency action.

Perhaps recognizing that there is little basis for suggesting CDC would hypothetically and arbitrarily deny an Alaskan cruise ship application, Alaska states that their real concern is that "uncertainty remains." ECF No. 68 at 13. But "[i]t would be a strange thing indeed if uncertainty were a sufficiently certain harm to constitute an injury in fact." *New Eng. Power Generators Ass'n, Inc. v. FERC*, 707 F.3d 364, 369 (D.C. Cir. 2013).

Alaska also alleges an injury in the form of "fewer unemployed cruise tourism workers drawing unemployment benefits." ECF No. 68–1 ¶ 34. Even if these costs were not substantially likely to be reimbursed by the federal government, "[a]n increase in the payment of government benefits" is just "like a decrease in tax revenues" and Alaska's standing on the basis of this purported injury suffers from the same deficiencies just described. *See Massachusetts v. U.S. Dep't of Educ.*, 340 F. Supp. 3d 7, 17 (D.D.C. 2018).[5]

---

[5] Alaska also alleges "greater overall benefits to Alaska's economy," ECF No. 68-1 ¶ 34, but "[t]he alleged injuries to the state's economy and the health, safety, and welfare of its people clearly implicate the parens patriae rather than the proprietary interest of the state," *Kleppe*, 533 F.2d at 671; *see also Hawaii v. Standard Oil Co.*, 405 U.S. 251, 257–59 (1972) (holding that a state's lawsuit on

In addition to the many reasons Florida, Texas, and Alaska lack standing, Alaska faces an additional redressability issue: it cannot show "a 'substantial likelihood' that the requested relief will remedy the alleged injury in fact." *Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 771 (2000) (citation omitted). Before May 24, 2021, Alaska's injuries would not have been redressable by this Court in light of the Passenger Vessel Services Act of 1886, Pub. L. No. 49–421 ("PVSA"), which prohibits foreign-flagged vessels (i.e., almost all cruise ships) from traveling between U.S. ports unless they make a stop at a foreign port. To comply with this law, Alaskan cruise itineraries have typically included a stop at a Canadian port. But due to COVID-19, Canadian law bars "[c]ruise vessels carrying more than 100 people . . . from operating in Canadian waters" until at least February 28, 2022.[6] Accordingly, the PVSA effectively prevented any passenger cruise ship operations in Alaska until at least February 2022.

While ATRA, which was signed into law on May 24, 2021, temporarily permits "covered cruise ships" to meet an alternative standard for PVSA compliance, that workaround requires compliance with the CSO. Specifically, under ATRA, a "covered cruise ship" is defined as one that "has been issued, operates in accordance

---

behalf of its economy is a *parens patriae* suit on behalf of its citizens). And "it is no part" of a State's "duty or power to enforce [its residents'] rights in respect of their relations with the Federal Government." *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 610 n.16 (1982) (quotation omitted).

[6] *See* Defs.' PI Ex. 11 (News Release, Transport Canada, Government of Canada announces one-year ban for pleasure craft and cruise vessels (Feb. 4, 2021), https://www.canada.ca/en/transport-canada/news/2021/02/government-of-canada-announces-one-year-ban-for-pleasure-craft-and-cruise-vessels.html (last visited May 7, 2021)).

with, and retains a COVID-19 Conditional Sailing Certificate of the [CDC]" and "operates in accordance" with that Certificate. ATRA § 2(a), (b). The term "COVID-19 Conditional Sailing Certificate" refers, of course, to the Certificate required under the CSO.[7] Thus, if the Court were to invalidate the CSO, passenger cruise ship operations in Alaska this summer would be implausible: the CDC would lack a basis for issuing a COVID-19 Conditional Sailing Certificate, which ATRA requires for cruise operators to bypass the PVSA. Accordingly, Alaska's requested relief would not actually redress its alleged injury, so it lacks standing to intervention to intervene to seek it. *See DaimlerChrysler Corp.*, 547 U.S. at 352 (a plaintiff "must demonstrate standing for each claim [it] seeks to press" and for "each form of relief sought" (citation omitted)).

Other causation and redressability issues also undermine Alaska's effort to intervene. Alaska's alleged injuries are focused on loss of tax revenues, increased costs, and harm to the economy from "cruise ships and cruise passengers visiting Alaska *this summer*"—Alaska's cruising season. ECF No. 68–1 ¶ 34 (emphasis added). But the challenged technical guidance informs the public and the industry

---

[7] *See, e.g.*, Framework for Conditional Sailing and Initial Phase COVID-19 Testing Requirements for Protection of Crew, 85 Fed. Reg. 70,153, 70,159 (Nov. 1, 2020) ("A cruise ship operator shall not commence or continue any passenger operations in U.S. waters without a COVID-19 Conditional Sailing Certificate issued by CDC that meets the requirements in this framework for each cruise ship that the cruise ship operator intends to operate with passengers in U.S. waters."); *see also Garcia v. Vanguard Car Rental USA, Inc.*, 540 F.3d 1242, 1246–47 (11th Cir. 2008) ("When Congress employs a term of art, it presumptively adopts the meaning and 'cluster of ideas' that the term has accumulated over time."); *Assa'ad v. U.S. Att'y Gen.*, 332 F.3d 1321, 1329 (11th Cir. 2003) ("When Congress uses language with a well-known legal meaning, . . . we generally presume that it was aware of and intended the statute to incorporate that understood meaning.").

15

about what the agency will likely require in order for cruise operators to obtain a Certificate under the CSO. Accordingly, if this Court were to set aside any of the challenged guidance or declare it invalid, the result would not be "[m]ore cruise ships and cruise passengers visiting Alaska this summer," ECF No. 16–1 ¶ 34, but industry confusion regarding the requirements for obtaining a COVID-19 Conditional Sailing Certificate and additional delay while CDC reassessed its criteria for reviewing and approving applications for Certificates under the CSO.[8] Alaska therefore has not established its standing to intervene to press the claims and seek the relief asserted in its Complaint.[9]

## III. ALASKA OTHERWISE SHOULD NOT BE PERMITTED TO INTERVENE UNDER RULE 24(b).

The Court should deny Alaska's request for permissive intervention. Even if the standards were met, permissive intervention remains wholly at the Court's discretion, and the Court should deny the motion for at least four reasons.

First, the adequacy of participation in the suit as *amicus curiae* to protect a movant's interests is a sufficient reason to deny permissive intervention. *See Nat'l*

---

[8] The same is true for Alaska's notice-and-comment claim. *See* ECF No. 68–1 ¶¶ 38-39. If the CSO were invalidated on that basis, the result would be additional delay and uncertainty, not an increased likelihood of "[m]ore cruise ships and cruise passengers visiting Alaska this summer." *Id*. ¶ 34.

[9] Alaska also seeks a declaratory judgment that just "part of the CDC's [CSO] . . . is invalid and/or unlawful." ECF No. 68-1 at 9. But Alaska does not specify with any particularity which part of the CSO that it challenges. Under Federal Rule of Civil Procedure 8, Defendants are entitled to "fair notice of the claim being asserted so as to permit [them] to . . . prepare an adequate defense" and to understand whether a plaintiff has standing to press that claim. *See Brown v. Califano*, 75 F.R.D. 497, 498 (D.D.C. 1977); *see also Scarbrough v. Astrue*, 327 F. App'x 827, 829 (11th Cir. 2009) ("Because [plaintiff's] complaint . . . provided no details about . . . which acts of the [agency] infringed those rights, it cannot be said that the [agency] received fair notice of what claims [plaintiff] alleged.").

*Ass'n of Home Builders*, 519 F. Supp. 2d at 93; *Vazzo*, 2018 WL 1629216, at *6; *Fishing Rights All. v. Pritzker*, 2016 WL 11491618, at *2–*3 (M.D. Fla. June 8, 2016).

Alaska's proposed complaint does not point to any specific infirmity in the CSO or current guidance, and its motion suggests that it primarily wishes to intervene simply "in support of plaintiff, the State of Florida." ECF No. 68 at 1. It can readily offer such support as an amicus. Moreover, while Alaska asserts that it "firmly disagrees" with Defendants' view of ATRA, it offers no alternative reading; to the contrary, it acknowledges that, "[u]nder the terms of [ATRA], cruise ships visiting Alaska during the 2021 season will be required to obtain a Conditional Sailing Certificate from the CDC and abide by all CDC restrictions or guidance related to cruise ships, including restrictions or guidance issued after passage of the Act." *Id*. at 11–12. Regardless, it asserts no claim for relief based on ATRA,[10] and any interest it may have in the Court's construction of that statute can be more-than-adequately addressed through participation as an amicus.[11]

---

[10] Alaska also raises other interests unconnected to the claims in its proposed Complaint. For example, it discusses interests that might take place hypothetically, "if the CDC imposes onerous [future] requirements," and gestures at Conditional Sailing Certificates that may be approved in the future. ECF No. 68 at 12-13. But it cannot intervene to file a Complaint challenging hypothetical future agency action. Since these issues are "irrelevant to the issue[s]" in its proposed Complaint, permissive intervention should be denied. *See Mt. Hawley Ins. Co. v. Sandy Lake Properties, Inc.*, 425 F.3d 1308, 1312 (11th Cir. 2005).

[11] Notably, in an APA case "[t]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985) (quoting *Camp v. Pitts*, 411 U.S. 138, 142 (1973)). "The task of the reviewing court is to apply the appropriate APA standard of review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to the reviewing court." *Id*. at 743-44. Accordingly, "[t]he entire case on review is a question of law, and only a question of law," *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1225 (D.C. Cir. 1993), and amicus participation is more than sufficient for Alaska to submit its views on those questions of law.

Second, the adequacy of a separate lawsuit is an independently sufficient reason to deny permissive intervention. *See Burke v. Ocwen Fin. Corp.*, 833 F. App'x 288, 294 (11th Cir. 2020). Alaska is free to file suit in its home state if it has standing.

Third, the public interest would be disserved by having a single district court in one Circuit decide the fate of the CSO. For example, in the context of considering nationwide injunctions, the Supreme Court has repeatedly emphasized the benefits of percolating important questions of law in multiple forums. *See Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) (highlighting that nationwide injunctions "have a detrimental effect by foreclosing adjudication by a number of different courts and judges"); *see also Trump v. Hawaii*, 138 S. Ct. 2392, 2425 (2018) (Thomas, J., concurring) (explaining that universal injunctions "take a toll on the federal court system—preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch"); *Arizona v. Evans*, 514 U.S. 1, 23 n.1 (1995) (Ginsburg, J., dissenting) (recognizing benefits of "periods of 'percolation' in, and diverse opinions from, state and federal appellate courts").

Finally, Alaska's attempt to intervene here smacks of simple forum shopping. There is no apparent reason for Alaska to pursue its claims in the Middle District of Florida other than its evident belief that the State of Florida has drawn a more favorable forum than the District of Alaska. *Cf. In re W. Caribbean Airways Crew Members*, No. 07–CV–22015, 2010 WL 11601239, at *10 (S.D. Fla. Jan. 8, 2010) (disfavoring intervention where intervenor was forum shopping). Alaska could not

establish venue here on its own, clear across the country, and such gamesmanship should not be rewarded.

## CONCLUSION

For the foregoing reasons, the Court should deny the motion to intervene.

Dated: June 9, 2021

Respectfully submitted,

BRIAN D. NETTER
Deputy Assistant Attorney General

ERIC BECKENHAUER
Assistant Branch Director
Federal Programs Branch, Civil Division

*s/ Amy E. Powell*
AMY ELIZABETH POWELL
Senior Trial Counsel
Federal Programs Branch
Civil Division, Department of Justice
150 Fayetteville St, Suite 2100
Raleigh, NC 27601
Phone: 919-856-4013
Email: amy.powell@usdoj.gov

*/s/Liam C. Holland*
LIAM C. HOLLAND
Trial Attorney
Federal Programs Branch
Civil Division, Department of Justice
1100 L. Street, NW
Washington, DC 20530
Phone: 202-514-4964
Email: Liam.C.Holland@usdoj.gov

*Counsel for Defendants*