UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

STATE OF FLORIDA,

    Plaintiff,

    v.

XAVIER BECERRA, Secretary of the Dep't of Health and Human Services, *et al.*,

    Defendants.

Case No. 8:21-cv-839-SDM-AAS

**DEFENDANTS' TIME-SENSITIVE MOTION
FOR A STAY PENDING APPEAL**

**INTRODUCTION**

Defendants respectfully seek a stay pending appeal of the Court's order of June 18, 2021, which preliminarily enjoined enforcement of the Center for Disease Control and Prevention's ("CDC") Conditional Sailing Order and related guidance with respect to cruise ships arriving in, within, or departing from Florida ports. *See* Order, ECF No. 91 ("Op."). The government has styled this filing as a time-sensitive motion to give the Court an opportunity to rule before the preliminary injunction takes effect on July 18, 2021.

The balance of the equities overwhelming favors a stay. Despite an improving public health outlook in many parts of the country, the United States remains in the midst of a once-in-a-century pandemic that has killed over six hundred thousand

1

Americans and nearly four million people worldwide. The Conditional Sailing Order ("CSO") is an important tool in ensuring that cruise ship operations do not exacerbate the spread of dangerous variants during this inflection point in the pandemic. It does not shut down the cruise industry but instead provides a sensible, flexible framework for re-opening, based on the best available scientific evidence. Here, the undisputed evidence shows that unregulated cruise ship operations would exacerbate the spread of COVID-19, and that the harm to the public that would result from such operations cannot be undone. Cruise ships are uniquely situated to spread COVID-19, due in part to their close quarters for passengers and crew for prolonged periods, and stops at foreign ports that risk introducing new variants of COVID-19 into the United States.

     Under the CSO framework, the CDC has worked in close consultation with the cruise lines to issue reasonable guidance with respect to each phase of re-opening and adjust that guidance in accord with the best available evidence concerning risk of transmission. Cruise lines are now in various stages of re-opening. Several ships already have Conditional Sailing Certificates, and more are scheduled to resume sailing each week this summer on dates chosen by the cruise lines—particularly now that ships operating highly vaccinated voyages may obtain a Conditional Sailing Certificate under the CSO without completing a simulated voyage. There is thus no evidence that cruise lines will instead resume sailing in a way that provides Florida additional revenue if the CSO is enjoined. On the contrary, the injunction—together with Florida's refusal to allow cruise lines to verify the vaccination status of their

passengers—will disrupt the orderly process for resuming operations that the CDC developed in close consultation with the cruise industry. The balance of the harms and the public interest thus overwhelmingly favor Defendants and maintaining the status quo pending appeal.

Finally, although Defendants recognize the Court has held otherwise, Defendants respectfully submit that they have a substantial likelihood of success on appeal. All of the ships covered by the preliminary injunction are foreign-flagged and stop at a foreign port on every cruise. The CSO is based on longstanding regulations that authorize CDC to issue controlled free pratique to ships seeking to disembark passengers at U.S. ports, and the conditions that the CDC established pursuant to that authority—like testing, reporting, and social distancing—are conventional communicable disease-control practices, at a scale commensurate with the scope of the pandemic and the elevated risks of transmission on cruise ships. It is well within the CDC's traditional authority to require such measures to prevent the introduction or spread of communicable disease into the United States from foreign-flagged ships seeking to operate in U.S. waters and, indeed, Congress enacted legislation in May 2021 that is premised on the CDC's authority to issue Conditional Sailing Certificates pursuant to the CSO.

## BACKGROUND

A comprehensive background, including a description of the CDC's authorities and actions in this matter, is set forth in Defendants' Memorandum in Opposition to Plaintiff's Motion for a Preliminary Injunction, *see* ECF No. 31

("Defs.' PI Opp'n"), at 4–12; the Declaration of Capt. Aimee Treffiletti, submitted in support of that opposition, *see* ECF No. 31–1 ("1st Treffiletti Decl."); Defendants' Supplemental Brief, *see* ECF No. 72; and the Supplemental Declaration of Capt. Aimee Treffiletti, submitted in support of that supplemental brief, *see* ECF No. 72–1 ("2d Treffiletti Decl.").

Since the time of those filings, there have been additional developments with respect to the cruise industry's implementation of the health and safety protocols required under the CSO and technical guidance. As Defendants originally explained, the timing of re-opening is now largely in the hands of the cruise industry, although the CDC continues to consult with and provide technical assistance to the industry and to review applications as they are submitted. *See* Third Declaration of Capt. Aimee Treffiletti (3d Treffiletti Decl.") ¶¶ 22-23, attached hereto. In the less than two months since the final phases of guidance were released, 12 ships have already been approved or conditionally approved to begin passenger voyages under Conditional Sailing Certificates on dates chosen by the cruise operator, and 13 ships have been approved or conditionally approved for a simulated voyage. 3d Treffiletti Decl. ¶¶ 18-21. Those ships generally expect to begin revenue voyages within two weeks of a successful simulated voyage. *Id*. ¶ 18. The CDC has received port agreements for 47 ships in 11 ports, including ships at all four major Florida ports. *Id*. ¶¶ 16-17. Accordingly, the industry is already engaged in the phased re-opening that it had requested. *See, e.g.*, Defs.' Ex. 8, ECF No. 46-8 (advocating for a phased resumption of cruising to begin by July, and noting that it takes about 90 days to plan a cruise).

Given the cruise industry's estimate that it takes 90 days to plan a cruise, the cruise lines have been able to plan cruises unusually quickly, given that guidance for later phases was released in April and early May. Moreover, CDC intervention and oversight has helped to remedy problems with proper implementation of public health measures in the first voyages. 3d Treffiletti Decl. ¶¶ 24-29.

By contrast, Florida is actively impairing the cruise ship industry's ability to resume operations. Florida law prohibits cruise ship operators from requiring documentation of vaccinated status. *See* Emergency Management, Fl. SB 2006, § 18 (enacting Fl. Stat. 381.00316(1), (4)). Florida is thus impeding the cruise industry's ability to offer highly vaccinated cruises, which both the industry and the travelling public see as desirable. *See, e.g.*, Cruise Lines Wrestle With Florida Ban on Vaccine Passports, *Wall St. Journal* (June 13, 2021), https://www.wsj.com/articles/cruise-lines-wrestle-with-florida-ban-on-vaccine-passports-11623587416; *see* 3d Treffiletti Decl. ¶¶ 33-36.

## LEGAL STANDARDS FOR A STAY PENDING APPEAL

"[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936). A stay is especially appropriate "in cases of extraordinary public moment." *Id.* at 256. A court considering whether to stay an injunction pending appeal "considers four factors: (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably

injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Swain v. Junior*, 958 F.3d 1081, 1088 (11th Cir. 2020). Where the federal government is a party, its interests and the public interest overlap. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). "[I]ndividualized judgments" of each factor must be made in each case, and "the formula [for doing so] cannot be reduced to a set of rigid rules." *Hilton v. Braunskill*, 481 U.S. 770, 777 (1987). Importantly, "[t]he court is not required to find that ultimate success by the movant is a mathematical probability," and "may grant a stay even though its own approach may be contrary to movant's view of the merits." *Wash. Metro. Area Transit Comm'n v. Holiday Tours*, 559 F.2d 841, 843 (D.C. Cir. 1977).

## ARGUMENT

### I. The Balance of Harms Favors Maintaining the Status Quo and Enforcement of the CDC's Health and Safety Protocols on Cruise Ships.

The Court should enter a stay pending appeal to preserve the status quo. The balance of the harms and related equitable considerations overwhelmingly favor maintenance of the CDC's COVID-19 health and safety protocols that the cruise industry is in the midst of implementing. At a time of emerging COVID-19 variants of concern, *see* 3d Treffiletti Decl. ¶¶ 30-31, this Court's order creates a substantial risk that cruise ships will exacerbate the introduction and spread of the virus in the United States. The evidence in the record shows that the risks imposed by this Court's order are not comparable to those at on-shore facilities like hotels or other

places where people gather or travel together for brief periods of time. *See, e.g.*, *Framework for Conditional Sailing and Initial Phase COVID–19 Testing Requirements for Protection of Crew*, 85 Fed. Reg. 70153-01, 70156 (Nov. 4, 2020); Treffiletti Decl. ¶ 76; 3d Treffiletti Decl. ¶¶ 4-5. And this Court's suggestion that the availability of vaccinations alone suffices to mitigate this risk, Op. at 119, is both undermined by Florida law prohibiting cruise ship operators from requiring passengers to verify their vaccination status, *see id.* at 18 n.8; 3d Treffiletti Decl. ¶¶ 33-36, and contrary to the CDC's findings, *see, e.g.*, 1st Treffiletti Decl. ¶¶ 66-72, 75, 82; 3d Treffiletti Decl. ¶¶ 5, 32, 36. There is no reason to conclude that the Court of Appeals will reject the considered scientific and medical judgment of responsible public health officials that unrestricted cruise ship operations will exacerbate the spread of COVID-19.[1] *See* 3d Treffiletti Decl. ¶¶ 24-32 (explaining that CDC oversight is essential to ensuring that lapses in implementing public health measures are identified and promptly addressed).

Courts have consistently found that enjoining measures to control the spread of a deadly global pandemic is squarely contrary to the public interest. *See, e.g.*, *Talleywhacker, Inc. v. Cooper*, 465 F. Supp. 3d 523, 543 (E.D.N.C. June 8, 2020)

---

[1] To the extent the Court was relying on Plaintiff's position that "[t]he Cruise Line International Association established mandatory COVID-19 protocols," Op. at 120, that statement appears to be based on a citation in Florida's reply brief to a comment submitted by CLIA in September 2020 that CLIA was working on developing a mandatory industry-wide COVID policy at that time. *See* https://www.regulations.gov/comment/CDC-2020-0087-9921. In July 2021, no such policy appears on CLIA's website, and there is nothing in the record suggesting that a "mandatory" policy was ever adopted or implemented. In any event, a trade organization does not have legal authority to regulate the cruise ship industry, and not all cruise lines are members.

(finding that "the public interest does not weigh in favor of injunctive relief" where the government takes "intricate steps to craft reopening policies to balance the public health and economic issues associated with the COVID-19 pandemic," and "neither the court nor plaintiffs are better positioned to second-guess those determinations"); *Alsop v. Desantis*, Case No. 8:20-cv-1052-T-23SPF, 2020 WL 4927592, at *5 (M.D. Fla. Aug. 21, 2020) (Merryday, J.) ("The need to avoid judicial second-guessing [of public health officials] remains especially acute 'where, as here, a party seeks emergency relief in an interlocutory posture, while local officials are actively shaping their response to changing facts on the ground.'").

On the other hand, the ongoing resumption of cruise operations undermines Florida's claims of harm. More cruise ships are beginning operations each week, *see* 3d Treffiletti Decl. ¶¶ 15-21, and Florida has not shown that it would have *any* additional revenue if the CSO were lifted on July 18, especially in light of the likely detrimental impact on consumer confidence in the industry. The CDC, unlike the State of Florida, has worked cooperatively with the cruise lines to ensure that a safe re-opening is possible. There is no evidence that cruise ship operations will become more profitable (benefiting Florida indirectly) if the CDC's COVID-19 health and safety protocols that reassure passengers of the safety of their voyages are enjoined.

## II. Defendants Are Likely to Succeed on the Merits.

While Defendants recognize that the Court has concluded that the CSO is likely unlawful in certain respects, they respectfully submit that the Court should stay its order pending appeal in recognition of the significant possibility that the Eleventh Circuit may view the issues differently.

*Standing*. As an initial matter, the CSO regulates cruise lines, not States, making Florida's claim to standing much more difficult to establish. Here, Florida has failed to meet its evidentiary burden to demonstrate its "counterintuitive theory of standing," *California v. Texas*, 141 S. Ct. 2104, 2119 (2021)—namely that cruising would resume more quickly, indirectly raising Florida's revenues, if the CSO's health and safety protocols were lifted on July 18. Critically, Florida offered no evidence to demonstrate that cruise operators would resume operations more quickly or more profitably this summer with the Court's injunction in effect than without it. The State's past evidence of increased unemployment spending has no bearing on that question. "[N]either logic nor intuition" supports the counter-intuitive notion that cruise-ship operations will be more profitable after July 18 in the absence of reasonable, enforceable safety protocols that were developed in consultation with the industry and that should help allay customer fears of cruising in a pandemic, *see California*, 2021 WL 2459255, at *8. Critically, Florida has offered no evidence supporting that counter-intuitive assertion.

In fact, because Florida law prohibits cruise operators from requiring customers to document their vaccination status, it is Florida, not the CSO, that is

hindering the cruise industry's return to operations. As the Court recognized, a plaintiff can "defeat standing" by contributing to its own injury. *See* Op. at 18 n.8. Florida has actively impeded the cruise industry's ability to conduct safe operations by prohibiting cruise ship operators from requiring documentation that passengers are vaccinated—with violators subject to a fine of up to $5,000 per violation. *See* Emergency Management, Fl. SB 2006, § 18 (enacting Fl. Stat. 381.00316(1), (4)). Florida has thus undermined the vaccination strategy that industry representatives themselves developed in April 2021 to "facilitate cruise resumption in the U.S. by Summer 2021." 1st Treffiletti Decl. Ex. E, ECF No. 31-6. And while SB 2006 may not "necessarily" prevent passengers from "volunteering" their vaccination status, Op. at 18 n.8, that is little comfort to an industry seeking to reassure prospective customers of the safety of their voyages or to promote "fully vaccinated" cruises. *See* 3d Treffiletti Decl. ¶¶ 32-35 (describing cruise lines' disrupted plans to incentivize vaccinations).

Florida's purported injuries as alleged in declarations (monetary losses in 2020) were caused by the COVID-19 pandemic, have nothing to do with the CSO (which *mitigates* the continued harm from the pandemic), and fail to show that Florida will benefit financially if the CSO is enjoined beginning July 18. If cruise lines choose to curtail their Florida-based operations or "abandon Florida's ports," Op. at 115, that will be a consequence of the State's own actions in prohibiting operators from requiring documentation of passengers' vaccination status. The predictable effect of an injunction disrupting the CSO regime governing the

resumption of cruise operations is confusion that exacerbates, rather than redresses, Florida's purported injuries.

*Statutory Authority & Ratification.* In any event, the CSO lies well within the agency's traditional statutory and regulatory authority, and Defendants respectfully submit that they are likely to prevail on these issues on appeal. The CDC has authority to make and enforce such regulations as in its judgment are necessary to prevent the introduction, transmission, or spread of communicable disease from a foreign country into the United States. 42 U.S.C. § 264(a). All of the cruise ships subject to the CSO in Florida are foreign-flagged vessels that stop at one or more foreign ports on every cruise. *See* 3d Treffiletti Decl.¶ 7. For carriers arriving at U.S. ports, longstanding regulations (unchallenged here) allow the CDC to issue a "controlled free pratique"—defined as "permission for a carrier to enter a U.S. port, disembark, and begin operation under certain stipulated conditions," 42 C.F.R. § 71.1(b)—to prevent the introduction or spread of a communicable disease, *see id.* § 71.31(b).

The CSO and technical guidance are well within that authority. The protocols that cruise ships must follow under the CSO and that guidance—which include measures such as public health surveillance, testing, reporting of cases, vaccination, quarantine of exposed persons and their contacts, and isolation of infected persons— are standard communicable disease-control measures. *See* 3d Treffiletti Decl. ¶ 11. Indeed, Florida did not identify any other protocols that would be effective in preventing and containing COVID-19 outbreaks on cruise ships. Even under the

11

Court's interpretation of the statute, these are the types of measures that Congress explicitly authorized, including through authorization of "other measures." And while the Court described the CDC's safety protocols as unprecedented "in duration and scope," Op. at 60-61, the duration and scope of the protocols have been dictated by the duration and scope of the pandemic caused by a novel coronavirus, which has placed cruise ships at particular risk of COVID-19 outbreaks. *See, e.g.*, 85 Fed. Reg. at 70154-57; *No Sail Order & Suspension of Further Embarkation*, 85 Fed. Reg. 44,085, at 44090-91 (Jul. 21, 2020); 1st Treffiletti Decl. ¶ 76; 3d Treffiletti Decl. ¶¶ 4-6.

Plaintiff's motion hinged on its inaccurate description of the CSO as an industry-wide "shutdown." The Court seems to have adopted this description, *see* Op. at 15, and also describes the CSO as requiring "detention" of cruise ships, *see, e.g., id*. at 38. The CSO, however, neither detains nor shuts down cruise ships, but imposes pre-conditions on passenger operations that many cruise lines have already met and others soon will. *See* 3d Treffiletti Decl. ¶¶ 15-23 (re-opening); *id*. at ¶ 14 (CSO does not detain ships). The Court's description of the CSO requirements may also be caused in part by misunderstandings of what is required. *See, e.g., id*. at ¶¶ 12-13 (clarifying that the CSO does not require a laboratory or new ventilation systems). And while the CSO imposes a variety of important public health measures, they are not measures of a different kind altogether than previous public health measures, which also involved testing, quarantine, and similar measures.

Furthermore, Congress specifically approved the CSO and technical guidance in legislation enacted in May 2021. Federal law generally requires that a foreign-

12

flagged vessel stop at a foreign port when transporting passengers between U.S. ports. *See* 46 U.S.C. § 55103. To comply with that statute, Alaskan cruise itineraries typically include a stop at a Canadian port but, because of the pandemic, Canada has barred cruise ships from operating in Canadian waters through February 2022. *See* ECF No. 46-11. Thus, in May 2021, Congress enacted the Alaska Tourism Restoration Act, which provided a temporary exemption from the requirement to stop at a foreign port for a covered cruise ship that "has been issued, operates in accordance with, and retains a COVID–19 Conditional Sailing Certificate of the [CDC]." Alaska Tourism Restoration Act, Pub. L. No. 117-14, § 2(a), (b), 135 Stat. 273, 273-74 ("ATRA"). That statutory exemption would be meaningless if, as the Court ruled, the CDC has no authority to issue a Conditional Sailing Certificate. The suggestion that Congress was unaware of the CSO's requirements that it incorporated in the May 2021 legislation, *see* Op. at 67, is simply not plausible. Congress used language from the CSO in identifying that a "Conditional Sailing Certificate" was required, and specifically referenced Section 264 as the statutory authority for CDC to "suspend vessel operations," as in the No Sail Orders, as well. ATRA § 2(f).[2]

---

[2] Nor is it plausible that the reference to "Conditional Sailing Certificates" is a way of identifying the category of ships temporarily exempted from the requirements of the Passenger Vessel Services Act ("PVSA"). In ATRA, Congress separately *named* the specific ships to which the PVSA exemption applied. ATRA § 2(a)(2). The reference to the CSO requirements is thus a separate, substantive requirement for the application of ATRA.

13

Defendants recognize that the Court has already held to the contrary. But the Court need not conclude that it erred in order to grant the stay requested here.[3] *See, e.g.*, *Wash. Metro. Area Transit Comm'n*, 559 F.2d at 843.

*Nondelegation.* There is similarly a substantial likelihood that the Court of Appeals will view the nondelegation point differently. The vessels at issue here are foreign-flagged, and the non-delegation doctrine applies with reduced force in the context of foreign affairs. *See United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 314-330 (1936); *see also Gundy v. United States*, 139 S. Ct. 2116, 2137 (2019) (Gorsuch, J., dissenting). Moreover, even in the domestic context, the Supreme Court has rejected non-delegation challenges to statutes that empower agencies to regulate in the "public interest," *see National Broad. Co. v. United States*, 319 U.S. 190, 225-226 (1943); to set prices that are "fair and equitable," *see Yakus v. United States*, 321 U.S. 414, 420 (1944); and to establish air-quality standards to "protect the public health," *see Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 472-476 (2001) (citation omitted). The standard set out in 42 U.S.C. § 264(a)—which allows the CDC to take actions

---

[3] The Supreme Court recently upheld a stay of a judgment invalidating the eviction moratorium, although a concurring opinion expressed doubts about the CDC's position on the merits. *Ala. Ass'n of Realtors v. HHS*, No. 20-CV-3377 (DLF), 2021 WL 1946376, at *4 (D.D.C. May 14, 2021) (staying judgment invalidating eviction moratorium), *motion to vacate stay denied*, No. 21-5093, 2021 WL 2221646, at *1-4 (D.C. Cir. June 2, 2021) ("*AAR*"), *denying application to vacate stay*, No. 20A169, 2021 WL 2667610 (U.S. June 29, 2021). The decisions calling into question the CDC's authority to issue the eviction moratorium emphasized that the regulation of landlord-tenant relations is an area of traditional state concern and bears no resemblance to the CDC's conventional tools for preventing the spread of communicable disease. *See, e.g.*, *Tiger Lily, LLC v. U.S. Dep't of Hous. & Urban Dev.*, 992 F.3d 518, 522-23 (6th Cir. 2021). By contrast, the cruise ships at issue here travel in international and interstate waters, which are areas of traditional federal jurisdiction, and the Conditional Sailing Order and technical guidance rely on conventional disease-control measures to prevent and contain outbreaks of COVID-19. *See* 3d Treffiletti Decl. ¶¶ 10-11.

14

"necessary to prevent the [international or interstate] introduction, transmission, or spread of communicable diseases"—is more specific than those standards. And in any event, Congress specifically considered and approved the Conditional Sailing Order and technical guidance when it enacted ATRA in May 2021. In addition, courts "are not supposed to read . . . tea leaves to predict where [the nondelegation doctrine] might end up." *Big Time Vapes, Inc. v. FDA*, 963 F.3d 436, 447 (5th Cir. 2020) (quotation omitted), *cert. denied*, 20-850, 2021 WL 2302098, (U.S. June 7, 2021).

*Arbitrary and Capricious*. There is likewise a significant possibility that the Eleventh Circuit will disagree with the Court's arbitrary and capricious analysis. First, while the Court determined that the CSO imposes impermissibly vague requirements on the cruise industry, the industry itself raised no such claim—which is no surprise because the technical guidance reflected twice-weekly input from industry representatives. *See* 1st Treffiletti Decl. ¶ 52; *see also* 2d Treffiletti Decl. ¶ 5 (ongoing consultations); 3d Treffiletti Decl. ¶¶ 22-23 (same). Nor has Florida ever raised this issue. *See* Compl. ¶¶ 55-61. In any event, it was eminently reasonable for the CDC to clarify any technical requirements in subsequent guidance, as Congress itself recognized in the ATRA. *See* ATRA § 2(a)(1)(B) (defining "covered cruise ship" as one that operates "in accordance with any restrictions or guidance of the [CDC] associated with [a Conditional Sailing] Certificate, including any such restrictions or guidance issued after the date of enactment of this Act").

Second, there is a significant possibility that the Eleventh Circuit will conclude that CDC's explanation that "[c]ruise ships by their very nature travel interstate and internationally and can move beyond the jurisdictional boundaries of any single state or local health authority," 85 Fed. Reg. at 70157, sufficiently considered the adequacy of state and local government COVID-19 control measures, *see* Op. at 99. This finding is not controversial—indeed, local Florida communities advocated for federal regulation in this area. *See* ECF No. 31-2, at 14, 18, 20 (Florida port authorities asking for federal regulation); *see also* 3d Treffiletti Decl. ¶¶ 8-9 (explaining lack of local authority and resources in this area). And not only has Florida failed to identify any state or local regulation it thinks adequate, but it has in fact impaired the cruise industry's ability to prevent and contain COVID-19 outbreaks by "blocking any business or government entity from requiring proof of COVID-19 vaccination." Press Release, *Governor Ron DeSantis Signs Landmark Legislation to Ban Vaccine Passports and Stem Government Overreach*, May 3, 2021. Accordingly, it is unlikely that Plaintiff will ultimately prevail on these issues.

*Notice and Comment*. Finally, there is a significant possibility that the Eleventh Circuit will disagree that the CSO was improperly issued without notice and comment, or that Florida was actually prejudiced by any procedural error. As the Court recognized, in light of the COVID-19 public health emergency, CDC "might have justifiably attempted to invoke the 'good cause' exception in the original no-sail order (and perhaps even in an extension)." Op. at 106. The CSO is a separate agency action from the prior orders. Given the quickly evolving nature of the pandemic,

16

much the same considerations support the CDC's invocation of the good-cause exception for the CSO, particularly given that it was not until January 2021—several months *after* the CSO was issued—that the pandemic reached its peak in the United States. In any event, the CSO reflects public input submitted in response to a July 2020 request for information, and for months after its issuance CDC worked closely with Florida, the cruise industry, and other stakeholders to incorporate their views in resuming cruises through implementing guidance. 1st Treffiletti Decl. ¶¶ 37, 54-55. Florida has made no effort to explain what the supposed errors were, how it was not heard by the CDC, or how a greater opportunity to comment would have led to different outcome or accelerated, rather than delayed, the resumption of passenger cruise operations.

## CONCLUSION

For the foregoing reasons, the Court should stay its injunction pending appeal.

## Local Rule 3.01(g) Certification

Undersigned counsel conferred with counsel for the State of Florida by email on July 6, 2021. Plaintiff's counsel indicated that Plaintiff opposes this motion.

Dated: July 6, 2021

Respectfully submitted,

BRIAN D. NETTER
Deputy Assistant Attorney General

ERIC BECKENHAUER
Assistant Branch Director
Federal Programs Branch, Civil Division

*s/ Amy E. Powell*
AMY ELIZABETH POWELL

17

Senior Trial Counsel
Federal Programs Branch
Civil Division, Department of Justice
150 Fayetteville St, Suite 2100
Raleigh, NC 27601
Phone: 919-856-4013
Email: amy.powell@usdoj.gov

*/s/ Liam C. Holland*
LIAM C. HOLLAND
Trial Attorney
Federal Programs Branch
Civil Division, Department of Justice
1100 L. Street, NW
Washington, DC 20530
Phone: 202-514-4964
Email: Liam.C.Holland@usdoj.gov

*Counsel for Defendants*